UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

DR. IRAKLI GLONTI and DAVID DATESHIDZE,

                              Plaintiffs,

              - against -                                    07 CV 10975 (CM)


LEHMAN BROTHERS, INC. and
RBC DAIN RAUSCHER, INC.

                              Defendants.
-------------------------------------------------------------------X

        Geoffrey Valentino, Esq., hereby declares under penalty of perjury:

        1.      I am a Vice President of defendant Lehman Brothers, Inc., and I submit

this declaration in support of Lehman Brothers' motion to stay the claims against it in the

Complaint and compel them to arbitration.

        2.      Attached hereto as Exhibit A is a true and correct copy of the Complaint in

this action.

        3.      Annexed hereto as Exhibit B is a true and correct copy of an agreement

containing an arbitration clause with plaintiff Irakli Glonti's signature.

        4.      Annexed hereto as Exhibit C is a true and correct copy of an agreement

containing an arbitration clause with plaintiff David Dateshidze's signature

                                            _____
                                                  Geoffrey Valentino

Exhibit A Part 1

# Judge McMahon

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

DR. IRAKLI GLONTI,
Plaintiff

and

DAVID DATESHIDZE,
Plaintiff

– against –

LEHMAN BROTHERS, INC.,
Defendant

and

RBC DAIN RAUSCHER, INC.,
Defendant

-------------------------------------------------------------x

**07 CV 10975**

**COMPLAINT**

FILED
U.S. DISTRICT COURT
2007 DEC -4   AM 8:49

Arnold I. Kalman, Esquire
Law Offices of Arnold I. Kalman
245 South Hutchinson Street
Philadelphia, PA 19107-5722
Telephone: (215) 829-9613
Fax: (215) 829-9619
E-mail: arnold.i.kalman@verizon.net

Attorney for Plaintiffs, Dr. Irakli
Glonti and David Dateshidze

Dated: December 4, 2007

## Table of Contents

I.  Introduction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

    A.  Dr. Glonti and Mr. Dateshidze entrust their investment assets to Lehman Brothers and RBC Dain Rauscher for them to exclusively manage and control  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

    B.  Overview of the participation by Lehman Brothers and RBC Dain Rauscher with Foerster in the unlawful conduct alleged in the Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

II.  Jurisdiction and Venue  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

III.  Jury Trial Demand  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

IV.  The Parties  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

    A.  Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

        1.  Dr. Irakli Glonti  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

        2.  David Dateshidze  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

    B.  Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

        1.  Lehman Brothers Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

        2.  RBC Dain Rauscher Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

V.  Relevant administrative and disciplinary actions taken by securities industry regulators against Lehman Brothers, RBC Dain Rauscher and Foerster  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

    A.  SEC administrative proceedings against Lehman Brothers  . . . . . . .  22

    B.  NYSE disciplinary proceedings against RBC Dain Rauscher  . . . . . .  24

    C.  NASD disciplinary proceedings against Foerster  . . . . . . . . . . . . . .  26

VI.  Operative Facts  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

A.   Foerster learns of the extent of Dr. Glonti's wealth, befriends him
     and encourages him to transfer a portion of his investment assets
     to the United States and to be managed and controlled from there  .  27

B.   Foerster opens an account for Dr. Glonti, at Salomon Smith
     Barney, and Dr. Glonti transfers to it $500,000 from his
     investment account in Switzerland  . . . . . . . . . . . . . . . . . . . . . . . . . .  32

C.   Foerster regularly updates Dr. Glonti, by telephone, of the
     performance of the investment assets he entrusted to Salomon
     Smith Barney and him to manage and control  . . . . . . . . . . . . . . . .  34

D.   Salomon Smith Barney and Foerster misrepresent to Dr. Glonti
     the performance of the investment assets to which he entrusted
     them to manage and control  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  35

E.   Foerster informs Dr. Glonti of his move to Lehman Brothers and
     instructs Dr. Glonti to transfer his investment assets from Salomon
     Smith Barney to Lehman Brothers and to entrust an additional $1
     million to Lehman Brothers and him to manage and control  . . . . . .  37

     1.   Feigeles and Lehman Brothers' Private Client
          Services Group  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  37

     2.   Foerster entices Dr. Glonti to transfer his assets to Lehman
          Brothers and him to manage and control  . . . . . . . . . . . . . . .  38

F.   Dr. Glonti opens his account with Lehman Brothers and transfers
     from Switzerland $1 million to entrust with Lehman Brothers and
     Foerster  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  40

G.   Dr. Glonti travels to New York City to visit with Foerster and
     Feigeles at Lehman Brothers' headquarters  . . . . . . . . . . . . . . . . . .  41

     1.   Foerster introduces Dr. Glonti to Feigeles and other key
          Lehman Brothers officials  . . . . . . . . . . . . . . . . . . . . . . . . . .  42

     2.   Foerster invests his time to build Dr. Glonti's trust and
          confidence in him  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  43

H.   Foerster instructs Lehman Brothers to address all communications
     with Dr. Glonti to his address in Tbilisi, Georgia  . . . . . . . . . . . . . .  44

I.     Foerster regularly reaches Dr. Glonti, by telephone, at his various overseas locations, to update him on the performance of the investment assets to which he entrusted Lehman Brothers and him to manage and control . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

J.    After Dr. Glonti transferred his assets to Lehman Brothers and Foerster to manage and control, Foerster and Lehman Brothers immediately make unsuitable investments and excessively trade securities in his account without his authorization, such that within 15 months, the investment assets to which Dr. Glonti entrusted them lose approximately 52% of their original value . . . . 45

K.    Foerster convinces Dr. Glonti to believe the account statements he receives from Salomon Smith Barney and Lehman Brothers do not represent the entirety of the investment assets that he had entrusted to them . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

L.    Dr. Glonti's substantial and lengthy visits with Foerster and Foerster's family, in 2001, convinces Dr. Glonti that he has no basis on which to doubt the trust and confidence he places in Foerster to properly manage and control the assets he entrusted to Lehman Brothers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

M.   Following Dr. Glonti's lengthy visits with Foerster and Foerster's family, Foerster resumes placing telephone calls overseas to Dr. Glonti informing him of the performance of the investment assets to which he entrusted Lehman Brothers and him, and then visits Dr. Glonti in Rome to laud their performance with his assets . . . . . 54

N.    Encouraged by what Foerster reported to be the appreciation of the investment assets to which he entrusted to Lehman Brothers, Dr. Glonti convinces Mr. Dateshidze to entrust his investment assets to the management and control of Lehman Brothers and Foerster . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

    1.    Foerster changes the address with which Lehman Brothers corresponds with Dr. Glonti . . . . . . . . . . . . . . . . . . . . . . . . . . 56

    2.    Foerster opens an account for Mr. Dateshidze at Lehman Brothers without the necessary customer information that is required by law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

O.  Dr. Glonti continues, in 2002, his annual trips to New York City
    to visit with Foerster and Foerster's family . . . . . . . . . . . . . . . . . . .  59

P.  Foerster represents to Dr. Glonti, throughout 2002, his investment
    assets and those of Mr. Dateshidze to which they entrusted Lehman
    Brothers and him appreciated in value, whereas their investment
    assets actually plummeted in value . . . . . . . . . . . . . . . . . . . . . . . . .  60

    1.  Dr. Glonti's investment assets lose 85% of their value . . . . . .  61

    2.  Mr. Dateshidze's investment assets lose 48% of their value . .  62

Q.  Foerster represents to Dr. Glonti, throughout the first half of 2003,
    his investment assets and those of Mr. Dateshidze, to which they
    entrusted Lehman Brothers and him, appreciated in value,
    whereas their investment assets actually plummeted in value . . . .  65

    1.  Dr. Glonti's investment assets lose value . . . . . . . . . . . . . . .  65

    2.  Mr. Dateshidze's investment assets lose value . . . . . . . . . . .  66

R.  The turnover rate of the accounts of Dr. Glonti and Mr. Dateshidze
    during the period they entrusted their investment assets
    to Lehman Brothers and Foerster to manage and control show the
    trading in their accounts to be excessive . . . . . . . . . . . . . . . . . . . . .  68

    1.  The turnover rate in Dr. Glonti's account is excessive . . . . . .  68

    2.  The turnover rate in Mr. Dateshidze's account is excessive . .  69

S.  Foerster forges Lehman Brother account statements to make it
    appear Dr. Glonti has sufficient cash assets available to him
    to use . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  69

T.  Lehman Brothers terminates Foerster's employment and,
    immediately afterwards, RBC Dain Rauscher employs Foerster,
    paying him a substantial starting bonus which, in part, was
    determined on the basis of the commissions that Lehman Brothers
    charged Dr. Glonti and Mr. Dateshidze . . . . . . . . . . . . . . . . . . . . . .  71

U.  Foerster transfers the investment assets that Dr. Glonti and Mr.
    Dateshidze had entrusted to Lehman Brothers to RBC Dain
    Rauscher to manage and control . . . . . . . . . . . . . . . . . . . . . . . . . . . .  72

iv

V.    Foerster arranges for Dr. Glonti and Mr. Dateshidze to open
      accounts with RBC Dain Rauscher which the firm and him will
      manage and control . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

W.    Foerster thereafter forges the signatures of Dr. Glonti and Mr.
      Dateshidze to opening account documents and misrepresents
      critical contact information and investment objectives for them,
      and RBC Dain Rauscher fails to verbally verify with Dr. Glonti
      and Mr. Dateshidze the accuracy of such critical information
      about them . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

X.    RBC Dain Rauscher and Foerster entice Dr. Glonti and Mr.
      Dateshidze to entrust additional assets to them to manage and
      control, thereby denying them the use of such assets to invest
      elsewhere in profitable business opportunities . . . . . . . . . . . . . . . . . 78

Y.    RBC Dain Rauscher permits unsuitable investments, unauthorized
      and excessive trading and unauthorized transactions to occur in the
      accounts to which Dr. Glonti and Mr. Dateshidze entrusted
      exclusively to it and Foerster to manage and control . . . . . . . . . . . 80

Z.    RBC Dain Rauscher and Foerster encourage Dr. Glonti and Mr.
      Dateshidze to place their complete trust and confidence in them
      just as Dr. Glonti and Mr. Dateshidze had placed their trust and
      confidence in Lehman Brothers and Foerster . . . . . . . . . . . . . . . . . 81

      1.    RBC Dain Rauscher encourages Foerster to give further
            reason for Dr. Glonti to believe he can continue, without
            reservation, to place his complete trust and confidence
            in them . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

      2.    RBC Dain Rauscher encourages other of its employees to
            give reason for Dr. Glonti to believe he can continue, without
            reservation, to place his complete trust and confidence in
            RBC Dain Rauscher and Foerster . . . . . . . . . . . . . . . . . . . . . . 84

AA.   RBC Dain Rauscher and Foerster make unsuitable investments in
      the accounts of Dr. Glonti and Mr. Dateshidze to which they
      entrusted them to manage and control and excessively trade
      stocks in their accounts without their authorization . . . . . . . . . . . . 86

1.  RBC Dain Rauscher and Foerster excessively traded stock in Dr. Glonti's account, without his authorization, throughout the entire time he entrusted his account to them to manage and control . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

2.  RBC Dain Rauscher and Foerster excessively traded stock in Mr. Dateshidze's account, without his authorization, throughout the entire time he entrusted his account to them to manage and control . . . . . . . . . . . . . . . . . . . . . . . . . . 90

BB.  RBC Dain Rauscher and Foerster represented the value of the investment assets that Dr. Glonti and Mr. Dateshidze entrusted to them to manage and control continuously appreciated month-after-month, from June 2003 through January 2006 . . . . . . 94

CC.  From, at least, June 2004 through April 2006, Foerster withdraws more than $971,000 from the accounts of Dr. Glonti and Mr. Dateshidze, for his personal use and without their authorization, and to which RBC Dain Rauscher is recklessly indifferent . . . . . . . 111

DD.  RBC Dain Rauscher is indifferent to Foerster's unauthorized transactions in the accounts of Dr. Glonti and Mr. Dateshidze and, thereafter, conceals from them Foerster's unauthorized activities in their accounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

VII.  Fraudulent Concealment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

VIII.  Claims for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

Count I  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

Count II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

Count III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

Count IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

Count V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140

Count VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141

Count VII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142

Count VIII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

Count IX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

Count X . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146

Count XI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147

Count XII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

Count XIII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150

Count XIV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

Count XV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

IX.    Requests for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

Plaintiffs, Dr. Irakli Glonti and David Dateshidze, by their attorney, file this complaint against Lehman Brothers, Inc. ("Lehman Brothers") and RBC Dain Rauscher, Inc. ("RBC Dain Rauscher"), and allege:

## I. Introduction

**A.    Dr. Glonti and Mr. Dateshidze entrust their investment assets to Lehman Brothers and RBC Dain Rauscher for them to exclusively manage and control.**

1.    Dr. Glonti and Mr. Dateshidze are citizens of the Republic of Georgia. They reside outside the United States. At the times relevant to the facts alleged in this complaint, Dr. Glonti had limited capability communicating in English and Mr. Dateshidze had no such capability.

2.    Dr. Glonti and Mr. Dateshidze entrusted their investment assets, in the United States, to Lehman Brothers and RBC Dain Rauscher. They entirely relinquished the management and control of their assets to these firms, giving them the authority, in their discretion, to select, purchase and sell securities in their accounts.

3.    Lehman Brothers managed and controlled Dr. Glonti's investment assets from October 2000 through May 2003, and Mr. Dateshidze's assets from April 2002 through May 2003. RBC Dain Rauscher, thereafter, managed and controlled their assets from May 2003 through April 2006.

4.    Dr. Glonti and Mr. Dateshidze entrusted their investment assets to Lehman Brothers and RBC Dain Rauscher with the expectation these firms would assure their investment objectives would be fulfilled and the firms would diligently

1

oversee and supervise the activities of Frank Foerster ("Foerster"), who the firms employed as a stock broker and to whom they assigned management and control of their assets.

**B.    Overview of the participation by Lehman Brothers and RBC Dain Rauscher with Foerster in the unlawful conduct alleged in the Complaint.**

5.    Lehman Brothers and RBC Dain Rauschser, however, failed to fulfill the duties they assumed when they were entrusted by Dr. Glonti and Mr. Dateshidze with their investment assets.

6.    Lehman Brothers and RBC Dain Rauscher, directly or indirectly, permitted, assisted or facilitated Foerster, while he acted within their effective control and performed work they had assigned to him which was within the scope of their business and which served and furthered their business purposes:

(1) to forge opening account statements in which he misrepresented the investment experience and objectives, suitability criteria and contact information of Dr. Glonti and Mr. Dateshidze;

(2) to purchase and sell securities in their accounts not suitable for and inconsistent with the investment objectives of Dr. Glonti and Mr. Dateshidze;

(3) to misrepresent to Dr. Glonti and Mr. Dateshidze that Lehman Brothers and RBC Dain Rauscher firms purchased and sold securities in their accounts according to their investment objectives;

(4) to excessively trade securities in their accounts contrary to their investment objectives and risk tolerance, with willful and reckless disregard for

their interests and which was solely motivated to generate commission revenues for himself and that of the firms;

(5) to aggressively trade securities in their accounts and charge them commissions for such trading, thereby eliminating almost the entire value of their investments, all the while representing to Dr. Glonti and Mr. Dateshidze that Lehman Brothers and RBC Dain Rauscher were trading securities in their accounts according their investment instructions;

(6) to trade securities in their accounts that lacked any business sense or apparent investment strategy;

(7) to overstate the value of their accounts;

(8) to misrepresent to them they had investment gains on what were non-existent holdings;

(9) to misrepresent to them the firms used the funds that Dr. Glonti and Mr. Dateshidze entrusted to them to purchase investment vehicles for their accounts, whereas he used these funds for purposes for which they had not approved;

(10) to send falsified account statements to Dr. Glonti;

(11) to deceive Dr. Glonti and Mr. Dateshidze such that they transferred to Lehman Brothers and RBC Dain Rauscher and entrusted them with additional funds and securities, which they would not otherwise have done, had they known the truth about the investment loses they had suffered;

(12) to conceal the circumstances of the investment assets to which they. entrusted Lehman Brothers and RBC Dain Rauscher and securities law violations

3

by directing the firms to deliver the statements of account, trade confirmations and activity review letters covering their accounts to the home address of Foerster's mother-in-law in Long Island, New York;

(13) to obtain a credit card from RBC Dain Rauscher under Mr. Dateshidze's name that was without his authorization;

(14) to misappropriate funds from Dr. Glonti's account, at RBC Dain Rauscher, through unauthorized wire transfers to accounts outside of the firm and under the control of Foerster;

(15) to misappropriate funds from Dr. Glonti's account, at RBC Dain Rauscher, through unauthorized transfers from it to Mr. Dateshidze's account at the firm;

(16) to misappropriate, thereafter, these funds through unauthorized use of the credit card which RBC Dain Rauscher issued Mr. Dateshidze;

(17) to misappropriate funds from Dr. Glonti's account, at RBC Dain Rauscher, through unauthorized transfers from it to his account at Lehman Brothers;

(18) to misappropriate, thereafter, these funds through unauthorized use of the credit card which Lehman Brothers issued Dr. Glonti;

(19) to misappropriate funds from Dr. Glonti's account, at RBC Dain Rauscher, thereby denying him the use of such funds to pursue business opportunities in Tbilisi, Republic of Georgia;

(20) to misappropriate funds from Mr. Dateshidze's account, at RBC Dain

4

Rauscher, through unauthorized use of the credit card the firm issued Mr. Dateshidze;

(21) to misappropriate funds from Mr. Dateshidze's account, at RBC Dain Rauscher, through unauthorized wire transfers to an account outside of the firm and under the control of Foerster;

(22) to misrepresent to Mr. Dateshidze that there were sufficient funds in his account, at RBC Dain Rauscher, for him to pursue a business opportunity in Moscow, Russia;

(23) to make unauthorized withdrawals of funds from Dr. Glonti's account, at RBC Dain Rauscher, and to represent such funds originated from Mr. Dateshidze's account;

(24) to lie to Dr. Glonti that funds which had been transferred from his account, at RBC Dain Rauscher, to Mr. Dateshidze's overseas account had originated from Mr. Dateshidze's account, whereas there were insufficient funds in Mr. Dateshidze's account to cover this transfer and thus the funds transferred to Mr. Dateshidze came exclusively from Dr. Glonti's account;

(25) to conceal from Dr. Glonti and Mr. Dateshidze the diversion of funds from their accounts and thereby permit him to continue looting their accounts;

(26) to forge the signatures of Dr. Glonti and Mr. Dateshidze for purposes of Foerster making unauthorized transfers of funds from their accounts;

(27) to continue to manage and control the accounts of Dr. Glonti and Mr. Dateshidze after the firms procedures detected suspicious, irregular and unusual

5

activities in their accounts by him;

(28) to violate the securities industry's standards and rules by which the United States Securities and Exchange Commission ("SEC") and self-regulatory organizations expect firms and brokers to deal with investors and expect firms to supervise their brokers, including:

(a) U.S. Patriot Act, 31 U.S.C. §5318(l), and Securities and Exchange Commission, Customer Identification Program, 31 C.F.R. §103.122;

(b) NASD Rules 2110 (Standards of Commercial Honor and Principles of Trade), 2120 (Use of Manipulative, Deceptive or Other Fraudulent Devices), 2310 (Recommendations to Customers (Suitability)), 2330 (Customers' Securities or Funds), 2510 (Discretionary Accounts), 3010 (Supervision), 3011 (Anti-Money Laundering Compliance Program), 3012 (Supervisory Control Systems), 3070 (Reporting Requirements), 3013 (Annual Certification of Compliance and Supervisory Processes), 3030 (Outside Business Activities of an Associated Person), 3040 (Private Securities Transactions of an Associated Person), 3050 (Transactions for or by Associated Persons), 3110 (Books and Records), Special Notice to Members 02-21 Anti-Money Laundering of the NASD; and

(c) NYSE Rules 342 (Offices—Approval, Supervision and Control), 351(Reporting Requirements), 401(Business Conduct),405 (Diligence as to Accounts ("Know Your Customer")), 409 (Statements of Accounts to Customers), 410 (Records of Orders), 445 (Anti-Money Laundering Compliance Program); and

(29) to conceal the aforesaid misconduct from Dr. Glonti and Mr. Dateshidze

6

and actively mislead them about such conduct, thereby preventing them from discovering the claims they had against Lehman Brothers and RBC Dain Rauscher for the aforesaid misconduct.

7.    Lehman Brothers and RBC Dain Rauscher were aware of a high probability that Foerster's conduct was unlawful, but acted in deliberate disregard of it.

8.    Lehman Brothers and RBC Dain Rauscher failed (a) to exercise adequate and reasonable supervision over Foerster, (b) to follow securities industry's standards and rules by which the Securities and Exchange Commission and self-regulatory organizations expected them to deal with investors and to supervise their brokers; and (c) to respond to indicators – "red flags" – of misconduct by Foerster.

9.    "Red flags" indicative of suspicious, irregular, unusual or improper activities by Foerster, in the accounts of Dr. Glonti and Mr. Dateshidze, to which Lehman Brothers and RBC Dain Rauscher deliberately, knowingly or intentionally ignored, or to which they did not respond or follow-up, or to which they were grossly negligent, recklessly indifferent, or willfully blind, include:

(1) the evident lack of concern shown by Dr. Glonti and Mr. Dateshidze for investment risks, commissions or other transaction costs associated with Foerster's trading of securities in their accounts;

(2) the evident lack of concern shown by Dr. Glonti and Mr. Dateshidze for significant and substantial trading losses which was inconsistent with the level of

7

wealth Foerster reported Dr. Glonti and Mr. Dateshidze to have;

(3) the evident lack of concern shown by Dr. Glonti and Mr. Dateshidze for extraordinarily high levels of commission and other transaction costs they incurred due to Foerster's trading securities in their accounts in comparison to the equity values of their accounts;

(4) the evident lack of concern shown by Dr. Glonti and Mr. Dateshidze for concentration in risky investments;

(5) the evident lack of concern shown by Dr. Glonti and Mr. Dateshidze for generation of exception and activity reports;

(6) the evident lack of concern shown by Dr. Glonti and Mr. Dateshidze for significant and substantial depletion, in a short period of time, of the investment assets, to which they entrusted the firms;

(7) the evident lack of concern shown by Dr. Glonti and Mr. Dateshidze for securities transactions that lack business sense or apparent investment strategy;

(8) the suspicious transfers from Dr. Glonti's account, at RBC Dain Rauscher, to the unrelated account of Mr. Dateshidze, at the firm, and for which the firm did not receive verbal authorization from Dr. Glonti;

(9) the suspicious transfers from Dr. Glonti's account, at RBC Dain Rauscher, to the unrelated account of Mr. Dateshidze, at the firm, where both of which were under management and control by Foerster;

(10) the suspicious and systematic pattern and practice by Foerster to use photocopied or faxed letters of authorization to transfer funds from the accounts of

8

Dr. Glonti and Mr. Dateshidze, at RBC Dain Rauscher, and for which the firm did not first receive verbal authorization from them to make such transfers;

(11) the suspicious and systematic pattern and practice by Foerster to use photocopied or faxed letters of authorization to transfer funds from the accounts of Dr. Glonti and Mr. Dateshidze, at RBC Dain Rauscher, without the firm's verification of the authenticity of the purported signatures of Dr. Glonti and Mr. Dateshidze appearing on the letters of authorization;

(12) the suspicious and systematic pattern of numerous wire transfers being made from the account of Dr. Glonti, at RBC Dain Rauscher, to third parties without the firm first receiving verbal authorization from Dr. Glonti to execute such transfers;

(13) the suspicious and systematic pattern of wire transfers into the account of Dr. Glonti, at Lehman Brothers, which had then been inactive for considerable time, followed by immediate cash withdrawals therefrom;

(14) the suspicious and systematic pattern of journal transfers from Dr. Glonti's account, at RBC Dain Rauscher, to Mr. Dateshidze's account at the firm, followed by immediate cash withdrawals therefrom;

(15) the unexplained high levels of activity in the account of Dr. Glonti with no appreciable corresponding level of securities transactions;

(16) the lack of verification of the sources of the assets of Dr. Glonti and Mr. Dateshidze, so the firms could determine if the inflow and outflow of money and securities from their accounts was consistent with their financial status;

(17) the lack of verification and understanding by the firms of what the trading patterns of Dr. Glonti and Mr. Dateshidze would be, so that deviations from the patterns could be detected by the firms later on, if they occur;

(18) no regular and periodic verbal contact with Dr. Glonti and Mr. Dateshidze to verify the accuracy of contact information on record with the firms, such as their addresses, telephone numbers, e-mail addresses and other identifying information;

(19) no verbal verification by Lehman Brothers to the change made on its records of the address initially reported for Dr. Glonti; and

(20) failure to address irregularities at the time the accounts of Dr. Glonti and Mr. Dateshidze were opened because of insufficient verification of their identities.

## II. Jurisdiction and Venue

10.    This Complaint is filed by plaintiffs against defendants:

a.    under the Judicial Code, 28 U.S.C. §1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78aa, for violations of Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, and Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), and for which, for the aforesaid violations, Lehman Brothers and RBC Dain Rauscher are primarily, and jointly and severally, liable, or for which Lehman Brothers is primarily liable under principles of successive and independent tortfeasor liability, or for which Lehman Brothers and RBC Dain

Rauscher are vicariously liable under principles of respondeat superior;

      b.    under the Judicial Code, 28 U.S.C. §§1331, and 18 U.S.C. §1964, against RBC Dain Rauscher, Inc., for violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1962(c), relating to unauthorized transactions in the accounts of Dr. Glonti and Mr. Dateshidze at the firm, including unauthorized withdrawals of funds from their accounts by journal entries, wire transfers and illegitimate of use their credit cards, and for which, for the aforesaid violation, RBC Dain Rauscher is vicariously liable under principles of respondeat superior;

      c.    under the Judicial Code, 28 U.S.C. §1332, and principles supplemental jurisdiction, under 28 U.S.C. §1367, against Lehman Brothers and RBC Dain Rauscher, arising out of, or in connection with, unsuitable investment, unauthorized and excessive trading, and unlawful transactions, in the accounts of Dr. Glonti and Mr. Dateshidze, for:

        (1) fraud;

        (2) breach of fiduciary duty;

        (3) failure to supervise and control Foerster;

        (4) negligent misrepresentation;

        (5) negligence;

        (6) gross negligence; and

        (7) misappropriation and conversion;

and for which Lehman Brothers and RBC Dain Rauscher are primarily, and jointly

and severally, liable for the aforesaid violations of common law; or for which Lehman Brothers is primarily liable for the aforesaid violations under principles of successive and independent tortfeasor liability; or for which Lehman Brothers and RBC Dain Rauscher are vicariously liable under principles of respondeat superior.

11.    Diversity of citizenship exists between plaintiffs and defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

12.    Venue in this judicial district is appropriate, including under (a) the Judicial Code, 28 U.S.C. §1391; (b) Section 27 of the Exchange Act, 15 U.S.C.A. §78aa; (c) the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1965, because defendants are subject to personal jurisdiction in this judicial district and reside in this district, specifically, Lehman Brothers has its corporate headquarters in this judicial district; Lehman Brothers and RBC Dain Rauscher transact substantial business in this judicial district; and many of the acts, transactions, and occurrences alleged herein, including the dissemination to plaintiffs of materially false and misleading information, unsuitable, excessive and unauthorized trading in securities in their accounts and misappropriation of funds from their accounts with Lehman Brothers and RBC Dain Rauscher occurred, if not wholly, but at least in part, in this judicial district.

13.    In connection with the acts alleged in this Complaint, Lehman Brothers and RBC Dain Rauscher, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails, telephone communications and the facilities of the national securities exchanges.

### III.  Jury Trial Demand

14.     A jury trial is demanded on all issues and claims being asserted by Dr.
Glonti and Mr. Dateshidze against Lehman Brothers and RBC Dain Rauscher.

### IV.  The Parties

**A.      Plaintiffs**

**1.      Dr. Irakli Glonti**

15.     Plaintiff, Dr. Irakli Glonti, is a citizen of the Republic of Georgia and
resides and is domiciled at 27 Ivane Javakhishvili Street, Tbilisi 0102, Georgia.

16.     Dr. Glonti is 45 years old.  He was educated in Georgia, which then
was a part of the Union of Soviet Socialist Republics ("Soviet Union"), and received
his medical degree from there in 1985.  Dr. Glonti received further specialized
training in cardio-anesthesiology, in Moscow, obtaining a degree of Doctor of
Philosophy in this field from there, and practiced, in Moscow, medicine from 1985
through 1991.

17.     Dr. Glonti returned to Georgia, in 1991, immediately after the collapse
of the Soviet Union.  In Georgia, he formed a business venture trading in oil
products.

18.     Dr. Glonti afterwards returned to Moscow where he continued as a
trader in oil products and then expanded his business to cover crude oil refining.

19.     Dr. Glonti has continued to do business in this field and has later
associated himself with business ventures, which are worldwide in scope, and are
intent on leasing natural resources.  He is currently involved in a venture to

develop mining rights for precious minerals in Georgia.

20.    Dr. Glonti also started a telecommunication business based in Georgia and operates this business from there.

21.    Dr. Glonti did not end his involvement entirely in the medical field, because in 1998, he purchased a 50% ownership interest in a Moscow medical clinic. After he recouped his investment and further profited from it, in 2005, he sold his interest in the medical center.

22.    Dr. Glonti originally entrusted the income he earned from his medical practice and business ventures to investment firms, based in Geneva and Lugano, Switzerland, to control and manage.  He gave these firms the right to manage and control his assets, and in their discretion, to select, purchase and sell securities  in accordance with his conservative investment objective.  These investment firms include Banca del Gottardo, Geneve (account opened 1998), Banca Privata Edmond de Rothschild, S.A., Geneve (account opened 1999) and Banca Privata Edmond de Rothschild, S.A., Lugano (account opened 2004).

23.    All correspondence which the banks had with him were maintained by and at the banks, and therefore the banks did not correspond with him at his addresses either in Tbilisi or Moscow.  In other words, no statements of account were transmitted to him.  His communications, thus, with his Swiss bankers, about the performance of the investment assets to which he entrusted them, were over the telephone and he came to rely upon and trust their word of their performance with his assets.

14

24.   Dr. Glonti was never formally instructed in the English language.  He is self-taught.  Dr. Glonti taught himself, gradually and over time, to speak, read and write in the English language, but only began earnestly, in 2002, to do so. Before then, Dr. Glonti knew about 200 words of English, and therefore was under a severe disability and at a severe disadvantage when it came for him to communicate in English – both speaking the language and understanding it.  He has only lately grasped the language, and he still has considerable disability understanding and communicating in the English language, such that he finds it is necessary for him to have a person, who is fluent in both the Georgian and English languages, to interpret for him.

**2.   David Dateshidze**

25.   Plaintiff, David Dateshidze, is a citizen of the Republic of Georgia and resides and is domiciled at David Agmashenebeli Avenue 2/8, Flat 28, Tbilisi 0102, Georgia.

26.   Mr. Dateshidze is 39 years old.  He was educated at the Technical University, in Georgia, and received a degree, in engineering, from there in 1993.

27.   Mr. Dateshidze was involved briefly in a business that supplied gasoline in Georgia.  In 1996, he was appointed district engineer for the Tbilisi municipal authority and, in 2000, he was appointed head of the municipality's technical department covering education.

28.   Mr. Dateshidze ended his association with the Tbilisi municipal authority to start a venture that traded in wine with Russia.

15

29.    Mr. Dateshidze is married to Dr. Glonti's sister.

30.    Mr. Dateshidze does not speak, write, read in the English language or otherwise comprehends the language.

31.    Mr. Dateshidze has not traveled outside of Georgia, except to Moscow, Russia, for purposes of business, and to Turkey and Cyprus for vacation.

**B.    Defendants**

**1.    Lehman Brothers Inc.**

32.    Lehman Brothers Inc. ("Lehman Brothers") is a Delaware Corporation having its principal place of business at 745 Seventh Avenue, New York, NY 10019.

33.    Lehman Brothers is a global investment bank, serving institutional, corporate, government and high-net-worth individual clients and customers.

34.    Lehman Brothers' Private Client Services Group's investment representatives serve the investment needs of private investors with substantial assets as well as thousands of mid-sized institutional accounts worldwide.  The group's investment representatives provide their clients with direct access to banking, fixed income, equity, foreign exchange and derivative products, as well as Lehman Brothers' research and execution capabilities.

35.    Lehman Brothers is registered as a broker–dealer and as investment advisors with the SEC and as such is subject to regulation by the SEC and by self-regulatory organizations, principally the NASD, and national securities exchanges such as the NYSE (which has been designated by the SEC as Lehman Brothers' primary regulator).

16

36.    Lehman Brothers employed Foerster, as a stockbroker, in its Private

Client Services Group, at its New York City office, located at 399 Park Avenue, from

October 2000 through May 15, 2003.

37.    Before Lehman Brothers employed Foerster, he was employed by

Salomon Smith Barney from August 1999 and there received training to become a

registered stockbroker.

38.    During the period in which Lehman Brothers employed Foerster, Dr.

Glonti and Mr. Dateshidze entrusted their investment assets to Lehman Brothers

and Foerster to control and manage and, in their discretion, to select, purchase and

sell securities in these accounts.

39.    The securities traded by Lehman Brothers and Foerster in the

accounts of Dr. Glonti and Mr. Dateshidze produced significant and substantial

commission revenues for Lehman Brothers and Foerster to share.  In the

approximately 30 months during which Lehman Brothers employed Foerster, and

in which Lehman Brothers and Foerster traded securities in their accounts, they

received from Dr. Glonti and Mr. Dateshidze $457,346.00 in commission revenues.

On information and belief, these commissions possibly could accounted for

approximately 35% to 40% of the total commission revenues Foerster produced for

Lehman Brothers in the accounts assigned to him by the firm, and may possibly

have accounted for as much as 80% to 90% of the commission revenues that he

produced for the firm.

17

2.    **RBC Dain Rauscher Inc.**

40.    RBC Dain Rauscher Inc. is a wholly-owned subsidiary of the Royal Bank of Canada, Canada's largest bank. It is a Minnesota corporation with its principal place of business and headquarters at Dain Rauscher Plaza, 60 S. 6th St., Minneapolis, MN 55402-4422.

41.    RBC Dain Rauscher's Private Client Group offers advice, full-service brokerage, and other services to individual investors and has offices, in this judicial district, at 1211 Avenue of the Americas, New York, NY 10036. .

42.    RBC Dain Rauscher has about 1,650 brokers, operating from some 150 offices, in 40 states and Washington, DC, including from 1211 Avenue of the Americas, New York, NY 10036. It has more than $135 billion of assets under management in more than 670,000 client accounts.

43.    RBC Dain Rauscher is registered as a broker–dealer and as investment advisors with the SEC and as such is subject to regulation by the SEC and by self-regulatory organizations, principally the NASD, and national securities exchanges such as the New York Stock Exchange.

44.    RBC Dain Rauscher employed Foerster as a stockbroker with its New York City office, located at 1211 Avenue of the Americas, from May 16, 2003 through April 6, 2006.

45.    To encourage Foerster to bring the accounts to which Lehman Brothers had entrusted him during the time he was employed by that firm, on information and belief, RBC Dain Rauscher offered him a sign-on bonus of, at least,

18

$347,500.00, which Foerster accepted. RBC Dain Rauscher determined this bonus on the basis of the commission revenues Foerster produced for Lehman Brothers during the last 12 months in which he was employed at the firm. During this period, Foerster generated $331,724 in commission revenues for Lehman Brothers associated with securities he traded in the accounts of Dr. Glonti and Mr. Dateshidze.

46.    Foerster solicited Dr. Glonti and Mr. Dateshidze to transfer their investment assets from Lehman Brothers to RBC Dain Rauscher. To encourage them to transfer their accounts to RBC Dain Rauscher, he misrepresented their investment account balances at Lehman Brothers, grossly inflating the size of their balances. Dr. Glonti and Mr. Dateshidze relying on Foerster's misrepresentation thereupon transferred their investment accounts to RBC Dain Rauscher and Foerster for them to control and manage.

47.    During the period in which RBC Dain Rauscher employed Foerster, Dr. Glonti and Mr. Dateshidze entrusted their investment assets to RBC Dain Rauscher and Foerster to control and manage and, in their discretion, to select, purchase and sell securities in these accounts.

48.    The securities traded by RBC Dain Rauscher and Foerster in the accounts of Dr. Glonti and Mr. Dateshidze produced significant and substantial commission revenues for RBC Dain Rauscher and Foerster to share. In the approximately 36 months during which Lehman Brothers employed Foerster, and in which RBC Dain Rauscher and Foerster traded securities in their accounts, they

19

received from Dr. Glonti and Mr. Dateshidze $610,501 in commission revenues. On information and belief, these commissions could possibly account for approximately 35% to 40% of the total commission revenues Foerster produced for RBC Dain Rauscher in the accounts assigned to him by the firm, and may possibly have accounted for as much as 80% to 90% of the commission revenues he produced for the firm.

49.     In or about August 2005, but no later than by September 1, 2005, RBC Dain Rauscher became concerned over suspicious, irregular and unusual activities of Foerster in the accounts of Dr. Glonti and Mr. Dateshidze.

50.     When Foerster did not provide the firm with sufficient (a) explanations for his activities in the accounts of Dr. Glonti and Mr. Dateshidze, and (b) information about them to have permitted the firm, under law, to open accounts, in the first place, for them, RBC Dain Rauscher, on April 6, 2006, terminated Foerster's employment with it for cause.

51.     RBC Dain Rauscher, thereupon, demanded Foerster re-pay the firm a portion of the sign-on bonus it had paid him at the start of his employment with the firm – the amount for which the firm sought re-payment was approximately $139,000.

52.     On or about May 5, 2006, RBC Dain Rauscher's lawyers met with Foerster and his lawyer to learn from Foerster (a) more about the suspicious, irregular and unusual activities by him in the accounts of Dr. Glonti and Mr. Dateshidze that gave it cause for concern and reason to terminate Foerster's

20

Exhibit A Part 2

employment with the firm, and (b) information about Dr. Glonti and Mr. Dateshidze to have permitted the firm, under law, to open accounts, in the first place, for them.

53.    RBC Dain Rauscher professed doubt to Foerster that Mr. Dateshidze actually existed, though it had opened an account for him and traded stock in this account.

54.    RBC Dain Rauscher did not disclose to securities industry self-regulatory organizations the true reason for which it terminated Foerster, but concealed its reason from them and the public, and reported, on April 28, 2006, the reason for his termination to be "voluntary."

55.    RBC Dain Rauscher did not disclose to Dr. Glonti and Mr. Dateshidze it had terminated Foerster because it had become concerned over suspicious, irregular and unusual activities by Foerster in their accounts.

56.    And when Dr. Glonti and Mr. Dateshidze learned, three months afterwards, RBC Dain Rauscher had terminated Foerster, the firm did not disclose to them the reason for which it had terminated Foerster was because of its concerns over Foerster's suspicious, irregular and unusual activities in their accounts.

57.    In September 2006, as part of an NASD audit of RBC Dain Rauscher's 1211 Avenue of the Americas office, the auditors learned from the office's branch manager of complaints Dr. Glonti had expressed with the firm and Foerster's management and control of his account and that of Mr. Dateshidze.

58.    Thereafter, the NASD opened an investigation into Foerster's activities in the accounts of Dr. Glonti and Mr. Dateshidze.

59.    In response to the NASD's investigation and, in anticipation of

disciplinary action that the NASD could take against Foerster, RBC Dain Rauscher,

on December 6, 2006, notified securities industry self-regulatory organizations that,

because of information which Dr. Glonti had provided the firm, it was undertaking

an investigation to determine whether Foerster made unauthorized use of his funds

through wire transfers and VISA transactions.

## V. Relevant administrative and disciplinary actions taken by securities industry regulators against Lehman Brothers, RBC Dain Rauscher and Foerster

### A.    SEC administrative proceedings against Lehman Brothers

60.    On August 14, 2003, the United States Securities and Exchange

Commission censured Lehman Brothers and fined it $2.5 million for failing to

supervise a broker in its employ, Frank Gruttadauria, and to prevent or detect his

violations of federal securities laws during the 15-month period that it employed

him from October 2000 to January 2002.  During this period, and in the period

immediately before his employment with Lehman Brothers, Gruttadauria

misappropriated over $115 million from customers – transferring most of the money

to other customers to cover withdrawal requests – and overstated account values by

more than $280 million.

61.    The Commission found Gruttadauria (a) lied to customers about the

holdings in their accounts; (b) overstated the value of their accounts; (c) falsely told

customers that he used the funds that they deposited into their accounts to buy

securities, but used these funds for his own purposes; (d) misrepresented that he

22

had bought or sold other securities in their accounts; (e) told customers that they had returns on what were non-existent holdings; (f) misrepresented that the funds used to cover withdrawal requests came from customers' brokerage accounts when those accounts, in fact, had insufficient remaining funds to satisfy those requests; (g) sent customers falsified account statements; (h) made unauthorized transfers out of some customer accounts to other customers (often through intermediary bank and brokerage accounts) to make it appear as though the latter customers had sufficient assets in their brokerage accounts to cover their withdrawal requests, and then used these monies for his own purposes; and (i) forged client signatures on withdrawals for purposes of making unauthorized transfers of funds to himself.

62.    The Commission found Lehman Brothers did not have adequate supervisory procedures in place and a system for applying such procedures that could reasonably be expected to prevent and detect such violations, and directed that it implement such procedures.

63.    Afterwards, in response to the Gruttadauria episode, the Commission approved a series of rule changes at the NYSE (NYSE Information Memo 04-38) and NASD (NASD Notice to Members 04-71) designed to strengthen supervisory and supervisor control procedures that had shown to have failed.

64.    But before this, in the testimony of L.A. Richards, Director of Compliance Inspections and Examinations, United States Securities and Exchange Commission, on March 23, 2002, before the Subcommittee on Oversight and Investigations, Financial Services Committee, U.S. House of Representatives,

23

stated that, because of the Gruttadauria episode, brokerage firms had best diligently apply procedures already in force to prevent theft by stock brokers, such as that of Gruttadauria, from reoccurring, since such unlawful acts are reasonably foreseeable in the securities industry and not so unusual or startling.

65.    The Commission directed brokerage firms, in part, to prevent and detect theft by stockbrokers, by taking the following measures (a) verify changes to the address of a customer or addresses other than home address with the customer by telephone; (b) review change of address and changes to customer account information and assure changes cannot be made unless subject to supervisory review and thus firms should not directly rely upon the stockbroker's word; (c) have supervisors or compliance personnel confirm directly with the customer by telephone his or her authorization to transfer funds; (d) verify the customer's signature; (e) exercise supervision of third party wire transfers and scrutinize transfers to accounts serviced by the stockbroker; (f) review accounts for unusual activity such as customers with the same non-home mailing address or customers having the same mailing address as the broker or a broker's relative; and (g) investigate for unusual account activity with directions that firm's compliance department contact the customer directly to follow-up on its investigation of unusual activity.

B.    NYSE disciplinary proceedings against RBC Dain Rauscher

66.    On March 23, 2007, the NYSE, fined RBC Dain Rauscher $90,000.00 and censured the firm, in part, for violating NYSE 445.

24

67.    The NYSE determined RBC Dain Rauscher violated NYSE Rule 445, which establishes guidelines for implementing an adequate Anti-Money Laundering compliance program, by failing: (a) to establish written procedures regarding the filing of Suspicious Activity Reports; (b) to conduct an adequate review for structuring; and (c) to have an adequate monitoring system to review and document follow-up on exceptions found by the RBC Dain Rauscher's Anti-Money Laundering Department.

68.    The NYSE's inspection and examination of RBC Dain Rauscher records, in January 2003 through June 2003, determined the firm had not complied with NYSE Rule 445.

69.    NYSE Rule 445, effective April 2002, requires, among other things, RBC Dain Rauscher to develop and implement a written anti-money laundering program reasonably designed to achieve and monitor compliance with the requirements of the Bank Secrecy Act, 31 U.S.C. §5311, et seq., and the implementing regulations promulgated thereunder by the Department of the Treasury.

70.    Bank Secrecy Act regulations impose an obligation on a broker or dealer in securities to report any transaction that involves or aggregates to at least $5,000 that "the broker-dealer knows, suspects or has reason to suspect": (a) may derive from illegal activity; (b) is designed to evade the reporting or record keeping requirements of the Bank Secrecy Act ("structuring"); (c) has no business or apparent lawful purpose or is not the sort in which the particular customer would

normally be expected to engage, and the broker-dealer knows of no reasonable explanation for the transaction after examining the available facts, including the background and possible purpose of the transaction; or (d) involves the use of the broker-dealer to facilitate criminal activity.

71.     RBC Dain Rauscher must file a suspicious activity report ("SAR") no later than 30 calendar days after the detection of a reportable transaction.

72.     RBC Dain Rauscher's anti-money laundering program was deficient, in part, in that it did not include written procedures detailing the process utilized and the time requirements for filing SARs. Additionally, its procedures did not identify the process for determining when an item reviewed by it became suspicious so as to warrant a SAR filing.

73.     As a result of these deficiencies and other failures, the NYSE determined RBC Dain Rauscher was unable to accurately track, monitor and timely report potential suspicious activities in its accounts.

**C.    NASD disciplinary proceedings against Foerster**

74.     On July 17, 2007, the NASD suspended Foerster from associating with any NASD member firm in any capacity because of his theft of investment funds that Dr. Glonti and Mr. Dateshidze had entrusted to the care of RBC Dain Rauscher and Foerster.

75.     Foerster's suspension will become permanent, in January 2008, when he will be permanently debarred and prevented from ever associating with any NASD member firm in any capacity.

26

## VI. Operative Facts

**A.    Foerster learns of the extent of Dr. Glonti's wealth, befriends him and encourages him to transfer a portion of his investment assets to the United States and to be managed and controlled from there.**

76.    In or about Spring 2000, Dr. Glonti began to consider transferring a portion of his investment assets, which then were being entirely managed and controlled for him by investment firms based in Switzerland, to an investment firm based in the United States.

77.    At this time, Dr. Glonti was based in Moscow, Russia, operating business ventures in which he was involved from there, he however still maintained his residence in Tbilisi, Republic of Georgia.

78.    Dr. Glonti told an acquaintance, who was also based in Moscow, of his thought to transfer a portion of his investment assets to a United States-based investment firm to manage and control.

79.    Dr. Glonti's acquaintance recommended he use Foerster, with whom his acquaintance was familiar, as an investment advisor in the United States.

80.    Foerster was then employed by Salomon Smith Barney as a stockbroker, in its office at 1345 Avenue of the Americas, New York, NY 10105.

81.    Dr. Glonti's acquaintance told Foerster of Dr. Glonti's interest to transfer funds from Switzerland to the United States to entrust to a United States-based investment firm to manage and control.

82.    And Dr. Glonit's acquaintance told Foerster Dr. Glonti had

27

considerable wealth and funds available to entrust to an investment firm in the United States to manage and control.

83.   Foerster expressed his interest to him to speak with Dr. Glonti.

84.   Dr. Glonti's acquaintance thereupon provided Dr. Glonti with the telephone number at which to reach Foerster.

85.   Dr. Glonti then telephoned Foerster at his office at Salomon Smith Barney.

86.   Because Dr. Glonti did not have any command of the English language, he understood then only approximately 100 words, when he spoke to Foerster over the telephone, he informed Foerster of his disability and instructed Foerster when speaking with him to speak extremely slow and to use simple words and expressions, if he was at all to understand what Foerster had to say.

87.   In this brief telephone conversation, Dr. Glonti explained to Foerster the interest he had of placing the management and control of a portion of his investment assets with a United States-based investment company.

88.   Foerster thereafter repeatedly telephoned Dr. Glonti, pursuing Dr. Glonti with the intent of having him place his available investment funds with Salomon Smith Barney and Foerster to manage and control.

89.   In these telephone calls, Foerster encouraged Dr. Glonti to travel to the United States and to meet with him to discuss plans to place his investment assets with Salomon Smith Barney and him to manage and control.

90.   Foerster even offered to assist Dr. Glonti in obtaining a visa to travel

to the United States.

91.    To obtain a visa to travel to the United States, required Dr. Glonti to travel from Moscow to Tbilisi to apply for a visa directly from the United States embassy there.

92.    When Dr. Glonti's first attempt to obtain a visa failed, because of a clerical error, Foerster encouraged him to return to Tbilisi and continue to apply for a visa from the United States embassy there.

93.    Dr. Glonti afterwards did obtain a visa.

94.    Dr. Glonti then traveled to New York City to meet with Foerster, together with his acquaintance who had originally recommended Foerster to him.

95.    Dr. Glonti arrived for the first time in the United States, on May 22, 2000.

96.    Dr. Glonti spent three weeks in New York City, and Foerster spent almost the entire time of his visit with him, except for several days.

97.    Foerster encouraged Dr. Glonti to become his friend and to place his trust and confidence in him.

98.    And Foerster told Dr. Glonti he could rely upon him and he would not misguide him.

99.    Since this was Dr. Glonti's first visit ever to the United States, Foerster traveled extensively with Dr. Glonti around New York City introducing him to the City, showing him points of interest, taking him to events, restaurants, and even to his home where he introduced Dr. Glonti to his wife and three children.

100.   Foerster did all this to disarm Dr. Glonti so he would have no cause to doubt or distrust what he had to say to him in the future about the performance of the investment assets to which he would relinquish and entrust to Salomon Smith Barney and him to manage and control.

101.   During this time, Dr. Glonti opened-up to Foerster and disclosed to him the extent of his wealth, telling Foerster he had several millions of dollars available to place with an investment company in the United States to manage and control.

102.   Dr. Glonti explained to Foerster that his investment advisers in Switzerland managed his investments wisely and conservatively, allocating his investment assets within money market funds, balance funds, bonds and stocks, but that no more than 35% of his assets were invested in stocks.

103.   Dr. Glonti explained to Foerster that the investments assets he intended to transfer to the United States to be managed and controlled by an American investment firm should be allocated similarly.

104.   Foerster told Dr. Glonti that should he select Salomon Smith Barney and him to manage and control investment assets which he would transfer to the United States, they would allocate these assets along the lines in which his investment advisers in Switzerland did.

105.   But Foerster told Dr. Glonti that United States investment firms differ significantly from those in Switzerland, since they actively manage their clients' investment assets, whereas those in Switzerland did not and followed a more

30

traditional hands-off approach to investment management.

106. Foerster represented this "active management" approach to investment assets assured such assets appreciated since growth was correlated to the market performance of individual stocks rather than the performance of the overall market which he told Dr. Glonti influenced the investment decisions of his Switzerland-based investment advisers.

107. And Foerster convinced Dr. Glonti his investment assets would also appreciate because he had access to analyst reports covering individual companies, whereas his Switzerland-based investment advisers did not.

108. Foerster took Dr. Glonti on a tour of Salomon Smith Barney's offices impressing him with its size and the hustle and bustle of activity produced by scores of stock brokers at work.

109. Dr. Glonti did not ever experience such level of activity before, since when he visited with his Swiss-based investment advisers, he only saw at most three such advisers at once and none of the activity he witnessed at Salomon Smith Barney.

110. Foerster pointed out to Dr. Glonti that the information exchange between stock brokers going on before his eyes gave Salomon Smith Barney a competitive advantage over its Switzerland-based competitors.

111. Foerster, then, escorted Dr. Glonti to Salomon Smith Barney's analyst department, where the personnel there – some of whom appeared to Dr. Glonti to be elder statesman-type, thus giving him more confidence – praised Foerster's

31

investment acumen and abilities.

112.   Having impressed Dr. Glonti by his tour of Salomon Smith Barney with the activity of an American stockbrokerage firm and learning from him that he lacked sufficient understanding of the workings of the American stock market – Dr. Glonti spent a substantial portion of his life living under a totalitarian communist regime, Foerster had no difficulty thereafter having Dr. Glonti agree to entrust a portion of his investment assets to Salomon Smith Barney and him and to surrender management and control over such assets to them.

113.   Dr. Glonti, however, instructed them that under no circumstance should Salomon Smith Barney and Foerster place more than 35% of his investment assets in stocks or borrow any money on his behalf to purchase stocks, and in the event the overall stock investments they made for him should lose 10% of their value, they should stop all activity and contact him so he could consult with them on the direction they should thereafter take.

114.   Salomon Smith Barney and Foerster agreed.

**B.    Foerster opens an account for Dr. Glonti, at Salomon Smith Barney, and Dr. Glonti transfers to it $500,000 from his investment account in Switzerland.**

115.   Foerster took Dr. Glonti to his office at Salomon Smith Barney and guided him through the process by which to open an account with the firm.

116.   Knowing full well that Dr. Glonti operated under a severe disability – his capability to read and understand English was limited in the extreme – and recognizing Dr. Glonti was absolutely unfamiliar with the methods of United States

32

investment firms, Foerster instructed him to sign a single-page document and directed him to the place on the page of the document on which he was to sign his name and represented to Dr. Glonti the document to which he was about to sign to be a "mere formality" associated with opening an account in the United States.

117.    Dr. Glonti followed Foerster's instructions and signed the document.

118.    Although Dr. Glonti told Foerster he lived in Moscow, because the business ventures with which he was associated operated from there and he rarely traveled to Tbilisi, Foerster filled-out account opening documents identifying Dr. Glonti's address to be in Tbilisi and specified this address to be the address to which Salomon Smith Barney should send his statement of account and trade confirmations and to which it should correspond with him.

119.    After opening his investment account with Salomon Smith Barney, Dr. Glonti received a credit card that permitted him to draw cash from his account and charge to it purchases he made using it.

120.    Dr. Glonti also received a check book, but Foerster told him it was not possible for foreigners to use this form of payment.

121.    Dr. Glonti made an initial deposit to his Salomon Smith Barney account, in late May 2000, of approximately $200,000 of funds that he transferred from his account at Banca del Gottardo, in, Geneva, Switzerland.

122.    Just before Dr. Glonti returned to Moscow, from New York City, he instructed his Swiss banker to transfer an additional $300,000 to his account at Salomon Smith Barney and which was received in his account, on or about June 12,

33

2000.

    **C.**    **Foerster regularly updates Dr. Glonti, by telephone, of the performance of the investment assets he entrusted to Salomon Smith Barney and him to manage and control.**

    123.   Thereafter, Foerster regularly communicated with Dr. Glonti, by telephone, keeping him up to date on the performance of his investment account which Salomon Smith Barney and Foerster now managed and controlled and the cash balance available for him to draw upon.

    124.   Dr. Glonti needed to know particularly the cash balance available to him, since he started to travel extensively outside of Russia and used the credit card Salomon Smith Barney issued him, in part, to finance his travel.

    125.   Foerster, during these telephone conversations, represented to Dr. Glonti that the funds he had transferred from his account in Switzerland to Salomon Smith Barney were allocated according to the instructions he had given the firm and him, and there was sufficient available cash for him to draw on or to use while traveling throughout the world.

    126.   And Foerster regularly represented to Dr. Glonti that the value of his investment assets to which he entrusted to Salomon Smith Barney and him to manage and control steadily appreciated.

    127.   In October 2000, Foerster telephoned Dr. Glonti to tell him the investment assets he had entrusted to Salomon Smith Barney and him appreciated so much they had value of at least $600,000.

    128.   Because these representations, which Foerster repeatedly made to Dr.

Glonti over the telephone, served to put him at ease and made him feel he made the correct decision to entrust his investment assets to Salomon Smith Barney and Foerster, Dr. Glonti did not feel compelled to travel from Moscow or elsewhere in the world to Tbilisi to examine his account statements to verify what Foerster told him was true.

129.  Thus Foerster lulled Dr. Glonti to believe he could communicate over the telephone with Salomon Smith Barney and Foerster as he did with his Switzerland-based investment managers and learn the performance of the investment assets he entrusted to them and the funds available for him to draw upon, without having any reservation to doubt the truth of what Foerster reported to him.

**D.    Salomon Smith Barney and Foerster misrepresent to Dr. Glonti the performance of the investment assets to which he entrusted them to manage and control.**

130.  Salomon Smith Barney and Foerster represented to Dr. Glonti his investment assets to which he had entrusted them were allocated as he had instructed them and steadily increased in value.

131.  These representations by them to Dr. Glonti were not true.

132.  In the six month period, from May 2000 through October 2000, during which Dr. Glonti entrusted his investment assets to the management and control of Salomon Smith Barney and Foerster, they failed to allocate his investment assets according to his instructions.

133.  Salomon Smith Barney and Foerster allocated the investment assets,

35

to which Dr. Glonti entrusted them, almost entirely in stocks, and further, they caused him to borrow money to finance the purchase of these stocks.

134.    Salomon Smith Barney and Foerster, immediately upon receiving the approximately $500,000 in funds Dr. Glonti transferred to his account from Switzerland and entrusted to them, started to make investments in his account inconsistent with Dr. Glonti's investment objectives and thus unsuitable for him.

135.    And Salomon Smith Barney and Foerster, without receiving Dr. Glonti's authorization, immediately began excessively purchasing and selling stocks in his account, in disregard for his investment objectives, and trading such stocks solely to serve to generate commission revenues for themselves at his expense.

136.    In just the first six months, by the end of October 2000, the investment assets to which Dr. Glonti had entrusted Salomon Smith Barney and Foerster, lost 45% of their original value.

137.    The commissions costs to Dr. Glonti associated with the excessive and unauthorized trading of stock in his account by Salomon Smith Barney and Foerster were so high and prohibitive, they knew Dr. Glonti could not expect to earn a profit to cover these charges.

138.    The annualized turnover rate (the total cost of purchases of stock made in Dr. Glonti's account during the period to the amount he invested) was 13.1.

139.    Trading in an account is conclusively presumed to be excessive when the annualized turnover rate exceeds 6, and the annualized turnover rate for Dr. Glonti's account then was more than double what is conclusively presumed to be

excessive.

140.   Salomon Smith Barney did not telephone Dr. Glonti to alert him to the excessive trading activity in his account or warn him that the transaction costs for such trading sere extraordinarily high in relation to the equity value of his account.

**E.     Foerster informs Dr. Glonti of his move to Lehman Brothers and instructs Dr. Glonti to transfer his investment assets from Salomon Smith Barney to Lehman Brothers and to entrust an additional $1 million to Lehman Brothers and him to manage and control.**

141.   In or about September 2000, Foerster telephoned Dr. Glonti, who was then overseas in Africa, to inform him that he received an offer from Edward M. Feigeles, Lehman Brothers' global head of Private Client Services Group, to have him join Feigeles and his group at Lehman Brothers.

142.   Foerster also told Dr. Glonti that Feigeles was a family friend.

**1.     Feigeles and Lehman Brothers' Private Client Services Group**

143.   Lehman Brothers' Private Client Services Group sought as customers individuals throughout the world who have high net-worth.

144.   Under Feigeles' stewardship of the group, it grew such that its brokers' commission productivity had more than tripled the average rate of productivity for the industry.

145.   Intending to increase Lehman Brothers' share of the market, Feigeles led Lehman Brothers to acquire that segment of the business of Societe Generale Group (then the tenth largest bank in the world) devoted to servicing the investment needs of affluent individuals.

37

146.   This acquisition involved Lehman Brothers acquiring approximately 130 stock brokers from S.G. Cowen Securities Corporation and up to 60,000 of their accounts.

147.   It was then when Lehman Brothers' was finalizing this acquisition that Feigeles offered Foerster employment with his group.

148.   Foerster offered Lehman Brothers the opportunity to increase the scope of its investment business, which targeted affluent overseas investors, with the addition of Dr. Glonti's account.

### 2.    Foerster entices Dr. Glonti to transfer his assets to Lehman Brothers and him to manage and control.

149.   In telephone calls Foerster placed to Dr. Glonti, who was then in Africa, he encouraged Dr. Glonti to open an account at Lehman Brothers

150.   Foerster told Dr. Glonti, however, for him to open such an account with him at Lehman Brothers he needed to entrust substantially more of his investment assets with him at Lehman Brothers than he had with him at Salomon Smith Barney.

151.   Foerster told Dr. Glonti that Lehman Brothers required a minimum investment of at least $2 million, but he said he had spoken with Feigeles and Feigeles would waive Lehman Brother's minimum requirement in Dr. Glonti's case.

152.   Foerster reviewed the performance of the investment assets that Dr. Glonti entrusted to Salomon Smith Barney and him to manage and control and then told Dr. Glonti his assets now had a value of $600,000, and he next encouraged

38

him to transfer $1 million, at least, to Lehman Brothers from the accounts he had

entrusted to his investment advisors in Switzerland.

153.    To entice Dr. Glonti to transfer his investment assets from Salomon

Smith Barney to Lehman Brothers and to entrust with them an additional $1

million, Foerster represented to Dr. Glonti that Feigeles would arrange for him to

receive rights to initial public offerings which he could thereafter sell and from

which earn a substantial profit.

154.    Foerster told Dr. Glonti then that Feigeles was a former schoolmate of

his brother-in-law and he had placed funds with Feigeles to invest and had done

very well because of Feigeles' investment acumen and, therefore Dr. Glonti also

could benefit from Feigeles' investment acumen.

155.    Foerster told Dr. Glonti, that as he had previously put his trust and

confidence in Salomon Smith Barney and him to manage and control his investment

assets, he should continue to place his trust and confidence with him and Lehman

Brothers to manage and control his investment assets; and Foerster added Dr.

Glonti would thereby be helping Foerster's career enormously.

156.    Foerster told Dr. Glonti that Lehman Brothers and he would manage

and control his investment assets and allocate these assets along the lines in which

his investment advisers in Switzerland did.

157.    Dr. Glonti repeated the instructions to Foerster he had given to

Salomon Smith Barney and him, and directed Lehman Brothers and he follow the

same instructions covering the investment assets he intended to entrust to them –

under no circumstance should Lehman Brothers and Foerster place more than 35% of his investment assets in stocks or borrow any money on his behalf to purchase stocks, and in the event the overall stock investments they made should lose 10% of their value, they should stop all activity and contact him so he could consult with them on the direction they should thereafter take.

158.    Foerster agreed to follow Dr. Glonti's instructions.

F.    **Dr. Glonti opens his account with Lehman Brothers and transfers from Switzerland $1 million to entrust with Lehman Brothers and Foerster.**

159.    Dr. Glonti then undertook to open an account at Lehman Brothers.

160.    He transferred funds to entrust to Lehman Brothers and Foerster and over which he then surrendered to them management and control.

161.    Immediately on his employment by Lehman Brothers, Foerster transmitted, in October 2000, to Dr. Glonti, who was then in Tanzania, Africa, two blank single-page documents that he told Dr. Glonti, over the telephone, were a "mere formality" associated with opening an account with Lehman Brothers.

162.    Knowing of Dr. Glonti's disability with and limited capability of reading and understanding English, Foerster instructed Dr. Glonti to sign each document at the place on the document he had indicated for him to place his signature.

163.    Following Foerster's guidance, Dr. Glonti signed the two blank single-page forms where Foerster instructed him to sign.

164.    Afterwards Dr. Glonti instructed his investment advisers in

Switzerland to wire transfer $1 million to entrust to Lehman Brothers and

Foerster.

165.    The transfer of these funds was completed on October 24, 2000.

166.    Thereafter, approximately $220,526.00 of securities was transferred

from Dr. Glonti's account at Salomon Smith Barney and received in his account at

Lehman Brothers, on November 7, 2000.

167.    Foerster telephoned Dr. Glonti overseas telling him that the value of

the securities he had transferred from his account at Salomon Smith Barney to his

account at Lehman Brothers was approximately $600,000.00.

G.    **Dr. Glonti travels to New York City to visit with Foerster and Feigeles at Lehman Brothers' headquarters.**

168.    On October 22, 2000, Dr. Glonti arrived in New York City, for a two-

week visit with Foerster.

169.    Foerster, to build upon the reasons he had given for Dr. Glonti to

continue to place trust and confidence in him, invited Dr. Glonti to Lehman

Brother's offices.

1.    **Foerster introduces Dr. Glonti to Feigeles and other key Lehman Brothers officials**

170.    At Lehman Brothers' offices, Foerster introduced Dr. Glonti to

Feigeles, about whom he had previously spoken to Dr. Glonti, and Lehman

Brothers' branch manager of the office.

171.    Foerster arranged to have Dr. Glonti meet for a considerable time with

Feigeles, who not only headed Lehman Brothers' Private Client Services Group, but

41

served in the capacity of a managing director of the investment firm.

172.    During their meeting, Feigeles surprised Dr. Glonti with the extent to which he knew of the telecommunication company Dr. Glonti operated in Georgia and the scope of its business.

173.    And Feigeles encouraged Dr. Glonti to consider utilizing Lehman Brothers' capital generating capabilities to assist him to expand the scope of his Georgia-based telecommunications company, promising Dr. Glonti he could arrange as much as a $30 million capital investment.

174.    During this time, Foerster introduced Brian M. Reilly, a Lehman Brothers' Senior Vice President, who expressed interest with working with Dr. Glonti on developing overseas investments for the firm.

175.    Dr. Glonti learned that Reilly was a friend of Foerster and along with Feigeles was instrumental in bringing Foerster to Lehman Brothers.

176.    And Lehman Brothers' branch manager spoke to Dr. Glonti about Foerster, lauding Foerster's accomplishments and investment acumen, thereby intending to instill in Dr. Glonti additional confidence for him to entrust his investment assets to Lehman Brothers and Foerster to manage and control

177.    Lehman Brothers' branch manager specifically arranged a lunch for Dr. Glonti during which he touted Lehman Brothers, encouraged Dr. Glonti to increase the amount of assets he entrusted to the firm and Foerster to manage and control and to recommend the firm to Dr. Glonti's business associates as an investment firm in which to entrust their investment assets.

### 2.    Foerster invests his time to build Dr. Glonti's trust and confidence in him.

178.    And Foerster spent considerable time with Dr. Glonti outside of Lehman Brothers, during this visit by Dr. Glonti to New York City, so he would have no cause to doubt or distrust anything he said to him.

179.    Every day of Dr. Glonti's visit, Foerster either had lunch or dinner with him; they visited museums together; they attended theaters and concerts together; they shared their common interest in jazz and together attended jazz clubs; and they generally roamed about New York City experiencing the city together; and Foerster's wife too joined them on several occasions for dinner and attended a Broadway show with them.

180.    During this visit, Foerster instructed Dr. Glonti on transferring securities he held in his account at Salomon Smith Barney to his account at Lehman Brothers.

181.    Foerster later represented to Dr. Glonti the securities he transferred to Lehman Brothers had a value of $600,000; the value of these securities, however, was actually listed by Salomon Smith Barney to be $220,526.

182.    And as with Salomon Smith Barney, Foerster made sure Dr. Glonti received a credit card on which to draw cash and charge items he intended to purchase.

183.    Foerster told Dr. Glonti that though Lehman Brothers made available internet banking to its customers, he could not receive this privilege from the firm

43

until he entrusted, at least, $2 million of his investment assets to the firm to manage and control.

184.    Following "September 11, 2001," Foerster represented to Dr. Glonti he could not have internet access to his account because banking regulations had changed such that non-U.S. citizens were no longer permitted to have such access.

**H.    Foerster instructs Lehman Brothers to address all communications with Dr. Glonti to his address in Tbilisi, Georgia.**

185.    Although Lehman Brothers' branch manager, Feigeles and Foerster knew, from their extensive conversations with Dr. Glonti while he visited with them at Lehman Brothers' offices, that Dr. Glonti continued to reside in Moscow, to which without interruption he returned after every trip he made either for business or pleasure, Lehman Brothers permitted Foerster to have all statements of accounts and trade confirmations associated with Dr. Glonti's account delivered to his address in Tbilisi, Republic of Georgia, and to have as well as all other correspondence Lehman Brothers would have with Dr. Glonti delivered there.

**I.    Foerster regularly reaches Dr. Glonti, by telephone, at his various overseas locations, to update him on the performance of the investment assets to which he entrusted Lehman Brothers and him to manage and control.**

186.    Foerster continuously updated Dr. Glonti, throughout 2000, on the performance of his investment assets that he had entrusted to Lehman Brothers and him to manage and control by regularly telephoning Dr. Glonti, wherever in the world his business or personal travel took him, telling him in each conversation he

had with him his investment assets appreciated.

187.    To assist Dr. Glonti, since he traveled so extensively throughout the world, Foerster encouraged Dr. Glonti, when he needed to speak with him to use his mobile telephone number that he had given Dr. Glonti.

188.    These representations that Foerster repeatedly made to Dr. Glonti put him at ease such that he could feel comfortable that he made the "right" decision to entrust his investment assets to Lehman Bothers and Foerster.

189.    Dr. Glonti thus came to rely upon Foerster's representations about the performance of his account with Lehman Brothers and, therefore, did not feel compelled to travel from Moscow to Tbilisi to examine his account statements to verify what Foerster told him was true.

J.    **After Dr. Glonti transferred his assets to Lehman Brothers and Foerster to manage and control, Foerster and Lehman Brothers immediately make unsuitable investments and excessively trade securities in his account without his authorization, such that within 15 months, the investment assets to which Dr. Glonti entrusted them lose approximately 52% of their original value.**

190.    Immediately after Dr. Glonti left New York City, Lehman Brothers and Foerster allocated the investment assets (to which Dr. Glonti had surrendered and entrusted to them to manage and control) entirely in stocks, and thereafter aggressively traded these stocks in and out of his account, causing significant and substantial losses in the account and while at the same time generating significant commission revenues for themselves at substantial cost to Dr. Glonti.

191.    In the first 3 months of trading activity by Lehman Brothers and

45

Foerster in Dr. Glonti's account, the investment value of his account dropped by more than 18.6% and he incurred more than $15,374 in commission costs.

192.   The annualized turnover rate (the total cost of purchases of stock made in Dr. Glonti's account during the period to the amount he invested), for this period, was 3.5.

193.   It is permissible to infer excessive trading in an account when the annualized turnover rate exceeds 2 and excessive trading is presumed if the ratio exceeds 4; the annualized turnover rate in Dr. Glonti's account was just 12.5% below the ratio for which excessive trading is presumed.

194.   To cover the costs of commissions, in just this short period of time, Dr. Glonti would have had to have made a profit in his account of more than 14%, but he could not have recovered this cost since his account lost 18.6% of its value.

195.   Feigeles and Lehman Brother's branch manager did not contact Dr. Glonti by telephone to alert him to the condition of the investment assets to which he entrusted to them to manage and control or verbally verify with him he had authorized the trading activity at such an excessive level in his account.

196.   Because of the unauthorized and excessive trading of stocks by Lehman Brothers and Foerster in Dr. Glonti's account, they earned approximately $100,000 in commission revenues in just 14 months, from November 2000 through December 2001.

197.   By December 31, 2001, Dr. Glonti's account had lost approximately 52% of its original value and was down to $553,459.09.

46

198.   The annualized turnover rate (the total cost of purchases of stock made in Dr. Glonti's account during the period to the amount he invested), for calendar year 2001, was 3.6.

199.   It is permissible to infer excessive trading in an account when the annualized turnover rate exceeds 2 and excessive trading is presumed when the ratio exceeds 4; the annualized turnover rate in Dr. Glonti's account was just 10% below the ratio for which excessive trading is presumed.

200.   Excessive trading in an account is also measured as the percentage of return on the investor's average net-equity needed in order to pay the stockbroker's commission and other expenses, the "cost/equity maintenance factor."

201.   Based on this determination, Dr. Glonti would had to have earned, in calendar year 2001, a profit of 14.4% in his account simply to cover costs of the commissions with which he was charged by Lehman Brothers and Foerster.  In other words, just to break-even his account had to have earned such a profit.

202.   Dr. Glonti could not recover these unauthorized costs since the investment assets to which he entrusted to Lehman Brothers and Foerster to manage did not appreciate, but lost more than half of its value, resulting in an out-of-pocket loss to Dr. Glonti.

203.   And Dr. Glonti could not look to 2002 to improve the performance of his investment assets to which he had entrusted to Lehman Brothers and Foerster, because as a result of their control and management of his account in calendar year 2002, its performance result was worst than it was in 2001 under their

management and control.

204.   Feigeles and Lehman Brother's branch manager did not contact Dr. Glonti by telephone to alert him to the condition of the investment assets to which he entrusted to them to manage and control and verbally verify with him he had authorized the trading activity at such an excessive level in his account.

205.   Yet throughout 2001, Foerster regularly placed telephone calls to Dr. Glonti representing to him the investment assets to which he had entrusted to Lehman Brothers and him to manage and control performed extraordinarily well and he said to Dr. Glonti that these assets had increased on an annual basis of at least 15%.

> **K.    Foerster convinces Dr. Glonti to believe the account statements he receives from Salomon Smith Barney and Lehman Brothers do not represent the entirety of the investment assets that he had entrusted to them.**

206.   On several visits to Tbilisi, in 2001, Dr. Glonti had the opportunity to inspect account statements delivered to his address there by Salomon Smith Barney and Lehman Brothers.

207.   Dr. Glonti discovered then discrepancies between what Foerster reported to him by telephone to be the performance of his investment assets to which he had entrusted to the firms and Foerster and that which was reported on the account statements.

208.   Foerster, over the telephone, explained away the discrepancies Dr. Glonti found between what the account statements reported and what Foerster

48

represented to him, telling Dr. Glonti that Salomon Smith Barney and Lehman Brothers did not report on such statements his entire account balance with the firms.

209.    Foerster represented to Dr. Glonti that Salomon Smith Barney and Lehman Brothers reported just that portion of his investments allocated to stocks and money market fund, and since the majority of his investment assets, Foerster told him, were not allocated in these categories, they were thus recorded elsewhere

210.    Foerster further told Dr. Glonti since he had so much trouble understanding these statements and could not read them the proper way, he should just ignore them and rely entirely on what he had been told by him to be the investment performance of the investment assets to which he entrusted Salomon Smith Barney and then Lehman Brothers.

211.    Foerster told Dr. Glonti there was no reason for him to ever lie to him, first because he was Dr. Glonti's close friend and, second, because he and the firms were subject to strict internal company, as well as government oversight, and they would be punished if they ever lied to him.

212.    And Dr. Glonti had no reason to doubt what Foerster represented because he operated with his investment advisers in Switzerland in the same manner – he would telephone them to receive from them his account balances and they would report to him his balances over the telephone, and he had never been misled by them.

L.    **Dr. Glonti's substantial and lengthy visits with Foerster and Foerster's family, in 2001, convinces Dr. Glonti that he has no basis on which to doubt the trust and confidence he places in Foerster to properly manage and control the assets he entrusted to Lehman Brothers.**

213.    Dr. Glonti's additional visits with Foerster reinforced his belief that he could, without reservation, place his full and complete trust and confidence in Foerster.

214.    In 2001, Dr. Glonti traveled, from Moscow to New York City, to visit with Foerster twice, and on each visit his son accompanied him.

215.    On his first visit, Dr. Glonti spent almost a month, from May 28, 2001 through June 27, 2001, regularly visiting with Foerster and Foerster's family.

216.    They exchanged gifts and cards with one another, including between Dr. Glonti and Foerster's wife and children, and Foerster encouraged Dr. Glonti to understand he meant him to be part of the Foerster family.

217.    Dr. Glonti had previously been ill and was making a slow recovery back to full health, and Foerster and his wife were thus very attentive to him and his needs.

218.    Foerster promised Dr. Glonti he would treat Dr. Glonti's son as he would treat his son and, thereafter, Foerster, as he had promised, took Dr. Glonti's son alone or along with his children to restaurants, movies and Central Park, and even to a New York Yankees baseball game.

219.    And Foerster was specifically attentive to Dr. Glonti's needs on this occasion because Dr. Glonti had brought his son to the United States to receive

medical attention.

220.   Foerster arranged the medical appointments for Dr. Glonti's son and transportation for them to the medical facilities, in Danbury, Connecticut, at which his son was treated, and hotel accommodations for them.

221.   And Foerster accompanied Dr. Glonti and his son to Danbury, Connecticut, providing translation when needed, knowing full well the disability Dr. Glonti had reading and speaking English.

222.   It was at this time, that Foerster's wife offered Dr. Glonti and his son the use of their apartment on their next visit to the United States, during which his son would resume his medical treatment.

223.   The attention and care to which Foerster and his wife gave Dr. Glonti and his son left no doubt for him that he could trust whatever Foerster said to him and he could feel assured he was part of Foerster's family.

224.   During then and after, Foerster represented to Dr. Glonti the investment assets to which he had entrusted Lehman Brothers and him to manage and control consistently appreciated in value, and were as much as $1.8 million

225.   Dr. Glonti relied on Foerster's news to budget his travel, living and other expenses, with the expectation that the appreciation in the investment assets he had entrusted to Lehman Brothers would more than cover such expenses.

226.   At no time then, did Foerster alert Dr. Glonti that the investment assets Dr. Glonti entrusted to Lehman Brothers and him were being managed and controlled other than in the manner that Dr. Glonti had instructed them.

227.   Dr. Glonti returned for almost another month long visit with Foerster and his family between August 11, 2001, and September 9, 2001.

228.   On the occasion of this visit, Dr. Glonti again brought with him his son, and they stayed with Foerster at his family's apartment in New York City.

229.   When Dr. Glonti was briefly ill during this visit, Foerster, in Dr. Glonti's place, took Dr. Glonti's son with him to restaurants, movies and Central Park.

230.   And Foerster as well was attentive to Dr. Glonti's care and needs, such that Dr. Glonti came to rely completely on Foerster to arrange the smallest of matters relating to his trip.

231.   Foerster encouraged Dr. Glonti not only to bond with and become emotionally close to his wife and children, but he exerted every effort to have Dr. Glonti bond and become emotionally close with his parents and his wife's parents.

232.   Dr. Glonti accompanied Foerster's parents, who visited Foerster from their home in Germany, on excursions out and about New York City, and Foerster succeeded having a close bond between Dr. Glonti and his parents develop, such that when he later traveled with Foerster in Europe, Foerster's mother invited him to stay with her at her home.

233.   Foerster's mother expressed to Dr. Glonti how appreciative she was that Foerster and his family had such a friend as him.

234.   And Dr. Glonti and his son were frequent invited guests at family functions at the beach home of Foerster's wife's parents; there he met Foerster's

52

wife's brother who had been a schoolmate of Feigeles and her other siblings and their families; and there were times Dr. Glonti would spend the weekends at their home at the beach.

235.    Foerster completely disarmed Dr. Glonti, because involving him so extensively in Foerster's family was a sign to Dr. Glonti of total friendship, such that he could not doubt or distrust what Foerster told him.

236.    And during this visit, Dr. Glonti expressed to Foerster the concern he had with Lehman Brothers continuing to mail his account statements to his address in Tbilisi, Georgia.  He told Foerster this was because of his concern with the political unrest then taking place in Tbilisi, Georgia.

237.    Shortly afterwards, Foerster came to Dr. Glonti with a solution – he recommended that Dr. Glonti instruct Lehman Brothers to change the address to which his account statements were mailed and with which it corresponded with him and instruct the firm to direct all communications with him to the address at which Foerster's wife's parents lived.

238.    Foerster explained to Dr. Glonti this should pose no problem to Lehman Brothers since his wife's parents also had accounts at Lehman Brothers and it corresponded with them at their address.

239.    While with Foerster in New York, it was not uncommon for Foerster to have Dr. Glonti sign a single-page document that Foerster described to him to be a "mere formality" of Lehman Brothers.

240.    Dr. Glonti would dutifully sign a single-page document, at the place on

53

the page Foerster instructed him to write his name, knowing only the purpose for his signature was for the reason given to him by Foerster.

241.    Dr. Glonti was led to believe he would offend his friend if he attempted to verify with anyone else the content and purpose of that which Foerster asked him to sign.

**M.    Following Dr. Glonti's lengthy visits with Foerster and Foerster's family, Foerster resumes placing telephone calls overseas to Dr. Glonti informing him of the performance of the investment assets to which he entrusted Lehman Brothers and him, and then visits Dr. Glonti in Rome to laud their performance with his assets.**

242.    Following the events of September 11, 2001, Dr. Glonti frequently communicated with Foerster over the telephone concerning the affect this event had on his investment assets to which he entrusted Lehman Brothers and Foerster.

243.    Foerster represented to Dr. Glonti that the events had limited affect on his investment assets, because the majority of his investment assets were allocated to interest earning bank accounts and not to stocks.

244.    Foerster substantiated this for Dr. Glonti, in February 2002, when he met face-to-face with him, in Rome, Italy, and handed him then a statement of account showing him to have more than $1 million dollars of investment assets allocated in cash and approximately another 30% or more, or $500,000, allocated in stock.

245.    Foerster then represented to Dr. Glonti there was an additional $200,000 that was not reported on the statement he had prepared for him.

246.  Foerster also explained to Dr. Glonti his investment assets had recovered after September 11, 2001, because of his active management of his account.

247.  The document Foerster prepared and used then to represent to Dr. Glonti the performance of the investment assets which he had entrusted to Lehman Brothers and him was a forgery, because at the beginning of February 2002, Lehman Brothers reported Dr. Glonti's statement had a value of approximately no more than $485,000, of which $35,500 was allocated to cash and the remainder entirely allocated in stocks.

248.  Foerster and Dr. Glonti spent three days together experiencing Rome, its restaurants, historic sites and museums.

249.  The camaraderie between Foerster and Dr. Glonti as they experienced Rome together disarmed Dr. Glonti and eliminated any basis for him to question or doubt the truth Foerster told him about the performance of the investment assets to which he entrusted Lehman Brothers and Foerster.

250.  Shortly before this, the investment scandal over the activities of Frank Gruttadauria, who headed Lehman Brothers' private client services group in Cleveland, Ohio, came to public attention, and federal, state and self-regulatory organization investigations and criminal prosecutions ensued over securities law violations arising out of Gruttadauria's misconduct.

251.  And immediately after this scandal came to public attention, the SEC warned investment firms, including Lehman Brothers, to diligently apply

55

procedures already in force to prevent what had occurred from reoccurring since such unlawful acts are reasonably foreseeable in the securities industry, and not so unusual or startling.

252.    Foerster alerted Dr. Glonti to the investment scandal that arose out of Frank Gruttadauria's activities in Cleveland, and assured Dr. Glonti this could not happen to him because Lehman Brothers exercised strong supervision over its stock brokers and indeed had uncovered Frank Gruttadauria's activity and reported it to the federal authorities.

**N.    Encouraged by what Foerster reported to be the appreciation of the investment assets to which he entrusted to Lehman Brothers, Dr. Glonti convinces Mr. Dateshidze to entrust his investment assets to the management and control of Lehman Brothers and Foerster.**

253.    In or about March 2002, following additional overseas telephone calls from Foerster to Dr. Glonti, in which he represented to Dr. Glonti the investment assets to which he entrusted to Lehman Brothers and Foerster to manage and control continued to appreciate, Dr. Glonti arranged with Foerster to have him open an account for his brother-in-law, David Dateshidze.

254.    Dr. Glonti explained to Foerster that Mr. Dateshidze did not speak or read English at all.

**1.    Foerster changes the address with which Lehman Brothers corresponds with Dr. Glonti.**

255.    Foerster used this opportunity to remind Dr. Glonti of the concern he had expressed to him with Lehman Brothers' practice to deliver his account

56

statements to his address in Tbilisi, Georgia.

256.    Foerster told to Dr. Glonti that he could eliminate Dr. Glonti's concern, by allowing him to change the address to which Lehman Brothers delivered Dr. Glonti's account statements and otherwise corresponded with him.

257.    Foerster then recommended that Dr. Glonti change his mailing address and give Lehman Brothers as his new mailing address the home of Foerster's wife's parents in Atlantic Beach, New York.

258.    Foerster also recommended that Mr. Dateshidze should direct Lehman Brothers to mail his account statements to the same address.

259.    Dr. Glonti accepted Foerster's recommendation and, on or about March 26, 2002, Foerster prepared the document necessary to effect this change and transmitted the document by facsimile to Dr. Glonti.

260.    Dr. Glonti signed the document and transmitted by facsimile his authorization to Foerster to have Lehman Brothers direct all further correspondence with him to the address of Foerster's in-laws' home, at 88 Genesee Boulevard, Atlantic Beach, New York 11509, and thus the credit card Lehman Brothers issued Dr. Glonti, with which Foerster used to make unauthorized cash withdrawals from Dr. Glonti's account for his personal use, would be mailed to this address.

**2.    Foerster opens an account for Mr. Dateshidze at Lehman Brothers without the necessary customer information that is required by law.**

261.    At or about the same time, Foerster transmitted two blank, two single-

57

page documents to Mr. Dateshidze, who was in Tbilisi, Georgia with Dr. Glonti.

262. Foerster telephoned Dr. Glonti and instructed him to explain to Mr. Dateshidze the two single-page documents were a "mere formality" for Foerster to use to open Mr. Dateshidze's account and then instructed Dr. Glonti to guide Mr. Dateshidze to the place on each document on which he indicated Mr. Dateshidze was to sign.

263. Dr. Glonti followed Foerster's instructions and Mr. Dateshidze signed each document at the place at which Foerster directed him to sign and then re-transmitted the documents to him.

264. Foerster thereupon opened an account for Mr. Dateshidze with Lehman Brothers, and Lehman Brothers authorized him to open the account without requiring Foerster to secure more customer identification information from Mr. Dateshidze.

265. Dr. Glonti instructed Foerster to allocate the investment funds which Mr. Dateshidze was about to entrust to Lehman Brothers according to the same instructions he had given Foerster to allocate his investment assets to which he had entrusted to Lehman Brothers and Foerster.

266. On April 1, 2002, Lehman Brothers received from Mr. Dateshidze approximately $225,400.00 to which he had entrusted to it and Foerster and over which he surrendered to them management and control.

267. Immediately afterwards, Lehman Brothers and Foerster allocated the investment assets to which Mr. Dateshidze entrusted to them to manage and

control entirely in stocks and thereafter aggressively traded stocks in and out of his account, causing significant and substantial losses in the account and at the same time generated significant and substantial commission revenues for themselves at the expense of Mr. Dateshidze.

268.    Then, in October 2002, Mr. Dateshidze entrusted an additional $196,000.00 to Lehman Brothers and Foerster to manage and control.

269.    And immediately afterwards, Lehman Brothers and Foerster allocated the investment assets to which Mr. Dateshidze entrusted to them to manage and control entirely in stocks and thereafter aggressively traded stocks in and out of his account, causing significant and substantial losses in the account and at the same time generated significant and substantial commission revenues for themselves at the expense of Mr. Dateshidze.

**O.    Dr. Glonti continues, in 2002, his annual trips to New York City to visit with Foerster and Foerster's family.**

270.    During the two weeks, between August 14, 2002 and August 28, 2002, Dr. Glonti visited with Foerster and Foerster's family.

271.    And as before, Foerster devoted extensive periods of his time to Dr. Glonti, taking time-off from work to be with him, and when he could not, he arranged to meet with him for lunch or afterwards for dinner.

272.    And during Dr. Glonti's visits, they jogged together in Central Park almost every morning.

273.    Foerster encouraged Dr. Glonti to develop further emotional bonds

with his family such that he continued, as before, to spend at least one weekend

during his visit with Foerster's family, at his Foerster's wife's parent's beach home

on Long Island.

274.    And as had become the custom, they exchanged gifts of appreciation

with one another.

275.    Just before Dr. Glonti arrived for his annual visit with Foerster and

his family, on July 3, 2002, Foerster used Dr. Glonti's credit card, without his

knowledge and authorization, to pay to have his children attend overnight summer

camp.

276.    The cost to Dr. Glonti, because of the unauthorized use Foerster made

of his credit card, was $4,900.

**P.**    **Foerster represents to Dr. Glonti, throughout 2002, his
investment assets and those of Mr. Dateshidze to which they
entrusted Lehman Brothers and him appreciated in value,
whereas their investment assets actually plummeted in value.**

277.    Foerster regularly placed overseas telephone calls to Dr. Glonti to give

him updates on the performance of the investments he and Mr. Dateshidze

entrusted to Lehman Brothers and him and on every such occasion he represented

to him their accounts appreciated as much as 20% to 22%.

278.    Actually, the investment assets Dr. Glonti and Mr. Dateshidze

entrusted to Lehman Brothers and Foerster suffered significant and substantial

losses and were subjected to substantial commission charges directly attributable to

unauthorized and excessive trading of stocks in their accounts by Lehman Brothers

60

Exhibit A   Part 4

and Foerster.

**1.    Dr. Glonti's investment assets lose 85% of their value.**

279.   In 2002, Dr. Glonti's investment assets to which he entrusted to Lehman Brothers and Foerster dropped 85% in value, from $553,459, as reported by Lehman Brothers, in January 2002, to $75,870, as reported by it, for December 2002.

280.   Because of the unauthorized and excessive trading of stocks by Lehman Brothers and Foerster in Dr. Glonti's account, they earned approximately $122,965 in commission revenues.

281.   The annualized turnover rate (the total cost of purchases of stock made in Dr. Glonti's account during the period to the amount he invested), during this period, was 10.5.

282.   It is permissible to conclude excessive trading in an account when the annualized turnover rate exceeds 6, and the annualized turnover rate of Dr. Glonti's account exceeded that which is conclusively presumed to be excessive by 75%.

283.   Excessive trading in an account is also measured as the percentage of return on the investor's average net-equity needed in order to pay the stockbroker's commission and other expenses, the "cost/equity maintenance factor."

284.   Based on this determination, Dr. Glonti would had to have earned a profit of 42% in his account simply to cover costs of the commissions with which he was charged by Lehman Brothers and Foerster. In other words, just to break-even, he would had to have earned such a profit.

61

285.    Dr. Glonti could not recover this unauthorized cost because the investment assets to which he entrusted to Lehman Brothers and Foerster to manage did not appreciate, but lost 85% of its value, resulting in an out-of-pocket loss to Dr. Glonti.

286.    And Dr. Glonti could not look to 2003 to improve the performance of his investment assets to which he had entrusted to Lehman Brothers and Foerster, because as a result of their control and management of his account in 2003, its performance result was worst than it was 2002, under their management and control.

287.    Feigeles and Lehman Brother's branch manager did not contact Dr. Glonti by telephone to alert him to the condition of the investment assets to which he entrusted to them to manage and control or verbally verify with him whether he had authorized the trading activity at such an excessive level in his account.

2.    **Mr. Dateshidze's investment assets lose 48% of their value.**

288.    The investment assets Mr. Dateshidze entrusted to Lehman Brothers and Foerster to manage and control were quickly dissipated because of unauthorized and excessive trading of stocks in his account by them.

289.    Indeed, in just the first three months Lehman Brothers and Foerster managed and controlled Mr. Dateshidze's account, the trading activity was so substantial, his losses so significant, approximately 18%, and the transactions costs at such an exceedingly high level in relation to the equity value of his account, approximately 19%, that Lehman Brothers branch manager should have contacted

62

Mr. Dateshidze by telephone to alert him to this condition and verbally verified with Mr. Dateshidze whether he had authorized the trading activity at such an excessive level in his account.

290.    However, Lehman Brother's branch manager did not alert Mr. Dateshidze of the excessively high level of trading activity in his account.

291.    Mr. Dateshidze, entrusted $421,400, in 2002, to Lehman Brothers and Foerster to manage and control, but by the end of December 2002, the investment assets he had entrusted to them lost 48% of its value.

291.    Mr. Dateshidze's loss was directly attributable to the unauthorized and excessive trading of stock in his account by Lehman Brothers and Foerster and their substantial commission charges associated with their trading activity.

292.    Because of the unauthorized and excessive trading of stocks by Lehman Brothers and Foerster in Mr. Dateshidze's account, they earned approximately $137,831 in commission revenues, in just 8 months during 2002.

293.    The annualized turnover rate (the total cost of purchases of stock made in Mr. Dateshidze's account during the period to the amount he invested), in this period, was 23.

294.    It is permissible to conclude excessive trading in an account when the annualized turnover rate exceeds 6, and the annualized turnover rate of Mr. Dateshidze's account almost quadrupled that which is conclusively presumed to be excessive.

295    Excessive trading in an account is also measured as the percentage of

63

return on the investor's average net-equity needed in order to pay the stockbroker's commission and other expenses, the "cost/equity maintenance factor."

296.    Based on this determination, Mr. Dateshidze would had to have earned a profit of 90.8% in his account simply to cover costs of the commissions with which he was charged by Lehman Brothers and Foerster. In other words, just to break-even, he would had to have earned such a profit.

297.    Mr. Dateshidze could not recover this unauthorized cost because the investment assets he entrusted to Lehman Brothers and Foerster to manage did not appreciate, but lost almost half its value, resulting in an out-of-pocket loss to him.

298.    And Mr. Dateshidze could not look to 2003 to improve the performance of his investment assets to which he entrusted to Lehman Brothers and Foerster, because as a result of their control and management of his account in 2003, its performance result was worse than it was 2002, under their management and control.

299.    Feigeles and Lehman Brother's branch manager did not contact Mr. Dateshidze by telephone to alert him to the condition of the investment assets to which he entrusted to them to manage and control or verbally verify with him whether he had authorized the trading activity at such an excessive level in his account.

**Q.    Foerster represents to Dr. Glonti, throughout the first half of 2003, his investment assets and those of Mr. Dateshidze, to which they entrusted Lehman Brothers and him, appreciated in value, whereas their investment assets actually plummeted in value.**

300.    In January 2003, relying upon the representations Foerster made in overseas telephone calls to him that his investment assets, and those of Mr. Dateshidze to which they entrusted to Lehman Brothers and him, appreciated 20%-22%, and indeed, being told by Foerster that his investment assets then had a value of at least $2.2 million, Dr. Glonti transferred $127,600 worth of securities from an account in Switzerland to entrust to Lehman Brothers and Foerster.

301.    Lehman Brothers and Foerster immediately traded these securities, converting them to cash so as to purchase stock and to continue to excessively trade in Dr. Glonti's account without his authorization.

**1.    Dr. Glonti's investment assets lose value.**

302.    Because of the unauthorized and excessive trading of stocks by Lehman Brothers and Foerster in Dr. Glonti's account, they earned approximately $46,924 in commission revenues, in little more than five months, in 2003.

303.    In just five months of activity, in 2003, the annualized turnover rate (the total cost of purchases of stock made in Dr. Glonti's account during the period to the amount he invested) was 23.4.

304.    It is permissible to conclude excessive trading in an account if the annualized turnover rate exceeds 6, and the annualized turnover rate of Dr. Glonti's account was quadrupled of that which is conclusively presumed to be excessive.

65

305.   Excessive trading in an account is also measured as the percentage of return on the investor's average net-equity needed in order to pay the stockbroker's commission and other expenses, the "cost/equity maintenance factor."

306    Based on this determination, Dr. Glonti would had to have earned a profit of 94% in his account simply to cover costs of the commissions with which he was charged by Lehman Brothers and Foerster.  In other words, just to break-even, he would had to have earned such a profit.

307.   Dr. Glonti could not recover this unauthorized cost because the investment assets he entrusted to Lehman Brothers and Foerster to manage did not appreciate, but lost more value, resulting in an out-of-pocket loss to Dr. Glonti.

308.   Feigeles and Lehman Brother's branch manager did not contact Dr. Glonti by telephone to alert him to the condition of the investment assets to which he entrusted to them to manage and control or verbally verify with him whether he had authorized the trading activity at such an excessive level in his account.

2.    **Mr. Dateshidze's investment assets lose value.**

309.   The investment assets Mr. Dateshidze entrusted to Lehman Brothers and Foerster to manage and control were quickly dissipated because of unauthorized and excessive trading of stocks in his account by them.

310.   Mr. Dateshidze's loss was directly attributable to the unauthorized and excessive trading of stock in his account by Lehman Brothers and Foerster and their substantial commission charges associated with their trading activity.

311.   Because of the unauthorized and excessive trading of stocks by

66

Lehman Brothers and Foerster in Mr. Dateshidze's account, they earned approximately $49,567 in commission revenues in just 5 months.

312.   The annualized turnover rate (the total cost of purchases of stock made in Mr. Dateshidze's account during the period to the amount he invested) was 19.7.

313.   It is permissible to conclude excessive trading in an account if the annualized turnover rate exceeds 6, and the annualized turnover rate of Mr. Dateshidze's account was more than tripled of that which is conclusively presumed to be excessive.

314.   Excessive trading in an account is also measured as the percentage of return on the investor's average net-equity needed in order to pay the stockbroker's commission and other expenses, the "cost/equity maintenance factor."

315.   Based on this determination, Mr. Dateshidze would had to have earned a profit of 98.4% in his account simply to cover costs of the commissions with which he was charged by Lehman Brothers and Foerster.  In other words, just to break-even, he would had to have earned such a profit.

316.   Mr. Dateshidze could not recover this unauthorized cost because the investment assets he entrusted to Lehman Brothers and Foerster to manage did not appreciate, but lost their value, resulting in an out-of-pocket loss to him.

317.   Feigeles and Lehman Brother's branch manager did not contact Mr. Dateshidze by telephone to alert him to the condition of the investment assets to which he entrusted to them to manage and control or verbally verify with him whether he had authorized the trading activity at such an excessive level in his

67

account.

**R.    The turnover rate of the accounts of Dr. Glonti and Mr. Dateshidze during the period they entrusted their investment assets to Lehman Brothers and Foerster to manage and control show the trading in their accounts to be excessive.**

**1.    The turnover rate in Dr. Glonti's account is excessive.**

318.    The annualized turnover rate (the total cost of purchases of stock made in Dr. Glonti's account throughout the entire period during which he entrusted his investment assets to Lehman Brothers to the amount he invested) was 6.

319.    It is permissible to conclude excessive trading in an account when the annualized turnover rate exceeds 6, but it is presumed to be excessive at this level, and the annualized turnover rate of stock in Dr. Glonti's account equals the rate for which trading is concluded to be excessive.

320.    The commission revenues Lehman Brothers and Foerster generated because of unauthorized and excessive trading of stock in Dr. Glonti's account accounted for more than 21% of the funds Dr. Glonti originally entrusted to Lehman Brothers and Foerster to manage and control.

321.    Thus, just to break-even, Dr. Glonti would had to have earned a profit of, at least, 21% to cover the commission costs with which Lehman Brothers and Foerster charged his account for their trading of stock in his account.

322.    Dr. Glonti, however, did not earn any profit, but lost approximately 87% of the value of the investment assets he entrusted to Lehman Brothers and Foerster.

2.    **The turnover rate in Mr. Dateshidze's account is excessive.**

323.    The annualized turnover rate (the total cost of purchases of stock made in Mr. Dateshidze's account throughout the entire period during which he entrusted his investment assets to Lehman Brothers to the amount he invested) was 21.7.

324.    It is permissible to conclude excessive trading in an account if the annualized turnover rate exceeds 6, and the annualized turnover rate of Mr. Dateshidze's account was almost quadrupled of that which is conclusively presumed to be excessive.

325.    The commission revenues Lehman Brothers and Foerster generated because of unauthorized and excessive trading of stock in Mr. Dateshidze's account accounted for more than 44% of the funds Mr. Dateshidze originally entrusted to Lehman Brothers and Foerster to manage and control.

326.    Thus, just to break-even, Mr. Dateshidze would had to have earned a profit of, at least, 44% to cover the commission costs with which Lehman Brothers and Foerster charged his account for their trading of stock in his account.

327.    Mr. Dateshidze, however, did not earn any profit, but lost approximately 54 % of the value of the investment assets he entrusted to Lehman Brothers and Foerster.

S.    **Foerster forges Lehman Brother account statements to make it appear Dr. Glonti has sufficient cash assets available to him to use.**

328.    In addition to misrepresenting to Dr. Glonti and Mr. Dateshidze the performance of the investment assets they had entrusted to Lehman Brothers and

69

him to manage and control, Foerster concealed from Dr. Glonti and Mr. Dateshidze they had suffered significant and substantial losses because of trading in stock in their accounts by Lehman Brothers and Foerster by fabricating account statements and transmitting such to them.

329.   Dr. Glonti, in anticipation of traveling with his family to London from Tbilisi, telephoned Foerster, in or about April 2003, to request from him a copy of his account statement showing his available cash balance which he could then show to authorities in England in order to receive a visa from them to travel to London.

330.   If Foerster were, however, to disclose to Dr. Glonti his most recent account statement showing the cash balance then available to him, it would show there was no cash available to him and, indeed, he had a debit balance of more than $62,000.

331.   Thus, if Foerster would have disclosed this page of the statement to Dr. Glonti, it would cause him to raise questions about his account and that of Mr. Dateshidze, and which then would reveal that Lehman Brothers and Foerster traded stocks excessively in their accounts and without their authorization.

332.   Foerster, thereupon, used Dr. Glonti's March 2002 statement that showed more than $86,000 of cash readily available to him in his account and made it appear to be his March 2003 statement.

333.   Foerster then caused to have the statement which he fabricated transmitted it overseas to Dr. Glonti by facsimile on May 1, 2003.

334.   At or about this time, Foerster placed an overseas telephone call to Dr.

Glonti and represented to him that his investment assets to which he entrusted Lehman Brothers and him to manage and control appreciated in value to $2.3 million.

**T.    Lehman Brothers terminates Foerster's employment and, immediately afterwards, RBC Dain Rauscher employs Foerster, paying him a substantial starting bonus which, in part, was determined on the basis of the commissions that Lehman Brothers charged Dr. Glonti and Mr. Dateshidze.**

335.    Immediately after Lehman Brothers terminated its employment of Foerster, RBC Dain Rauscher employed him.

336.    RBC Dain Rauscher, in the previous year, acquired the stock brokerage business of Tucker Anthony Sutro to increase its commission revenues.

337.    With the addition of Foerster, RBC Dain Rauscher sought to increase its revenues with the commissions Foerster showed it that he could generate for it based on the commission revenues his business produced for Lehman Brothers.

338.    RBC Dain Rauscher, to lure Foerster to join it, promised him he would receive an immediate cash bonus on joining the firm.

339.    RBC Dain Rauscher and Foerster agreed this bonus would be determined on the basis of the commission revenues he generated for Lehman Brothers during the last twelve months in which he was employed by it.

340.    Foerster's unauthorized and excessive trading of stock in the accounts of Dr. Glonti and Mr. Dateshidze, at Lehman Brothers, in the previous 12 months generated commission revenues of $331,724.

341.    The commission revenues Foerster generated from trading stock in the

71

accounts of Dr. Glonti and Mr. Dateshidze served as a significant basis on which RBC Dain Rauscher determined the starting bonus it would pay Foerster.

342.   On information and belief, Foerster received a starting bonus from RBC Dain Rauscher of between $270,000 and $350,000.

343.   Indeed, Foerster possibly accelerated the unauthorized trading of stock in the accounts of Dr. Glonti and Mr. Dateshidze in anticipation he would leave Lehman Brothers to join another firm and would receive a starting bonus from such firm based on the commission revenues he generated for Lehman Brothers in the previous 12 months.

344.   And in anticipation of his move from Lehman Brothers to another investment firm, Foerster sold the stocks he had been trading in the accounts of Dr. Glonti and Mr. Dateshidze so that their accounts were now exclusively in cash, such that he could swiftly move their funds to an investment firm he would join.

**U.    Foerster transfers the investment assets that Dr. Glonti and Mr. Dateshidze had entrusted to Lehman Brothers to RBC Dain Rauscher to manage and control.**

345.   Foerster started his employment with RBC Dain Rauscher, on May 16, 2003.

346.   Shortly afterwards, but no later than May 19, 2003, Foerster telephoned Dr. Glonti, who was in Tbilisi, and told him he had ended his association with Lehman Brothers and had joined RBC Dain Rauscher.

347.   Foerster explained to Dr. Glonti his departure from Lehman Brothers was tied to the departure of his benefactor, Feigeles, from the firm.

348.   Feigeles' departure arose out of problems stemming from Lehman Brothers' acquisition of the private client services department of S.G. Cowen Securities Corporation.

349.   Foerster did not tell Dr. Glonti their departures could be attributed to a general "house cleaning" being done by Lehman Brothers of stock brokers having suspicious or irregular trading activities in accounts they supervised and had been precipitated by the investigation then being conducted by the Securities and Exchange Commission of Lehman Brothers arising out of the firm's failure to properly and adequately supervise the activities of such stock brokers, including Frank Gruttadauria.

350.   In this telephone call that Foerster placed to Dr. Glonti, he instructed Dr. Glonti to authorize him to transfer and entrust to RBC Dain Rauscher his investment account and that of Mr. Dateshidze for this firm and him then to manage and control as Lehman Brothers and he previously managed and controlled the investment assets they had entrusted to them.

351.   During this telephone call, Foerster represented to Dr. Glonti his investment assets had appreciated in value and his account was worth $2.3 million.

352.   And in the same telephone call, Foerster represented to Dr. Glonti that Mr. Dateshidze's investment assets appreciated in value and his account was now worth $550,000.

353.   In reliance upon that which Foerster told him and out of the deep friendship he developed for Foerster, Dr. Glonti instructed Foerster to transfer his

73

account and that of Mr. Dateshidze to RBC Dain Rauscher, but that Foerster should

not have Lehman Brothers close-out his account with it because he intended to

continue to utilize the credit card associated with his account there.

354.   Dr. Glonti repeated the instructions to Foerster he had given before to

him and directed RBC Dain Rauscher and he follow these instructions covering the

investment assets he and Mr. Dateshidze intended to entrust to them – under no

circumstance should RBC Dain Rauscher and Foerster place more than 35% of his

investment assets in stocks or borrow any money on his behalf to purchase stocks,

and if the overall stock investments they made lost 10% of their value, they should

stop all activity and contact him so he could consult with them on the direction they

should thereafter take.

355.   Foerster thereupon represented RBC Dain Rauscher and he would

follow the instructions Dr. Glonti had just given the firm and him.

356.   Foerster did not disclose to Dr. Glonti or Mr. Dateshidze, nor did RBC

Dain Rauscher disclose to them, the firm paid Foerster a significant and substantial

bonus to join the firm and the bonus was, in part, associated with the substantial

commission charges to them because of Foerster excessively trading stock, without

their authorization, in their accounts at Lehman Brothers over the previous 12

months.

**V.    Foerster arranges for Dr. Glonti and Mr. Dateshidze to open
       accounts with RBC Dain Rauscher which the firm and him will
       manage and control.**

357.   Beginning, on or about May 19, 2003, Foerster started to transmit to

74

Dr. Glonti and Mr. Dateshidze, in Tbilisi, Georgia, by facsimile, forms for them to

sign to open their accounts with at RBC Dain Rauscher.

358.    Knowing Dr. Glonti's capability to read in the English language to be

severely limited and knowing full well Mr. Dateshidze could not read in the English

language at all, Foerster did not transmit to them the account opening documents

in their entirety, but transmitted blank pages of the account opening documents on

where there was space provided for their signature.

359.    Foerster told Dr. Glonti and Mr. Dateshidze the material he had

transmitted to them was a "mere formality" associated with opening an account at

RBC Dain Rauscher, and Foerster instructed them to pay attention on each page to

only the space provided for their signature and he indicated on each such page the

place at which they should sign.

**W.    Foerster thereafter forges the signatures of Dr. Glonti and Mr. Dateshidze to opening account documents and misrepresents critical contact information and investment objectives for them, and RBC Dain Rauscher fails to verbally verify with Dr. Glonti and Mr. Dateshidze the accuracy of such critical information about them.**

360.    Afterwards, Foerster forged the signatures of Dr. Glonti and Mr.

Dateshidze on account opening documents and misrepresented on these documents

and on other forms he filled-out their investment experience and objectives (risk

tolerance), net worth, liquid assets, annual income and the length of years they

knew Foerster.

361.    Foerster initially represented on these forms Dr. Glonti to have

"extensive" investment experience, his investment objectives to be "aggressive growth," his net worth to be "$10 million," his liquid assets to be more than "$5 million," his annual income to be between "$500,000 and $999,999," and Dr. Glonti knew him for as long as "8 years."

362.   Foerster then represented Dr. Glonti to be in the "16%-28%" estimated tax bracket.

363.   And Foerster initially represented on these forms Mr. Dateshidze to have "high" investment experience, his investment objectives to be "growth (aggressive)," his net worth to be "$5 million," his liquid assets to be more than "$2 million," his annual income to be "$200,000," and Mr. Dateshidze knew him for "4 years."

364.   Foerster then represented Mr. Dateshidze to be in the "26%-28%" estimated tax bracket.

365.   And on such documents, Foerster misidentified critical contact information for Dr. Glonti and Mr. Dateshidze in Tbilisi, Georgia, giving their incorrect telephone numbers and addresses.

366.   RBC Dain Rauscher did not afterwards contact either Dr. Glonti or Mr. Dateshidze to verbally verify with them whether the information reported about them to be the truth, though notations and inconsistent information reported on the forms were sufficient to raise RBC Dain Rauscher's suspicions about that which was reported by Foerster.

367.   Foerster also prepared documentation to show the addresses at which

RBC Dain Rauscher should deliver the statements of account of Dr. Glonti and Mr. Dateshidze and with which to correspond with them to be that of his wife's parents (who also had an account at RBC Dain Rauscher) – 88 Genessee Boulevard, Atlantic Beach, NY 11509.

368.   RBC Dain Rauscher did not contact either Dr. Glonti or Mr. Dateshidze to verbally verify with them whether this was the correct address at which their account statements were to be delivered and at which RBC Dain Rauscher was to correspond with them.

369.   And Foerster secured for Dr. Glonti and Mr. Dateshidze, the latter without his authorization and by forging his signature, credit cards and giving the address of the accounts to be that of Foerster's wife's parents – 88 Genessee Boulevard, Atlantic Beach, NY 11509, and directions for the credit cards to be mailed to this address.

370.   RBC Dain Rauscher did not contact Mr. Dateshidze to verbally verify with him whether he had authorized a credit card to be issued to him.

371.   After RBC Dain Rauscher issued Mr. Dateshidze a credit card, Foerster obtained this card and used it to make unauthorized cash withdrawals for his personal use.

372.   Foerster next transferred, approximately $167,039, almost the entire balance then in Dr. Glonti's account at Lehman Brothers, to the account he had opened for him at RBC Dain Rauscher.

373.   In anticipation of his move from Lehman Brothers to RBC Dain

Rauscher, Foerster sold, by May 13, 2003, whatever stocks there were in Dr. Glonti's account to assure the investment assets of Dr. Glonti that he transferred from Lehman Brothers to RBC Dain Rauscher were in cash.

374.   RBC Dain Rauscher received, on or about May 27, 2003, the funds Foerster transferred from Dr. Glonti's account.

375.   Foerster also transferred, approximately $196,375, almost the entire balance then in Mr. Dateshidze's account at Lehman Brothers, to the account he had opened for him at RBC Dain Rauscher.

376.   In anticipation of his move from Lehman Brothers to RBC Dain Rauscher, Foerster sold, by May 14, 2003, whatever stocks there were in Mr. Dateshidze's account to assure the investment assets of Mr. Dateshidze that he transferred from Lehman Brothers to RBC Dain Rauscher were in cash.

377.   RBC Dain Rauscher received, on or about May 27, 2003, the funds Foerster transferred from Mr. Dateshidze's account.

**X.     RBC Dain Rauscher and Foerster entice Dr. Glonti and Mr. Dateshidze to entrust additional assets to them to manage and control, thereby denying them the use of such assets to invest elsewhere in profitable business opportunities.**

378.   As Dr. Glonti and Mr. Dateshidze had done with Lehman Brothers, they entrusted their investment assets to RBC Dain Rauscher and Foerster and surrendered to them management and control of their assets.

379.   As Lehman Brothers and Foerster did, RBC Dain Rauscher and Foerster represented the value of the investment assets that Dr. Glonti and Mr.

78

Dateshidze entrusted to them to manage and control continuously appreciated in value month-after-month, from May 2003 through April 2006.

380.   Foerster represented to Dr. Glonti that the investment assets he and Mr. Dateshidze entrusted to RBC Dain Rauscher, appreciated due, in part, to the sales of stock the firm permitted them to acquire in initial public offerings which it sponsored, and he encouraged them to entrust additional assets with the firm to maintain the good relations they had with it.

381.   In response to these representations and in reliance upon their truth, Dr. Glonti and Mr. Dateshidze transferred additional investment assets (Dr. Glonti from his accounts in Switzerland and Mr. Dateshidze from his account in Latvia) to entrust with RBC Dain Rauscher, which they would not have done if RBC Dain Rauscher and Foerster disclosed to them the true condition of their accounts:

a.   in December 2003, Dr. Glonti transferred $500,000, from Switzerland, and then in September 2004, he transferred $1.6 million, from Switzerland, to entrust with RBC Dain Rauscher to manage and control; and

b.   in August 2003, Mr. Dateshidze transferred, from Latvia, $75,000 to entrust to RBC Dain Rauscher to manage and control.

382.   Funds that Dr. Glonti and Mr. Dateshidze would otherwise have used to advance business opportunities in Tbilisi and Moscow, they entrusted to RBC Dain Rauscher and Foerster, in reliance upon the repeated representations by them their investment assets appreciated under the management and control of RBC Dain Rauscher.

79

383.    And when the time came that Dr. Glonti and Mr. Dateshidze specifically needed funds to invest in these business opportunities and they requested RBC Dain Rauscher and Foerster to transfer funds to be used for these business opportunities, these funds were not available to them, because the funds had been depleted through unsuitable, unauthorized and excessive trading and outright theft by RBC Dain Rauscher and Foerster.

384.    Dr. Glonti estimates the lost business opportunity to him to be, at least, $4 million.

385.    Mr. Dateshidze estimates the lost business opportunity to him to exceed $415,000.

**Y.    RBC Dain Rauscher permits unsuitable investments, unauthorized and excessive trading and unauthorized transactions to occur in the accounts to which Dr. Glonti and Mr. Dateshidze entrusted exclusively to it and Foerster to manage and control.**

386.    Notwithstanding the instructions Dr. Glonti gave to RBC Dain Rauscher and Foerster covering that which would be the suitable allocation of the investment assets to which he and Mr. Dateshidze entrusted to them to manage and control, RBC Dain Rauscher and Foerster:

a.    allocated the entire investment assets that he and Mr. Dateshidze entrusted to them in stock;

b.    traded stock in their accounts without their authorization and excessively, and thereafter caused them to lose almost all the investment assets they had entrusted to RBC Dain Rauscher and Foerster, and incur on top of this,

80

Exhibit A

Part 5

$610,510 in transaction and commissions costs for the trades in stock RBC Dain

Rauscher and Foerster transacted in their accounts;

      c.    misrepresented to Dr. Glonti and Mr. Dateshidze the value of

the investment assets they entrusted to them to manage and control;

      d.    made, at least, $971,000 in unauthorized transactions in their

accounts which involved money laundering, for example, (1) unauthorized wire

transfers from Dr. Glonti's account to third parties, (2) unauthorized transfers of

funds from Dr. Glonti's account to Mr. Dateshidze's account, (3) unauthorized

transfers of funds from Dr. Glonti's account to his account at Lehman Brothers, and

(4) unauthorized use of their credit cards whereby unauthorized charges for goods

and services were made thereto and cash withdrawals made therefrom; and

      e.    concealed the aforesaid unlawful activity from Dr. Glonti and

Mr. Dateshidze and misled them, and thereby prevented them from discovering

such activity and reducing the harm it caused them.

      **Z.**    **RBC Dain Rauscher and Foerster encourage Dr. Glonti and Mr. Dateshidze to place their complete trust and confidence in them just as Dr. Glonti and Mr. Dateshidze had placed their trust and confidence in Lehman Brothers and Foerster.**

      **1.**    **RBC Dain Rauscher encourages Foerster to give further reason for Dr. Glonti to believe he can continue, without reservation, to place his complete trust and confidence in them.**

      387.    To disarm Dr. Glonti so that he would not question or doubt the

representations RBC Dain Rauscher and Foerster made about the performance of

the investment assets he and Mr. Dateshidze entrusted to them to manage and

control, Foerster continued, with RBC Dain Rauscher's approval, to lead Dr. Glonti

to believe in the deep friendship he professed to have for him, not only through Dr.

Glonti's annual visits with him, but through travel and vacations he arranged for

them together in London, Italy and elsewhere in Europe, and in some instances for

them and their families together:

      a.    in June 2003, Foerster joined Dr. Glonti and his family for

vacation in London, where he spent his entire time there with Dr. Glonti and his

family;

      b.    from July 20, 2003 through July 26, 2003, Dr. Glonti visited

with Foerster and his family, in New York City, spending his entire time with

Foerster; during which they celebrated with Foerster's wife her birthday at a

restaurant and then attended a rock concert in further celebration; and he again

weekended at the beach with Foerster and his family, at Foerster's wife's parents'

beach property on Long Island;

      c.    from April 21, 2004 through April 25, 2004, Foerster joined Dr.

Glonti in London, where they were inseparable there, dining-out and attending

shows and concerts together;

      d.    in November 2004, Foerster and Dr. Glonti traveled through

Europe together, visiting locations in Holland, Italy, Germany and Switzerland, and

while in Germany they visited with Foerster's brother and mother and stayed with

Foerster's mother at her home, and in Munich, they socialized with Foerster's

friends, and thereafter, Foerster returned with Dr. Glonti to New York City

(unbeknownst to either Dr. Glonti or Mr. Dateshidze, Foerster made unauthorized use of the credit card which he secured for Mr. Dateshidze's account at RBC Dain Rauscher to make cash withdrawals to finance his trip through Europe with Dr. Glonti);

      e.    from November 12, 2004 through November 20, 2004, Dr. Glonti stayed, in New York City, and continued to socialize there with Foerster and Foerster's family, introducing Foerster and his wife to his friends who were visiting there;

      f.    in May 2005, Foerster joined Dr. Glonti and his family, in London, where they were vacationing.  Foerster brought gifts for Dr. Glonti's family, socialized with Dr. Glonti's friends there, played tennis with Dr. Glonti's son, joined Dr. Glonti in playing rounds of golf and went out to restaurants and concerts together (unbeknownst to either Dr. Glonti or Mr. Dateshidze, Foerster made unauthorized use of the credit card which he secured for Mr. Dateshidze's account at RBC Dain Rauscher to make cash withdrawals to finance his trip);

      g.    in July 2005, Foerster and his wife joined Dr. Glonti and his family and vacationed together in Italy, the vacation together was taken, in part, to celebrate Foerster's wife's birthday (unbeknownst to either Dr. Glonti or Mr. Dateshidze, Foerster made unauthorized use of the credit card which he secured for Mr. Dateshidze's account, at RBC Dain Rauscher, to make cash withdrawals to finance his and his wife's trip through Italy with Dr. Glonti and his family); and

      h.    on January 18, 2006 through January 30, 2006, Dr. Glonti

visited New York City, and there, as before, Foerster and Dr. Glonti were inseparable – dining out and attending shows and concerts together.

    **2.**    **RBC Dain Rauscher encourages other of its employees to give reason for Dr. Glonti to believe he can continue, without reservation, to place his complete trust and confidence in RBC Dain Rauscher and Foerster.**

388.    And also to further their purpose, Foerster broadened Dr. Glonti's exposure to RBC Dain Rauscher, introducing him to other employees of the firm, including Vincenzo Turano ("Turano"), and encouraged Dr. Glonti that he could rely on their word without questioning it, just as he came to rely on and trust his word without question:

    a.    in July 2003, while Dr. Glonti was visiting Foerster and his family, Foerster introduced Dr. Glonti to Turano, who worked side-by-side with Foerster and with him shared the same sales assistant, Kimberly Coehlo ("Coehlo"), they became friends, dined-out together and Turano gave Dr. Glonti the nickname "proffessore";

    b.    in November 2004, while Dr. Glonti and Foerster traveled through Europe, they met with Turano, in Lugano, Switzerland, where Turano assisted Dr. Glonti in opening an account for him there at Banque Privee Edmond de Rothschild, S.A.; and

    c.    in July 2005, while Foerster and his wife vacationed with Dr. Glonti and his family in Italy, Turano arranged their travel and hotel accommodations and then for Dr. Glonti and his family to meet his wife and their

84

friends with whom they dined and socialized during their visit.

389.   Although Turano led Dr. Glonti to believe he was his friend, could feel at ease with him and that he could place his complete trust and confidence in him and accept investment directions which he offered him, Turano concealed from and did not disclose to Dr. Glonti that Dr. Glonti put in jeopardy his and Mr. Dateshidze's assets by surrendering their investment assets to Foerster's management and control.

390.   And for the same purpose, Foerster encouraged Dr. Glonti to befriend his sales assistant, Coehlo, who also assisted Turano, which he did and afterwards Coehlo joined Foerster, when she could, when he would meet Dr. Glonti for lunch or after work hours for drinks.

391.   Coehlo would speak regularly with Dr. Glonti when he placed calls to Foerster to inquire about the performance of the investment assets to which he entrusted RBC Dain Rauscher and him to manage and control, and she would communicate with him through "sms" text messaging, extending birthday greetings and other pleasantries and responding to his questions on the whereabouts of Foerster.

392.   And Coehlo maintained contact information for Foerster on the whereabouts of Dr. Glonti when he traveled overseas.

**AA.** **RBC Dain Rauscher and Foerster make unsuitable investments in the accounts of Dr. Glonti and Mr. Dateshidze to which they entrusted them to manage and control and excessively trade stocks in their accounts without their authorization.**

**1.** **RBC Dain Rauscher and Foerster excessively traded stock in Dr. Glonti's account, without his authorization, throughout the entire time he entrusted his account to them to manage and control.**

393.   In just the first 8 months, May 2003 through December 2003, during which RBC Dain Rauscher and Foerster managed and controlled Dr. Glonti's account, their trading activity in stock in his account, had an annualized turnover rate (the total cost of purchases of stock made in Dr. Glonti's account during the period to the amount he invested) of 10.8.

394.   It is permissible to conclude excessive trading in an account when the annualized turnover rate exceeds 6, and the annualized turnover rate of Dr. Glonti's account exceeded by 80% that which is conclusively presumed to be excessive.

395.   Excessive trading in an account is also measured as the percentage of return on the investor's average net-equity needed in order to pay the stockbroker's commission and other expenses, the "cost/equity maintenance factor."

396.   The commissions that RBC Dain Rauscher and Foerster charged Dr. Glonti, during this period, for their unauthorized and excessive trading of stock in his account totaled $63,067.

397.   Because of these charges, Dr. Glonti would have had to have earned a profit of 43.2% in his account simply to cover costs of the commissions with which he was charged by RBC Dain Rauscher and Foerster. In other words, just to break-

even, he would have had to have earned such a profit in his account.

398.  Dr. Glonti could not recover this unauthorized cost because the investment assets he entrusted to RBC Dain Rauscher and Foerster to manage did not appreciate, but lost more value, resulting in an out-of-pocket loss to Dr. Glonti.

399.  Because the trading activity of stock in Dr. Glonti's account by Foerster was so excessive and the commission charges so substantial, RBC Dain Rauscher's internal controls required it to contact Dr. Glonti directly and verbally verify with him that he authorized such trading activity in his account.

400.  RBC Dain Rauscher stated its policy as follows: "We are directed, by firm policy, to contact clients, preferably in person or by telephone, who actively trade their accounts in order to review the activity and make sure that there are no discrepancies."

401.  Therefore, according to RBC Dain Rauscher's policy, either its compliance department or branch manager should have alerted Dr. Glonti to the excessive trading in his account, the significant and substantial commissions with which his account was being charged and the relatively high level of such transaction costs in relation to the equity value of his account, and should have spoken directly with Dr. Glonti to learn from him whether he authorized and approved of such activity and charges.

402.  For example, RBC Dain Rauscher and Foerster reported the trading of stock in the account of Dr. Glonti to have been almost entirely initiated by him, in other words, the purchases and sales of stock in his account they reported were

87

"unsolicited."

403.   If the trades in Dr. Glonti's account were truly "unsolicited," accordingly whenever Dr. Glonti called the firm to trade stock in his account, the compliance or supervisory personnel should then have instructed that his call be directed to them so they could speak with him directly about the trades and other transactions occurring in his account.

404.   Thus, RBC Dain Rauscher should have spoken directly to Dr. Glonti about the excessive trading activity in his account, no later than by July 2003, to determine whether he had authorized such trading activity in his account.

405.   RBC Dain Rauscher, however, did not verbally alert Dr. Glonti to such activity or commission charges then, or thereafter, and thereby permitted unauthorized and excessive trading by Foerster to continue unabated in his account.

406.   In calendar year 2004, during which RBC Dain Rauscher and Foerster managed and controlled Dr. Glonti's account, their trading activity in stock in his account corresponded to the annualized turnover rate (the total cost of purchases of stock made in Dr. Glonti's account during the period to the amount he invested) of 6.3.

407.   It is permissible to conclude excessive trading in an account when the annualized turnover rate exceeds 6, and the annualized turnover rate of Dr. Glonti's account exceeded by 5% that which is conclusively presumed to be excessive.

408.   Excessive trading in an account is also measured as the percentage of

return on the investor's average net-equity needed in order to pay the stockbroker's commission and other expenses, the "cost/equity maintenance factor."

409.    The commissions that RBC Dain Rauscher and Foerster charged Dr. Glonti, during this period, for their unauthorized and excessive trading of stock in his account totaled $263,087.

410.    Because of these charges, Dr. Glonti would have had to have earned a profit of 25.2% in his account simply to cover costs of the commissions with which he was charged by RBC Dain Rauscher and Foerster.  In other words, just to break-even, he would have had to have earned such a profit in his account.

411.    Dr. Glonti could not recover this unauthorized cost because the investment assets he entrusted to RBC Dain Rauscher and Foerster to manage did not appreciate, but lost more value, resulting in an out-of-pocket loss to Dr. Glonti.

412.    And in the first 8 months of 2005, during which RBC Dain Rauscher and Foerster managed and controlled Dr. Glonti's account, their trading activity in stock in his account corresponded to the annualized turnover rate (the total cost of purchases of stock made in Dr. Glonti's account during the period to the amount he invested) of 5.3.

413.    It is permissible to presume excessive trading in an account if the annualized turnover rate exceeds 4, and the annualized turnover rate of Dr. Glonti's account exceeded by 32.5% that which is presumed to be excessive and was just short of that for which it is permissible conclusively to presume excessive trading by 12%.

89

414. Excessive trading in an account is also measured as the percentage of return on the investor's average net-equity needed in order to pay the stockbroker's commission and other expenses, the "cost/equity maintenance factor."

415. The commissions that RBC Dain Rauscher and Foerster charged Dr. Glonti, during this period, for their unauthorized and excessive trading of stock in his account totaled $152,681.

416. Because of these charges, Dr. Glonti would have had to have earned a profit of 21.2% in his account simply to cover costs of the commissions with which he was charged by RBC Dain Rauscher and Foerster. In other words, just to break-even, he would have had to have earned such a profit in his account.

417. Dr. Glonti could not recover this unauthorized cost because the investment assets he entrusted to RBC Dain Rauscher and Foerster to manage did not appreciate, but lost more in value, resulting in an out-of-pocket loss to Dr. Glonti.

**2.    RBC Dain Rauscher and Foerster excessively traded stock in Mr. Dateshidze's account, without his authorization, throughout the entire time he entrusted his account to them to manage and control.**

418. In just the first 8 months, May 2003 through December 2003, during which RBC Dain Rauscher and Foerster managed and controlled Mr. Dateshidze's account, their trading activity in stock in his account, had an annualized turnover rate (the total cost of purchases of stock made in Mr. Dateshidze's account during the period to the amount he invested) of 11.

419.   It is permissible to conclude excessive trading in an account when the annualized turnover rate exceeds 6, and the annualized turnover rate of Mr. Dateshidze's account exceeded by 83% that which is conclusively presumed to be excessive.

420.   Excessive trading in an account is also measured as the percentage of return on the investor's average net-equity needed in order to pay the stockbroker's commission and other expenses, the "cost/equity maintenance factor."

421.   The commissions that RBC Dain Rauscher and Foerster charged Mr. Dateshidze, during this period, for their unauthorized and excessive trading of stock in his account totaled $73,766.

422.   Because of these charges, Mr. Dateshidze would have had to have earned a profit of 44% in his account simply to cover costs of the commissions with which he was charged by RBC Dain Rauscher and Foerster.  In other words, just to break-even, he would have had to have earned such a profit in his account.

423.   Mr. Dateshidze could not recover this unauthorized cost because the investment assets he entrusted to RBC Dain Rauscher and Foerster to manage did not appreciate, but lost more value, resulting in an out-of-pocket loss to Mr. Dateshidze.

424.   Because the trading activity of stock in Mr. Dateshidze's account by Foerster was so excessive and the commission charges so substantial, RBC Dain Rauscher's internal controls required it to contact Mr. Dateshidze directly and verbally verify with him that he authorized such trading activity in his account.

91

425. RBC Dain Rauscher stated its policy as follows: "We are directed, by firm policy, to contact clients, preferably in person or by telephone, who actively trade their accounts in order to review the activity and make sure that there are no discrepancies."

426. Therefore, according to RBC Dain Rauscher's policy, either its compliance department or branch manager should have alerted Mr. Dateshidze to the excessive trading in his account, the significant and substantial commissions with which his account was being charged and the relatively high level of such transaction costs in relation to the equity value of his account and should have spoken directly with Mr. Dateshidze to learn from him whether he authorized and approved of such activity and charges.

427. For example, RBC Dain Rauscher and Foerster reported the trading of stock in the account of Mr. Dateshidze to have been almost entirely initiated by him, in other words, the purchases and sales of stock in his account they reported were "unsolicited."

428. If the trades in Mr. Dateshidze's account were truly "unsolicited," accordingly whenever Mr. Dateshidze called the firm to trade stock in his account, the compliance or supervisory personnel should then have instructed that his call be directed to them so they could speak with him directly about the trades and other transactions occurring in his account.

429. Thus, RBC Dain Rauscher should have spoken directly to Mr. Dateshidze about the excessive trading activity in his account, no later than by July

2003, to determine whether he had authorized such trading activity in his account.

430.  RBC Dain Rauscher, however, did not verbally alert Mr. Dateshidze to such activity or commission charges then, or thereafter, and thereby permitted unauthorized and excessive trading by Foerster to continue unabated in his account.

431.  In calendar year 2004, during which RBC Dain Rauscher and Foerster managed and controlled Mr. Dateshidze's account, their trading activity in stock in his account, the annualized turnover rate (the total cost of purchases of stock made in Mr. Dateshidze's account during the period to the amount he invested) was 6.5.

432.  It is permissible to conclude excessive trading in an account when the annualized turnover rate exceeds 6, and the annualized turnover rate of Mr. Dateshidze's account exceeded by 8.3% that which is conclusively presumed to be excessive.

433.  Excessive trading in an account is also measured as the percentage of return on the investor's average net-equity needed in order to pay the stockbroker's commission and other expenses, the "cost/equity maintenance factor."

434.  The commissions that RBC Dain Rauscher and Foerster charged Mr. Dateshidze, during this period, for their unauthorized and excessive trading of stock in his account totaled $47,345.

435.  Because of these charges, Mr. Dateshidze would have had to have earned a profit of 26% in his account simply to cover costs of the commissions with which he was charged by RBC Dain Rauscher and Foerster.  In other words, just to

break-even, he would have had to have earned such a profit in his account.

436.   Mr. Dateshidze could not recover this unauthorized cost because the investment assets he entrusted to RBC Dain Rauscher and Foerster to manage did not appreciate, but lost more value, resulting in an out-of-pocket loss to Mr. Dateshidze.

> **BB.   RBC Dain Rauscher and Foerster represented the value of the investment assets that Dr. Glonti and Mr. Dateshidze entrusted to them to manage and control continuously appreciated month-after-month, from June 2003 through January 2006.**

437.   In overseas telephone calls placed by either Foerster to Dr. Glonti, or Dr. Glonti to Foerster, Foerster represented:

a.   on June 23, 2003, the investment assets he entrusted to them appreciated and had a value of $2.301 million, and that of Mr. Dateshidze appreciated and had a value of $558,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $140,002, and $164,662, respectively;

b.   on July 7, 2003, the investment assets he entrusted to them appreciated and had a value of $2.312 million, and that of Mr. Dateshidze appreciated and had a value of $567,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $140,002, and $164,662, respectively;

c.   on July 11, 2003, the investment assets he entrusted to them appreciated and had a value of $2.322 million, and that of Mr. Dateshidze

appreciated and had a value of $596,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $140,002, and $164,662, respectively;

      d.    on August 3, 2003, the investment assets he entrusted to them appreciated and had a value of $2.354 million, that of Mr. Dateshidze appreciated and had a value of $606,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $154,567, and $130,614, respectively;

      e.    on August 22, 2003, the investment assets he entrusted to them had a value of $2.352 million, and that of Mr. Dateshidze appreciated and had a value of $682,000 (this increase is, in part, a consequence of the transfer Foerster enticed Mr. Dateshidze to make of $75,000 from his account in Latvia to his account at RBC Dain Rauscher, on the representation Foerster had made of the successful performance of his investment assets); whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $150,830, and $256,460, respectively;

      f.    on September 17, 2003, the investment assets he entrusted to them appreciated and had a value of $2.405 million, and that of Mr. Dateshidze appreciated and had a value of $707,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $150,830, and $256,460, respectively;

      g.    on September 26, 2003, the investment assets he entrusted to

95

them appreciated and had a value of $2.449 million, and that of Mr. Dateshidze had a value of $706,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $144,553, and $247,357, respectively;

      h.    on October 14, 2003, the investment assets he entrusted to them appreciated and had a value of $2.471 million, and that of Mr. Dateshidze appreciated and had a value of $719,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $144,553, and $247,357, respectively;

      i.    on November 12, 2003, the investment assets he entrusted to them appreciated and had a value of $2.488 million, and that of Mr. Dateshidze appreciated and had a value of $719,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $134,402, and $216,736, respectively;

      j.    on December 3, 2003, the investment assets he entrusted to them appreciated and had a value of $2.487 million, and that of Mr. Dateshidze appreciated and had a value of $788,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $123,098, and $201,241, respectively;

      k.    on December 4, 2003, the investment assets he entrusted to them appreciated and had a value of $2.499 million, and that of Mr. Dateshidze had a value of $734,000; whereas RBC Dain Rauscher account statements reported their

investment assets to have a value, at approximately this time, of $123,098, and $201,241, respectively;

l.    on December 12, 2003, the investment assets he entrusted to them appreciated and had a value of $2.516 million, and that of Mr. Dateshidze appreciated and had a value of $741,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $123,098, and $201,241, respectively;

m.    on December 13, 2003, the investment assets he entrusted to them appreciated and had a value of $3.09 million (this increase was in part the consequence of Dr. Glonti transferring from his investment account in Switzerland $500,000 to his account at RBC Dain Rauscher), and that of Mr. Dateshidze appreciated and had a value of $749,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $123,098, and $201,241, respectively;

n.    on December 31, 2003, the investment assets he entrusted to them appreciated and had a value of $3.368 million, and that of Mr. Dateshidze appreciated and had a value of $771,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $638,742, and $200,540, respectively;

o.    on January 15, 2004, the investment assets he entrusted to them appreciated and had a value of $3.440 million, and that of Mr. Dateshidze appreciated and had a value of $778,000; whereas RBC Dain Rauscher account

97

statements reported their investment assets to have a value, at approximately this time, of $638,742, and $200,540, respectively;

  p. on January 23, 2004, the investment assets he entrusted to them appreciated and had a value of $3.489 million, and that of Mr. Dateshidze appreciated and had a value of $779,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $638,742, and $200,540, respectively;

  q. on February 3, 2004, the investment assets he entrusted to them had a value of $3.468 million, and that of Mr. Dateshidze had a value of $778,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $619,582, and $202,641, respectively;

  r. on February 11, 2004, the investment assets he entrusted to them appreciated and had a value of $3.507 million, and that of Mr. Dateshidze appreciated and had a value of $781,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $619,582, and $202,641, respectively;

  s. on March 2, 2004, the investment assets he entrusted to them appreciated and had a value of $3.527 million, and that of Mr. Dateshidze appreciated and had a value of $798,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $600,067, and $197,000, respectively;

  t. on March 12, 2004, the investment assets he entrusted to them

98

appreciated and had a value of $3.572 million, and that of Mr. Dateshidze had a value of $788,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $600,067, and $197,000, respectively;

u.    on April 1, 2004, the investment assets he entrusted to them had a value of $3.565 million, and that of Mr. Dateshidze had a value of $750,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $565,694, and $177,476, respectively;

v.    on April 12, 2004, the investment assets he entrusted to them appreciated and had a value of $3.586 million, and that of Mr. Dateshidze appreciated and had a value of $752,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $600,067, and $197,000, respectively;

w.    on April 20, 2004, the investment assets he entrusted to them appreciated and had a value of $3.637 million, and that of Mr. Dateshidze appreciated and had a value of $803,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $600,067, and $197,000, respectively;

x.    on May 15, 2004, the investment assets he entrusted to them appreciated and had a value of $3.660 million, and that of Mr. Dateshidze had a value of $794,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $476,915, and

$154,196, respectively;

y.    on May 18, 2004, the investment assets he entrusted to them appreciated and had a value of $3.693 million, and that of Mr. Dateshidze appreciated and had a value of $799,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $476,915, and $154,196, respectively;

z.    on May 26, 2004, the investment assets he entrusted to them appreciated and had a value of $3.747 million, and that of Mr. Dateshidze appreciated and had a value of $802,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $452,499, and $149,700, respectively;

aa.    on June 9, 2004, the investment assets he entrusted to them appreciated and had a value of $3.807 million, and that of Mr. Dateshidze appreciated and had a value of $809,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $452,499, and $149,700, respectively;

bb.    on June 15, 2004, the investment assets he entrusted to them appreciated and had a value of $3.812 million, and that of Mr. Dateshidze appreciated and had a value of $811,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $452,499, and $149700, respectively;

cc.    on June 17, 2004, the investment assets he entrusted to them

Exhibit A Part 6

had a value of $3.808 million, and that of Mr. Dateshidze had a value of $811,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $452,499, and $149700, respectively;

dd.    on June 23, 2004, the investment assets he entrusted to them appreciated and had a value of $3.811 million, and that of Mr. Dateshidze appreciated and had a value of $813,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $452,499, and $149,700, respectively;

ee.    on June 30, 2004, the investment assets he entrusted to them appreciated and had a value of $3.824 million, and that of Mr. Dateshidze appreciated and had a value of $818,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $408,604, and $136,629, respectively;

ff.    on July 19, 2004, the investment assets he entrusted to them appreciated and had a value of $3.851 million, and that of Mr. Dateshidze had a value of $812,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $408,604, and $136,629, respectively;

gg.    on August 4, 2004, the investment assets he entrusted to them appreciated and had a value of $3.907 million, and that of Mr. Dateshidze appreciated and had a value of $821,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this

101

time, of $319,942, and $104,439, respectively;

hh.    on August 10, 2004, the investment assets he entrusted to them appreciated and had a value of $3.921 million, and that of Mr. Dateshidze appreciated and had a value of $825,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $319,942, and $104,439, respectively;

ii.    on August 19, 2004, the investment assets he entrusted to them appreciated and had a value of $3.929 million, and that of Mr. Dateshidze had a value of $825,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $319,942, and $104,439, respectively;

jj.    on September 13, 2004, the investment assets he entrusted to them appreciated and had a value of $3.988 million, and that of Mr. Dateshidze appreciated and had a value of $837,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $288,190, and $95,898, respectively;

kk.    on September 21, 2004, the investment assets he entrusted to them appreciated and had a value of $4.037 million, and that of Mr. Dateshidze appreciated and had a value of $839,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $288,190, and $95,898, respectively;

ll.    on September 30, 2004, the investment assets he entrusted to

them appreciated and had a value of $4.108 million, and that of Mr. Dateshidze appreciated and had a value of $846,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $288,190, and $95,898, respectively;

mm.    on October 11, 2004, the investment assets he entrusted to them appreciated and had a value of $5.753 million (this increase is, in part, a consequence of the transfer Foerster enticed Dr. Glonti to make of approximately $1.605 million in cash and stock from his account in Switzerland to his account at RBC Dain Rauscher, on the representation Foerster had made of the successful performance of his investment assets), and that of Mr. Dateshidze appreciated and had a value of $854,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $1,672,976 (this increase in the value of Dr. Glonti's account is a consequence of the transfer by him of approximately $1.605 million in cash and stock from his account in Switzerland to his account at RBC Dain Rauscher), and $98,001, respectively;

nn.    on October 15, 2004, the investment assets he entrusted to them appreciated and had a value of $5.798 million, and that of Mr. Dateshidze had a value of $854,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $1,672,976, and $98,001, respectively;

oo.    on October 18, 2004, the investment assets he entrusted to them appreciated and had a value of $5.841 million, and that of Mr. Dateshidze

103

appreciated and had a value of $862,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $1,672,976, and $98,001, respectively;

pp.    on October 25, 2004, the investment assets he entrusted to them appreciated and had a value of $5.879 million, and that of Mr. Dateshidze appreciated and had a value of $867,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $1,672,976, and $98,001, respectively;

qq.    on October 28, 2004, the investment assets he entrusted to them appreciated and had a value of $5.891 million, and that of Mr. Dateshidze appreciated and had a value of $866,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $1,857,133, and $100,204, respectively;

rr.    on November 4, 2004, the investment assets he entrusted to them appreciated and had a value of $5.948 million, and that of Mr. Dateshidze appreciated and had a value of $870,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $1,857,133, and $100,204, respectively;

ss.    on November 11, 2004, the investment assets he entrusted to them appreciated and had a value of $6.119 million, and that of Mr. Dateshidze appreciated and had a value of $886,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this

104

time, of $1,857,133, and $100,204, respectively;

tt.    on November 15, 2004, the investment assets he entrusted to them appreciated and had a value of $6.135 million, and that of Mr. Dateshidze appreciated and had a value of $891,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $1,857,133, and $100,204, respectively;

uu.    on November 19, 2004, the investment assets he entrusted to them appreciated and had a value of $6.152 million, and that of Mr. Dateshidze had a value of $888,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $1,857,133, and $100,204, respectively;

vv.    on December 1, 2004, the investment assets he entrusted to them appreciated and had a value of $6.172 million, and that of Mr. Dateshidze had a value of $882,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $2,032,229, and $81,689, respectively;

ww.    on December 2, 2004, the investment assets he entrusted to them appreciated and had a value of $6.197 million, and that of Mr. Dateshidze appreciated and had a value of $889,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $2,032,229, and $81,689, respectively;

xx.    on December 9, 2004, the investment assets he entrusted to

105

them had a value of $6.149 million, and that of Mr. Dateshidze appreciated and had a value of $892,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $2,032,229, and $81,689, respectively;

      yy.  on December 20, 2004, the investment assets he entrusted to them appreciated and had a value of $6.238 million, and that of Mr. Dateshidze appreciated and had a value of $908,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $2,032,229, and $81,689, respectively;

      zz.  on December 28, 2004, the investment assets he entrusted to them appreciated and had a value of $6.292 million, and that of Mr. Dateshidze appreciated and had a value of $913,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $1,936,107, and $69,085, respectively;

      aaa.  on December 31, 2004, the investment assets he entrusted to them appreciated and had a value of $6.326 million, and that of Mr. Dateshidze appreciated and had a value of $918,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $1,936,107, and $69,085, respectively;

      bbb.  on January 14, 2005, the investment assets he entrusted to them appreciated and had a value of $6.358 million, and that of Mr. Dateshidze appreciated and had a value of $913,000; whereas RBC Dain Rauscher account

106

statements reported their investment assets to have a value, at approximately this time, of $1,936,107, and $69,085, respectively;

ccc.    on January 26, 2005, the investment assets he entrusted to them appreciated and had a value of $6.367 million, and that of Mr. Dateshidze had a value of $910,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $1,828,407, and $52,269, respectively;

ddd.    on January 31, 2005, the investment assets he entrusted to them appreciated and had a value of $6.384 million, and that of Mr. Dateshidze appreciated and had a value of $913,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $1,828,407, and $52,269, respectively;

eee.    on February 7, 2005, the investment assets he entrusted to them appreciated and had a value of $6.414 million, and that of Mr. Dateshidze appreciated and had a value of $915,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $1,828,407, and $52,269, respectively;

fff.    on February 16, 2005, the investment assets he entrusted to them appreciated and had a value of $6.415 million, and that of Mr. Dateshidze appreciated and had a value of $923,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $1,828,407, and $52,269, respectively;

ggg.    on February 24, 2005, the investment assets he entrusted to them appreciated and had a value of $6.484 million, and that of Mr. Dateshidze had a value of $918,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $1,823,533, and $36,130, respectively;

hhh.    on March 1, 2005, the investment assets he entrusted to them appreciated and had a value of $6.523 million, and that of Mr. Dateshidze appreciated and had a value of $924,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $1,823,533, and $36,130, respectively;

iii.    on March 21, 2005, the investment assets he entrusted to them appreciated and had a value of $6.994 million, and that of Mr. Dateshidze had a value of $508,000 (Foerster explained the reduction in the account to the transfer of $400,000 to Dr. Glonti's account which he then had transferred to Dr. Glonti's account in Switzerland which was thereafter transferred to Mr. Dateshidze in Moscow); whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $1,650,073, and $23,693, respectively;

jjj.    on April 8, 2005, the investment assets he entrusted to them had a value of $6.468 million, and that of Mr. Dateshidze appreciated and had a value of $509,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $1,650,073, and

108

$23,693, respectively;

      kkk.  on May 3, 2005, the investment assets he entrusted to them had a value of $6.355 million, and that of Mr. Dateshidze had a value of $508,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $901,542, and $8,735, respectively;

      lll.  on May 31, 2005, the investment assets he entrusted to them appreciated and had a value of $6.405 million, and that of Mr. Dateshidze appreciated and had a value of $515,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $904,134, and $6,264, respectively;

      mmm. on July 4, 2005, the investment assets he entrusted to them appreciated and had a value of $6.575 million, and that of Mr. Dateshidze appreciated and had a value of $525,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $873,947, and $8,085, respectively;

      nnn.  on August 8, 2005, the investment assets he entrusted to them appreciated and had a value of $6.637 million, and that of Mr. Dateshidze appreciated and had a value of $534,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $812,546, and $8,919, respectively;

      ooo.  on August 22, 2005, the investment assets he entrusted to them appreciated and had a value of $6.705 million, and that of Mr. Dateshidze

appreciated and had a value of $535,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $767,514, and $44.44, respectively;

ppp.    on August 26, 2005, the investment assets he entrusted to them appreciated and had a value of $6.782 million, and that of Mr. Dateshidze had a value of $532,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $767,514, and $44.44, respectively;

qqq.    on October 13, 2005, the investment assets he entrusted to them appreciated and had a value of $7.057 million, and that of Mr. Dateshidze appreciated and had a value of $558,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $759,153, and $8.44, respectively;

rrr.    on December 7, 2005, the investment assets he entrusted to them appreciated and had a value of $7.029 million, and that of Mr. Dateshidze had a value of $558,000; whereas RBC Dain Rauscher account statements reported their investment assets to have a value, at approximately this time, of $537,234, and $8.44, respectively;

sss.    on December 31, 2005, the investment assets he entrusted to them had a value of $6.629 million (this was in recognition of the instruction Dr. Glonti had given Foerster to transfer $400,000 from the account to his account at Banque Privee Edmund de Rothschild, S.A., and Foerster did not represent to him

110

the value of the investment assets to which Mr. Dateshidze had entrusted RBC

Dain Rauscher because earlier Dr. Glonti had instructed Foerster to transfer all the

funds in Mr. Dateshidze's account to his account in Moscow), whereas his RBC Dain

Rauscher account statement reported his investment assets to have a value, at

approximately this time, of $296,911; and

      ttt.   on January 12, 2006, the investment assets he entrusted to

them appreciated and had a value of $6.668 million, whereas his RBC Dain

Rauscher account statement reported his investment assets to have a value, at

approximately this time, of $296,911.

    **CC.  From, at least, June 2004 through April 2006, Foerster
          withdraws more than $971,000 from the accounts of Dr. Glonti
          and Mr. Dateshidze, for his personal use and without their
          authorization, and to which RBC Dain Rauscher is recklessly
          indifferent.**

    438.   Because Foerster continuously represented to Dr. Glonti and Mr.

Dateshidze the investment assets to which they entrusted to RBC Dain Rauscher

and him to manage and control consistently appreciated in value, Dr. Glonti and

Mr. Dateshidze relied upon his representations and continued to entrust their

investment assets to RBC Dain Rauscher and Foerster, and indeed, entrusted more

of their assets to them, removing these funds from accounts that were safely

managed and maintained in Switzerland and elsewhere:

      a.   in December 2003, Dr. Glonti transferred, from Switzerland,

$500,000, and then in September 2004, $1.6 million, to entrust to RBC Dain

Rauscher to manage and control; and

b.    in August 2003, Mr. Dateshidze transferred from Latvia $75,000 to entrust to RBC Dain Rauscher to manage and control.

439.    After Foerster secured these funds from Dr. Glonti and Mr. Dateshidze, he thereafter, made unauthorized use of these funds for his personal use.

440.    In many instances these unauthorized transfers from their accounts were initialed and approved by Michael Tuminello ("Tuminello") (at first RBC Dain Rauscher's assistant branch manager and later senior vice president and assistant complex manager and who exercised supervisory responsibility over Foerster)

441.    Tuminello was recklessly indifferent or willfully blind to the suspicious, irregular, unusual or improper means which Foerster used to effect these transfers and approved them regardless, without first verbally verifying with Dr. Glonti and Mr. Dateshidze they had authorized such transfers.

442.    From June 17, 2004 through April 3, 2006, Foerster made unauthorized withdrawals of approximately $971,000 from the accounts that Dr. Glonti and Mr. Dateshidze had entrusted to the management and control of RBC Dain Rauscher and him:

a.    on June 17, 2004, Foerster used Dr. Glonti's RBC Dain Rauscher-credit card to charge $10,900 to pay for Foerster's children to attend summer camp;

b.    on October 1, 2004, Foerster withdrew $2,400 from Mr. Dateshidze's RBC Dain Rauscher account and wired these funds to the account of

112

"Leonard Resck" at JP Morgan Chase Bank (Tuminello initialed and approved of this transfer);

      c.    throughout October 2004, Foerster used Dr. Glonti's RBC Dain Rauscher issued credit card to purchase $14,717.26 worth of goods and services for his personal use;

      d.    throughout October 2004, Foerster used Mr. Dateshidze's RBC Dain Rauscher issued credit card to withdraw $2,523.00 in cash for his personal use;

      e.    throughout November 2004, Foerster used Dr. Glonti's RBC Dain Rauscher issued credit card to purchase $5,163.17 worth of goods and services for his personal use;

      f.    throughout November 2004, Foerster used Mr. Dateshidze's RBC Dain Rauscher issued credit card to withdraw $14,680.23 in cash for his personal use (a substantial portion of the cash withdrawals that Foerster made using Mr. Dateshidze's credit card occurred overseas while Foerster was traveling in Germany and Switzerland);

      g.    throughout December 2004, Foerster used Dr. Glonti's RBC Dain Rauscher issued credit card to purchase $7,840.26 worth of goods and services for his personal use;

      h.    throughout December 2004, Foerster used Mr. Dateshidze's RBC Dain Rauscher issued credit card to withdraw $12,856.50 in cash for his personal use;

113

          i.      throughout January 2005, Foerster used Dr. Glonti's RBC Dain Rauscher issued credit card to purchase $3,532.68 worth of goods and services for his personal use;

          j.      throughout January 2005, Foerster used Mr. Dateshidze's RBC Dain Rauscher issued credit card to withdraw $12,552.00 in cash for his personal use;

          k.      throughout February 2005, Foerster used Dr. Glonti's RBC Dain Rauscher issued credit card to purchase $2,356.86 worth of goods and services for his personal use;

          l.      throughout February 2005, Foerster used Mr. Dateshidze's RBC Dain Rauscher issued credit card to withdraw $8,542.00 in cash for his personal use;

          m.      throughout March 2005, Foerster used Dr. Glonti's RBC Dain Rauscher issued credit card to purchase $9,516.87 worth of goods and services for his personal use;

          n.      throughout March 2005, Foerster used Mr. Dateshidze's RBC Dain Rauscher issued credit card to withdraw $11,889.60 in cash for his personal use;

          o.      on April 14, 2005, Dr. Glonti wired transferred $400,000 from his account to Banque Privee Edmund de Rothschild, S.A., in Switzerland, on the basis of Foerster's representation to him that the funds he had just transferred originated from Mr. Dateshidze's account, whereas there were insufficient funds in

114

Mr. Dateshidze's account for him to transfer;

      p.    throughout April 2005, Foerster used Dr. Glonti's RBC Dain Rauscher issued credit card to purchase $553.53 worth of goods and services for his personal use;

      q.    throughout April 2005, Foerster used Mr. Dateshidze's RBC Dain Rauscher issued credit card to withdraw $11,582.40 in cash for his personal use;

      r.    on May 18, 2005, Foerster withdrew $8,000 from Dr. Glonti's RBC Dain Rauscher account and deposited these funds in Mr. Dateshidze's RBC Dain Rauscher account;

      s.    on May 18, 2005, Foerster withdrew $15,000 from Dr. Glonti's RBC Dain Rauscher account and transferred these funds to Dr. Glonti's Lehman Brothers account, which thereafter Foerster entirely used, in August 2005, for purposes of making cash withdrawals and to purchase goods and services for his personal use, in the amount of $13,234.75, through Dr. Glonti's Lehman Brothers credit card;

      t.    throughout May 2005, Foerster used Dr. Glonti's RBC Dain Rauscher issued credit card to purchase $20,505.04 worth of goods and services for his personal use;

      u.    throughout May 2005, Foerster used Mr. Dateshidze's RBC Dain Rauscher issued credit card to withdraw $11,512.94 in cash for his personal use (a substantial portion of the cash withdrawals which Foerster made using Mr.

Dateshidze's credit card occurred overseas while Foerster was staying in London), the funds Forester withdrew from Dr. Glonti's account, on May 18, 2005, and then deposited in Mr. Dateshidze's account, were used to cover the cash withdrawals Foerster made during May 2005 from this account;

v.    on June 13, 2005, Foerster withdrew $9,000 from Dr. Glonti's RBC Dain Rauscher account and deposited these funds in Mr. Dateshidze's RBC Dain Rauscher account;

w.    on June 18, 2005, Foerster withdrew $8,500 from Dr. Glonti's RBC Dain Rauscher account and deposited these funds in Mr. Dateshidze's RBC Dain Rauscher account;

x.    throughout June 2005, Foerster used Dr. Glonti's RBC Dain Rauscher issued credit card to purchase $16,086.17 worth of goods and services for his personal use;

y.    throughout June 2005, Foerster used Mr. Dateshidze's RBC Dain Rauscher issued credit card to withdraw $15,689.90 in cash for his personal use, the funds Forester withdrew from Dr. Glonti's account on June 13 and 18, 2005, and deposited in Mr. Dateshidze's account, were used to cover the cash withdrawals Foerster made during June 2005 from this account;

z.    on July 12, 2005, Foerster withdrew $8,500 from Dr. Glonti's RBC Dain Rauscher account and deposited these funds in Mr. Dateshidze's RBC Dain Rauscher account;

aa.    on July 12, 2005, Foerster withdrew $6,500 from Dr. Glonti's

RBC Dain Rauscher account and transferred these funds to Dr. Glonti's Lehman Brothers account, which thereafter Foerster entirely used, in September 2005, for purposes of making cash withdrawals and to purchase goods and services for his personal use, in the amount of $29,660.01, through Dr. Glonti's Lehman Brothers credit card;

      bb.    on July 19, 2005, Foerster withdrew $6,500 from Dr. Glonti's RBC Dain Rauscher account and deposited these funds in Mr. Dateshidze's RBC Dain Rauscher account;

      cc.    on July 25, 2005, Foerster withdrew $6,500 from Dr. Glonti's RBC Dain Rauscher account and deposited these funds in Mr. Dateshidze's RBC Dain Rauscher account (this transfer was effected by him while he was overseas in Italy by wire instructions from there to the United States);

      dd.    throughout July 2005, Foerster used Dr. Glonti's RBC Dain Rauscher issued credit card to purchase $11,446.85 worth of goods and services for his personal use;

      ee.    throughout July 2005, Foerster used Mr. Dateshidze's RBC Dain Rauscher issued credit card to withdraw $19,857.63 in cash for his personal use (a substantial portion of the cash withdrawals Foerster made using Mr. Dateshidze's credit card occurred overseas while Foerster was traveling throughout Italy with his wife), the funds Forester withdrew from Dr. Glonti's account on July 12, 19 and 25, 2005, and deposited in Mr. Dateshidze's account were used to cover the cash withdrawals Foerster made during July 2005 from this account, and the funds he

117

transferred by Foerster, on July 25, 2005, from Dr. Glonti's account to Mr. Dateshidze's account effected by him while he was overseas in Italy by wire instructions from there to the United States;

ff.     on August 11, 2005, Foerster withdrew $6,500 from Dr. Glonti's RBC Dain Rauscher account and deposited these funds in Mr. Dateshidze's RBC Dain Rauscher account;

gg.     on August 26, 2005, Foerster withdrew $50,000 from Dr. Glonti's RBC Dain Rauscher account and transferred these funds to Dr. Glonti's Lehman Brothers account (Tuminello initialed and approved of this transfer), which thereafter Foerster used, in September 2005 and October 2005, for purposes of making cash withdrawals and to purchase goods and services for his personal use, in the amount of $47,231.42, through Dr. Glonti's Lehman Brothers credit card;

hh.     throughout August 2005, Foerster used Dr. Glonti's RBC Dain Rauscher issued credit card to purchase $8,899.88 worth of goods and services for his personal use;

ii.     throughout August 2005, Foerster used Mr. Dateshidze's RBC Dain Rauscher issued credit card to withdraw $15,384.33 in cash for his personal use, the funds Forester withdrew from Dr. Glonti's account on July 25, 2005 and August 11, 2005, and deposited in Mr. Dateshidze's account were used to cover the cash withdrawals Foerster made during August 2005 from this account;

jj.     on September 19, 2004, Foerster withdrew $9,186.50 from Dr. Glonti's RBC Dain Rauscher account and wired these funds to the account of

118

"Sophie Dimopoulou" at Natwest Bank UK. She is Foerster's sister-in-law, living then in London with his brother (Tuminello initialed and approved of this transfer);

      kk.    throughout September 2005, Foerster used Dr. Glonti's RBC Dain Rauscher issued credit card to purchase $8,391.12 worth of goods and services for his personal use;

      ll.    on October 24, 2005, Foerster withdrew $4,800 from Dr. Glonti's RBC Dain Rauscher account and wired these funds to the account of "Leonard Resck" at JP Morgan Chase Bank;

      mm.   on October 31, 2005, Foerster withdrew $4,800 from Dr. Glonti's RBC Dain Rauscher account and wired these funds to the account of "Leonard Resck" at JP Morgan Chase Bank;

      nn.    throughout October 2005, Foerster used Dr. Glonti's RBC Dain Rauscher issued credit card to purchase $399.99 worth of goods and services for his personal use;

      oo.    on November 4, 2005, Foerster withdrew $4,800 from Dr. Glonti's RBC Dain Rauscher account and wired these funds to the account of "Leonard Resck" at JP Morgan Chase Bank;

      pp.    on November 9, 2005, Foerster withdrew $5,800 from Dr. Glonti's RBC Dain Rauscher account and wired these funds to the account of "Leonard Resck" at JP Morgan Chase Bank;

      qq.    on November 15, 2005, Foerster withdrew $4,800 from Dr. Glonti's RBC Dain Rauscher account and wired these funds to the account of "Lucia

Zanatta" at CitiBank, Miami, Florida;

rr.    on November 15, 2005, Foerster withdrew $5,800 from Dr. Glonti's RBC Dain Rauscher account and wired these funds to the account of "Leonard Resck" at JP Morgan Chase Bank;

ss.    on November 18, 2005, Foerster withdrew $4,800 from Dr. Glonti's RBC Dain Rauscher account and wired these funds to the account of "Lucia Zanatta" at CitiBank, Miami, Florida;

tt.    on November 18, 2005, Foerster withdrew $5,800 from Dr. Glonti's RBC Dain Rauscher account and wired these funds to the account of "Leonard Resck" at JP Morgan Chase Bank;

uu.    on November 23, 2005, Foerster withdrew $4,800 from Dr. Glonti's RBC Dain Rauscher account and wired these funds to the account of "Lucia Zanatta" at CitiBank, Miami, Florida (Tuminello initialed and approved of this transfer);

vv.    on November 23, 2005, Foerster withdrew $5,800 from Dr. Glonti's RBC Dain Rauscher account and wired these funds to the account of "Leonard Resck" at JP Morgan Chase Bank (Tuminello initialed and approved of this transfer);

ww.    throughout November 2005, Foerster used Dr. Glonti's RBC Dain Rauscher issued credit card to purchase $34.99 worth of goods and services for his personal use;

xx.    on December 1, 2005, Foerster withdrew $4,800 from Dr.

120

Exhibit A

Part 7

Glonti's RBC Dain Rauscher account and wired these funds to the account of "Lucia

Zanatta" at CitiBank, Miami, Florida;

      yy.   on December 1, 2005, Foerster withdrew $5,800 from Dr.

Glonti's RBC Dain Rauscher account and wired these funds to the account of

"Leonard Resck" at JP Morgan Chase Bank;

      zz.   on December 6, 2005, Foerster withdrew $4,800 from Dr.

Glonti's RBC Dain Rauscher account and wired these funds to the account of "Lucia

Zanatta" at CitiBank, Miami, Florida;

      aaa.   on December 6, 2005, Foerster withdrew $5,800 from Dr.

Glonti's RBC Dain Rauscher account and wired these funds to the account of

"Leonard Resck" at JP Morgan Chase Bank;

      bbb.   on December 12, 2005, Foerster withdrew $4,800 from Dr.

Glonti's RBC Dain Rauscher account and wired these funds to the account of "Lucia

Zanatta" at CitiBank, Miami, Florida;

      ccc.   on December 12, 2005, Foerster withdrew $5,800 from Dr.

Glonti's RBC Dain Rauscher account and wired these funds to the account of

"Leonard Resck" at JP Morgan Chase Bank;

      ddd.   on December 16, 2005, Foerster withdrew $4,800 from Dr.

Glonti's RBC Dain Rauscher account and wired these funds to the account of "Lucia

Zanatta" at CitiBank, Miami, Florida;

      eee.   on December 21, 2005, Foerster withdrew $5,800 from Dr.

Glonti's RBC Dain Rauscher account and wired these funds to the account of

"Leonard Resck" at Bank of America;

      fff.    on December 21, 2005, Foerster withdrew $5,800 from Dr. Glonti's RBC Dain Rauscher account and wired these funds to the account of "Lucia Zanatta" at CitiBank, Miami, Florida;

      ggg.    throughout December 2005, Foerster used Dr. Glonti's RBC Dain Rauscher issued credit card to purchase $34.99 worth of goods and services for his personal use;

      hhh.    on January 9, 2006, Foerster withdrew $5,800 from Dr. Glonti's RBC Dain Rauscher account and wired these funds to the account of "Lucia Zanatta" at CitiBank, Miami, Florida (Tuminello initialed and approved of this transfer);

      iii.    on January 9, 2006, Foerster withdrew $5,800 from Dr. Glonti's RBC Dain Rauscher account and wired these funds to the account of "Leonard Resck" at Bank of America (Tuminello initialed and approved of this transfer);

      jjj.    on January 20, 2006, Foerster withdrew $5,800 from Dr. Glonti's RBC Dain Rauscher account and wired these funds to the account of "Leonard Resck" at Bank of America;

      kkk.    on January 20, 2006, Foerster withdrew $5,800 from Dr. Glonti's RBC Dain Rauscher account and wired these funds to the account of "Lucia Zanatta" at CitiBank, Miami, Florida;

      lll.    on January 31, 2006, Foerster withdrew $5,800 from Dr. Glonti's RBC Dain Rauscher account and wired these funds to the account of

"Leonard Resck" at Bank of America;

mmm. on January 31, 2006, Foerster withdrew $5,800 from Dr. Glonti's RBC Dain Rauscher account and wired these funds to the account of "Lucia Zanatta" at CitiBank, Miami, Florida;

nnn.  throughout January 2006, Foerster used Dr. Glonti's RBC Dain Rauscher issued credit card to purchase $34.99 worth of goods and services for his personal use;

ooo.  on February 9, 2006, Foerster withdrew $5,800 from Dr. Glonti's RBC Dain Rauscher account and wired these funds to the account of "Leonard Resck" at Bank of America (Tuminello initialed and approved of this transfer);

ppp.  on February 9, 2006, Foerster withdrew $5,800 from Dr. Glonti's RBC Dain Rauscher account and wired these funds to the account of "Lucia Zanatta" at CitiBank, Miami, Florida (Tuminello initialed and approved of this transfer);

qqq.  on February 23, 2006, Foerster withdrew $5,800 from Dr. Glonti's RBC Dain Rauscher account and wired these funds to the account of "Leonard Resck" at Bank of America (Tuminello initialed and approved of this transfer);

rrr.  on February 23, 2006, Foerster withdrew $5,800 from Dr. Glonti's RBC Dain Rauscher account and wired these funds to the account of "Lucia Zanatta" at CitiBank, Miami, Florida (Tuminello initialed and approved of this transfer);

sss.    throughout February 2006, Foerster used Dr. Glonti's RBC Dain Rauscher issued credit card to purchase $34.99 worth of goods and services for his personal use;

ttt.    on March 3, 2006, Foerster withdrew $5,800 from Dr. Glonti's RBC Dain Rauscher account and wired these funds to the account of "Lucia Zanatta" at CitiBank, Miami, Florida (Tuminello initialed and approved of this transfer);

uuu.    on March 3, 2006, Foerster withdrew $5,800 from Dr. Glonti's RBC Dain Rauscher account and wired these funds to the account of "Leonard Resck" at Bank of America (Tuminello initialed and approved of this transfer);

vvv.    on March 9, 2006, Foerster withdrew $5,800 from Dr. Glonti's RBC Dain Rauscher account and wired these funds to the account of "Lucia Zanatta" at CitiBank, Miami, Florida (Tuminello initialed and approved of this transfer);

www.    on March 9, 2006, Foerster withdrew $5,800 from Dr. Glonti's RBC Dain Rauscher account and wired these funds to the account of "Leonard Resck" at Bank of America (Tuminello initialed and approved of this transfer);

xxx.    on March 16, 2006, Foerster withdrew $5,800 from Dr. Glonti's RBC Dain Rauscher account and wired these funds to the account of "Lucia Zanatta" at CitiBank, Miami, Florida (Tuminello initialed and approved of this transfer);

yyy.    on March 16, 2006, Foerster withdrew $5,800 from Dr. Glonti's

124

RBC Dain Rauscher account and wired these funds to the account of "Leonard Resck" at Bank of America (Tuminello initialed and approved of this transfer);

       zzz.  on March 27, 2006, Foerster withdrew $5,800 from Dr. Glonti's RBC Dain Rauscher account and wired these funds to the account of "Lucia Zanatta" at CitiBank, Miami, Florida (RBC Dain Rauscher's records do not show any person in a supervisory role initialed and approved of this transfer);

       aaaa. on March 27, 2006, Foerster withdrew $5,800 from Dr. Glonti's RBC Dain Rauscher account and wired these funds to the account of "Leonard Resck" at Bank of America (Tuminello initialed and approved of this transfer);

       bbbb. on March 31, 2006, Foerster withdrew $5,800 from Dr. Glonti's RBC Dain Rauscher account and wired these funds to the account of "Lucia Zanatta" at CitiBank, Miami, Florida (Tuminello initialed and approved of this transfer);

       cccc.  on March 31, 2006, Foerster withdrew $5,800 from Dr. Glonti's RBC Dain Rauscher account and wired these funds to the account of "Leonard Resck" at Bank of America (Tuminello initialed and approved of this transfer);

       dddd. throughout March 2006, Foerster used Dr. Glonti's RBC Dain Rauscher issued credit card to purchase $34.99 worth of goods and services for his personal use;

       eeee.  on April 3, 2006, Foerster withdrew $5,800 from Dr. Glonti's RBC Dain Rauscher account and wired these funds to the account of "Lucia Zanatta" at CitiBank, Miami, Florida (Tuminello initialed and approved of this

transfer);

ffff.    on April 3, 2006, Foerster withdrew $5,800 from Dr. Glonti's RBC Dain Rauscher account and wired these funds to the account of "Leonard Resck" at Bank of America (Tuminello initialed and approved of this transfer); and

gggg.  throughout April 2006, Foerster used Dr. Glonti's RBC Dain Rauscher issued credit card to purchase $34.99 worth of goods and services for his personal use.

443.   While Foerster made these unauthorized transfers, Dr. Glonti made repeated requests of him, beginning in Fall 2005, to transfer funds overseas to him and Mr. Dateshidze for which they were in need to advance business opportunities for themselves in Tbilisi and Moscow.

444.   When alerted to this by Dr. Glonti, Foerster delayed transferring these funds to them or denied them these funds entirely, and thereafter increased and accelerated the amount of unauthorized withdrawals he made from Dr. Glonti's account at RBC Dain Rauscher.

**DD.   RBC Dain Rauscher is indifferent to Foerster's unauthorized transactions in the accounts of Dr. Glonti and Mr. Dateshidze and, thereafter, conceals from them Foerster's unauthorized activities in their accounts.**

445.   RBC Dain Rauscher did not exercise adequate and reasonable supervision over Foerster, failed to respond to indicators of misconduct, improper, irregular or suspicious activity by Foerster – "red flags"– and failed to follow-up such indicators, and thereby, because of the negligent, grossly negligent and/or

126

reckless indifference it exhibited under these circumstances, they participated, directly or indirectly, with Foerster in the above-alleged unauthorized transactions.

446.    RBC Dain Rauscher, Tuminello and other RBC Dain Rauscher compliance and supervisory personnel knew from speaking with Foerster, Turnano and Coehlo that Dr. Glonti and Mr. Dateshidze resided outside the United States

447.    The negligent, grossly negligent, reckless indifference and/or willful blindness RBC Dain Rauscher exhibited to the aforesaid suspicious, irregular, unusual and improper conduct of Foerster is shown, in part, when:

a.    RBC Dain Rauscher did not speak with Dr. Glonti and Mr. Dateshidze to verify verbally with them whether they had authorized the facsimile transmissions instructing it to transfer funds from their accounts to third parties.

b.    RBC Dain Rauscher did not speak with Dr. Glonti and Mr. Dateshidze to verify verbally with them whether it was their signatures appearing on the facsimile transmissions instructing it to transfer funds from their accounts to third parties.

c.    RBC Dain Rauscher did not question the authenticity of facsimile transmissions instructing it to transfer funds from their accounts which originated from commercial establishments, such as FedEx Kinko's locations, in close proximity to its office at 1211 Avenue of the Americas, New York, including those facsimile transmissions originating from the FedEx Kinko's store at the ground level of the office building in which it was located, though RBC Dain Rauscher knew that at the times of these transmissions were made Dr. Glonti and

127

Mr. Dateshidze resided outside the United States and thus all facsimile transmissions originating with them would be identified by an overseas telephone number and not telephone numbers with Manhattan "212" area code pre-fixes.

      d.   RBC Dain Rauscher did not question the authenticity of instructions it received for it to transfer funds from the accounts of Dr. Glonti that were made to appear to be facsimile transmissions, but on which did not appear the identity of the location from which the transmission originated.

      e.   RBC Dain Rauschser did not question the systematic pattern of structured transfers of funds from the account of Dr. Glonti to "Leonard Resck" and "Lucia Zanatta." For example, in November 2005, 8 transfers of funds were made from his account to them totaling $42,400; in December 2005, 9 transfers of funds were made from his account to them totaling $48,200; in January 2006, 6 transfers of funds were made from his account totaling $34,800; and in March 2006, 10 transfers of funds were made from his account totaling $58,000.

    448.   When RBC Dain Rauscher specifically learned of Foerster's unlawful conduct and the harm to which it and Foerster caused Dr. Glonti and Mr. Dateshidze, it did not disclose this then to them, but concealed the misconduct of it and Foerster from them.

    449.   RBC Dain Rauscher terminated Foerster's employment with the firm, on April 6, 2006, because of suspicious, irregular and unusual activity by him in the accounts of Dr. Glonti and Mr. Dateshidze.

    450.   RBC Dain Rauscher did not disclose to Dr. Glonti or Mr. Dateshidze

that the firm had terminated Foerster or that the firm had terminated him because of suspicious, irregular and unusual activity by him in their accounts while at the firm, and that RBC Dain Rauscher had undertaken an internal investigation of his activities in their accounts.

451.    RBC Dain Rauscher did not disclose to Dr. Glonti or Mr. Dateshidze the NASD undertook an investigation of it because of suspicious, irregular and unusual activity in their accounts.

452.    And RBC Dain Rauscher instructed its personnel with whom Dr. Glonti communicated, including Turano and Coehlo, that they should not disclose to Dr. Glonti the action the firm took against Foerster or the reasons for such action.

453.    Thereafter, when Dr. Glonti could not reach Foerster at RBC Dain Rauscher (believing him to be employed there) to instruct him to transfer funds from his account and that of Mr. Dateshidze which they urgently needed for purposes of advancing their business opportunities in Tbilisi and Moscow, he then attempted to communicate with Coehlo.

454.    However, Coehlo would not disclose Foerster's absence from RBC Dain Rauscher; nor did Turano tell him of Foerster's absence.

### VII. Fraudulent Concealment

455.    Lehman Brothers and RBC Dain Rauscher by their aforesaid acts disarmed Dr. Glonti and Mr. Dateshidze and lulled them to justifiedly believe the firms managed and controlled the investment assets, to which they had surrendered and exclusively entrusted to them, according to the instructions that Dr. Glonti had

given them.

456.  Dr. Glonti and Mr. Dateshidze trusted and expected Lehman Brothers and RBC Dain Rauscher to act in their best interests and Lehman Brothers and RBC Dain Rauscher gave no reason for Dr. Glonti and Mr. Dateshidze to doubt or question they would.

457.  Lehman Brothers and RBC Dain Rauscher told Dr. Glonti his investment assets and those of Mr. Dateshidze with which they had been entrusted were being well managed and because of their management, their investment assets appreciated in value.

458.  The words spoken and actions taken by Lehman Brothers and RBC Dain Rauscher gave no cause for Dr. Glonti and Mr. Dateshidze to doubt or distrust the assets to which they had entrusted the firms were managed and controlled according to the instructions Dr. Glonti had given them.

459.  By the aforesaid conduct, that is their own wrongdoing, Lehman Brothers and RBC Dain Rauscher deceived Dr. Glonti and Mr. Dateshidze and concealed from them that they (a) made unsuitable investments in their accounts, (b) traded stock in their account excessively and without their authorization, and (c) engaged in unauthorized transactions in their accounts.

460.  Because of the trust and confidence Dr. Glonti and Mr. Dateshidze placed in Lehman Brothers and RBC Dain Rauscher, as fiduciaries, they had a duty to speak and reveal facts to Dr. Glonti and Mr. Dateshidze to show that while they were entrusted exclusively to manage and control their accounts the firms made

130

unsuitable investments, traded stock in their accounts excessively and without their authorization and engaged in unauthorized transactions in their accounts.

461.    Under these circumstances, the silence of Lehman Brothers and RBC Dain Rauscher when they ought to have spoken, or failure to disclose when they ought to have disclosed, prevented Dr. Glonti and Mr. Dateshidze from taking immediate action to perfect their claims.

462.    Dr. Glonti and Mr. Dateshidze could not have discovered their claims against Lehman Brothers and RBC Dain Rauscher because the fraudulent conduct by the firms and Foerster was self-concealing.

463.    Lehman Brothers and RBC Dain Rauscher refused to report to Dr. Glonti and Mr. Dateshidze suspicious, irregular and unusual activities by Foerster in their accounts.

464.    And when RBC Dain Rauscher became aware of the suspicious, irregular and unusual activities of Foerster in the accounts of Dr. Glonti and Mr. Dateshidze, and terminated Foerster's employment with it over such conduct, it did not disclose this as the reason for terminating his employment, but concealed this, representing to the public that Foerster had ended his employment voluntarily.

465.    Lehman Brothers and RBC Dain Rauscher did not attempt to contact Dr. Glonti and Mr. Dateshidze to inform them of Foerster's unlawful activity or to have them verbally verify whether such activity had been authorized by them, because if they had, their actions would have alerted Dr. Glonti and Mr. Dateshidze to claims they had against the firms for failing to properly manage and supervise

131

the investment and trading activity by Foerster in the accounts they had entrusted to the firms.

## VIII. Claims for Relief

### Count I

(Against Lehman Brothers and RBC Dain Rauscher, for violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, arising out of, or in connection with, unsuitable investments and trading, and unauthorized and excessive trading by them in the investment accounts to which Dr. Glonti and Mr. Dateshidze entrusted them)

466.    Plaintiffs, Dr. Glonti and Mr. Dateshidze, repeat as if fully set forth here the allegations in ¶¶1 through 465, above.

467.    At the times alleged in this Complaint, Lehman Brothers and RBC Dain Rauscher, directly and indirectly:

a.    made investments (including the purchase and sale of securities) not suitable to plaintiffs' investment objectives, financial situation and needs, and were in violation of plaintiffs' express instructions and the anti-fraud provisions of the statutes, rules, and regulations cited above;

b.    employed devices, schemes, and artifices to defraud (or in reckless disregard of plaintiffs' investment objectives and/or best interests), including unauthorized and excessive trading of stock (i.e., "churning") in plaintiffs' accounts;

c.    made untrue statements of material fact;

d.    failed to state material facts necessary in order to make the

132

statements made, in light of the circumstances under which they were made, not misleading;

e. engaged in acts, practices, and courses of business that operated as a fraud and deceit on plaintiffs, all as more fully set forth above; and

f. with reckless disregard for the truth, made statements containing misstatements and omissions of material fact as alleged herein.

468. Plaintiffs relied on the statements set forth above in making their investment decisions to entrust their investment assets, including the purchase and sale of securities, exclusively with Lehman Brothers and RBC Dain Rauscher.

469. Had plaintiffs known of the materially adverse information that was not disclosed by Lehman Brothers and RBC Dain Rauscher, they would not have entrusted their investment assets to them and would not have sustained damages.

470. By reason of such wrongful conduct, Lehman Brothers and RBC Dain Rauscher are liable to plaintiffs, for violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, arising out of, or in connection with, unsuitable investments and trading, and unauthorized and excessive trading by them in the investment accounts to which Dr. Glonti and Mr. Dateshidze entrusted them.

471. As a direct and proximate result of their wrongful conduct, plaintiffs suffered damages arising out of, or in connection with, unsuitable investments made and unauthorized and excessive trading in investment accounts to which they entrusted Lehman Brothers and RBC Dain Rauscher to manage and control.

## Count II

(Against Lehman Brothers and RBC Dain Rauscher, for violations of Section 20(a) of the Securities Exchange Act of , 15 U.S.C. §78t(a), arising out of, or in connection with, unsuitable investments and trading, and unauthorized and excessive trading by them in the accounts to which Dr. Glonti and Mr. Dateshidze entrusted to them)

472.    Plaintiffs, Dr. Glonti and Mr. Dateshidze, repeat as if fully set forth here the allegations in ¶¶1 through 465, above.

473.    This Count is asserted against Lehman Brothers and RBC Dain Rauscher and is based on Section 20(a) of the Securities Exchange Act, 15 U.S.C. §78t(a).

474.    Lehman Brothers and RBC Dain Rauscher acted as controlling persons within the meaning of Section 20(a) of the Exchange Act.

475.    By reason of the positions of Lehman Brothers and RBC Dain Rauscher, they had the power and authority to cause or to prevent the wrongful conduct complained of herein.

476.    Notwithstanding, Lehman Brothers and RBC Dain Rauscher knew of "red flags" that were indicative of suspicious, irregular, unusual or improper activities by Foerster in the accounts of Dr. Glonti and Mr. Dateshidze, but which they deliberately, knowingly or intentionally ignored, did not respond or follow-up, or to which they were grossly negligent or recklessly indifferent.

477.    By reason of such wrongful conduct, Lehman Brothers and RBC Dain Rauscher are liable to plaintiffs, pursuant to Section 20(a) of the Exchange Act.

478.    As a direct and proximate result of their wrongful conduct, plaintiffs

suffered damages arising out of, or in connection with, unsuitable investments
made and unauthorized and excessive trading in investment accounts to which they
entrusted Lehman Brothers and RBC Dain Rauscher to manage and control.

### Count III

(Against Lehman Brothers and RBC Dain Rauscher, under principles of respondeat
superior, for violation of Section 10(b) of the Securities Exchange Act of 1934, 15
U.S.C. §78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5,
arising out of, or in connection with, unsuitable investments and trading, and
unauthorized and excessive trading by them in the investment accounts to which
Dr. Glonti and Mr. Dateshidze entrusted them)

479.    Plaintiffs, Dr. Glonti and Mr. Dateshidze repeat as if fully set forth
here the allegations in ¶¶1 through 465, above.

480.    This Count is asserted against Lehman Brothers and RBC Dain
Rauscher  for violations of Section 10(b) of the Securities Exchange Act of 1934, 15
U.S.C. §78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5,
arising out of, or in connection with, unsuitable investments and trading, and
unauthorized and excessive trading by them in the accounts of Dr. Glonti and Mr.
Dateshidze, and for which they are liable to plaintiffs under the doctrine of
respondeat superior.

481.    Lehman Brothers and RBC Dain Rauscher employed Foerster and
throughout their employment of him controlled the means and manner of his work.

482.    During their employment of Foerster, he committed the complained of
violations of the anti-fraud provisions of the statutes, rules, and regulations cited
above, while acting within their effective control and performing work which they

135

had assigned to him that was within the scope of their business and which served and furthered their business purposes.

483.   Lehman Brothers and RBC Dain Rauscher are, therefore, liable to plaintiffs for the complained of harm they suffered because of Foerster's violations of the anti-fraud provisions of the statutes, rules, and regulations cited above, while in their employ and acting within the scope of his employment.

### Count IV

(Against RBC Dain Rauscher, under principles of respondeat superior, for violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1962(c), by Foerster, arising out of, or in connection with, unauthorized, non-securities related transactions by him in the accounts to which Dr. Glonti and Mr. Dateshidze entrusted Lehman Brothers and RBC Dain Rauscher)

484.   Plaintiffs, Dr. Glonti and Mr. Dateshidze, repeat as if fully set forth here the allegations in ¶¶1-5, ¶6(7), (11), (13)-(29), ¶9(8)-(14), (18), ¶10 b, ¶¶12-31, ¶¶40-59, ¶¶66-75, ¶¶335-385, ¶386 c-e, ¶¶387-392, and ¶¶437-465, above.

485.   This Count is asserted against RBC Dain Rauscher for violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1962(c), relating to unauthorized, non-securities related transactions in the accounts of Dr. Glonti and Mr. Dateshidze by Foerster, including unauthorized withdrawals of funds from their accounts by journal entries, wire transfers and unlawful of use their credit cards, and for which it is vicariously liable under principles of respondeat superior.

486.   Foerster is a "person" within the meaning of 18 U.S.C. §§1961(3) and 1962(c).

487.   Foerster, Dr. Glonti and Mr. Dateshidze are an association-in-fact

136

enterprise, within the meaning of 18 U.S.C. §§1961(4) and 1962(c), which engaged in and whose activities affect interstate commerce during, at least, a three year long period, from May 2003 through April 2006.

488.    Alternatively, Dr. Glonti and Mr. Dateshidze are an association-in-fact enterprise, within the meaning of 18 U.S.C. §§1961(4) and 1962(c), which engaged in and whose activities affect interstate commerce during, at least, a three year long period, from May 2003 through April 2006.

489.    Foerster was associated with such enterprise.

490.    Foerster conducted and participated in the conduct of the enterprise's affairs through a pattern of racketeering activity, including through fraudulent misrepresentations, unauthorized withdrawals of funds from accounts by journal entries, wire transfers and unlawful of use their credit cards, for the unlawful purpose of intentionally defrauding Dr. Glonti and Mr. Dateshidze and looting their accounts of funds for his personal use.

491.    Pursuant to and in furtherance of Foerster's scheme to defraud Dr. Glonti and Mr. Dateshidze of money and/or deprive them of rights of honest services, Foerster committed multiple acts relating to:

a.    fraud and related activity in connection with unauthorized use of credit cards, in violation of 18 U.S.C. §1029, as alleged in ¶¶367-371, ¶387 d, f, g, ¶442 a, c-n, p-q, s-u, x, y, aa, dd-ee, gg-ii, kk, nn, ww, ggg, nnn, sss, dddd, gggg;

b.    mail fraud, in violation of 18 U.S.C. §1341, as alleged in ¶¶367-371;

137

    c.     wire fraud, in violation of 18 U.S.C. §1343, as alleged in ¶¶372-375, ¶387 d, f, g, ¶437 a-ttt, ¶¶438-441, ¶442 a-gggg, ¶¶443-454;

    d.     financial institution fraud, in violation of 18 U.S.C. §1344, as alleged in ¶¶372-375, ¶387 d, f, g, ¶437 a-ttt, ¶¶438-441, ¶442 a-gggg, ¶¶443-454;

    e.     money laundering, in violation of 18 U.S.C. §1956, as alleged in ¶¶372-375, ¶387 d, f, g, ¶437 a-ttt, ¶¶438-441, ¶442 a-gggg, ¶¶443-454;

    f.     monetary transactions in property derived from specified unlawful activity, in violation of 18 U.S.C. §1957, as alleged in ¶¶372-375, ¶387 d, f, g, ¶437 a-ttt, ¶¶438-441, ¶442 a-gggg, ¶¶443-454;

    g.     interstate and foreign travel or transportation in aid of racketeering enterprises, in violation of 18 U.S.C. §1952, as alleged in ¶¶372-375, ¶387 d, f, g, ¶437 a-ttt, ¶¶438-441, ¶442 a-gggg, ¶¶443-454; and

    h.     transportation in interstate and foreign commerce of stolen money, in violation of 18 U.S.C. §2314, as alleged in ¶¶372-375, ¶387 d, f, g, ¶437 a-ttt, ¶¶438-441, ¶442 a-gggg, ¶¶443-454.

492.    The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

493.    Foerster conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

494.    As direct and proximate result of Foerster's racketeering activities and violations of 18 U.S.C. § 1962(c), Dr. Glonti and Mr. Dateshidze have been injured

138

in their business and property.

495.    RBC Dain Rauscher employed Foerster and throughout its employment of him controlled the means and manner of his work.

496.    During RBC Dain Rauscher's employment of Foerster, Foerster committed the complained of conduct while acting within their effective control and performing work which they had assigned to him that was within the scope of their business and which served and furthered their business purposes.

497.    RBC Dain Rauscher played an active role along with Foerster in perpetuating the fraud by him in the accounts of Dr. Glonti and Mr. Dateshidze to which it was entrusted exclusively to manage and control and financially benefitted therefrom by maintaining and controlling the accounts during the course of the fraud.

498.    RBC Dain Rauscher was aware of a high probability that Foerster's conduct was unlawful, but acted in deliberate disregard of it.

499.    RBC Dain Rauscher failed to (a) exercise adequate and reasonable supervision over Foerster, (b) follow securities industry's standards and rules by which self-regulatory organizations and the Securities and Exchange Commission expect them to deal with investors and expect them to supervise their brokers, and (c) respond to indicators – "red flags" – of misconduct by Foerster.

500.    RBC Dain Rauscher deliberately, knowingly or intentionally ignored, did not respond or follow-up, or was grossly negligent, or recklessly indifferent, or wilfully blind to "red flags" indicative of suspicious, irregular, unusual or improper

139

activities by Foerster in the accounts of Dr. Glonti and Mr. Dateshidze to which they entrusted RBC Dain Rauscher to manage and control.

### Count V

(Against Lehman Brothers and RBC Dain Rauscher for fraud, arising out of, or in connection with, unsuitable investments, unauthorized and excessive trading, and unauthorized transactions in the investment accounts to which Dr. Glonti and Mr. Dateshidze entrusted them to manage and control)

501.    Plaintiffs, Dr. Glonti and Mr. Dateshidze, repeat as if fully set forth here the allegations in ¶¶1-465, above.

502.    Lehman Brothers and RBC Dain Rauscher represented to Dr. Glonti and Mr. Dateshidze they would manage and control the assets to which they were exclusively entrusted according to Dr. Glonti's instructions, instead Lehman Brothers and RBC Dain Rauscher made unsuitable investments in their accounts, traded stock excessively in their accounts without their authorization and permitted unauthorized transactions in their accounts.

503.    The representations made by Lehman Brothers and RBC Dain Rauscher were a material factor in forming the decision of Dr. Glonti and Mr. Dateshidze to entrust exclusively their investment assets to them to control and manage.

504.    The representations made by Lehman Brothers and RBC Dain Rauscher to Dr. Glonti and Mr. Dateshidze were false.

505.    Lehman Brothers and RBC Dain Rauscher knew that at the time they made their representations to Dr. Glonti and Mr. Dateshidze that they were false or

Exhibit A    Part 8

were made with recklessness as to whether such representations were true or false.

506.    Lehman Brothers and RBC Dain Rauscher made their representations to Dr. Glonti and Mr. Dateshidze with an intent to defraud them and for the purpose of inducing them to rely and to act in reliance upon them.

507.    Dr. Glonti and Mr. Dateshidze were unaware of the falsity of these representations and they acted in reliance upon the truth of these representations and were justified in relying upon them.

508.    As a result of the reliance by Dr. Glonti and Mr. Dateshidze upon the truth of representations Lehman Brothers and RBC Dain Rauscher made to them, they sustained damages directly attributable to their misrepresentations.

### Count VI

(Against Lehman Brothers and RBC Dain Rauscher, under principles of respondeat superior, for fraud, arising out of, or in connection with, unsuitable investments, unauthorized and excessive trading, and unauthorized transactions in the investment accounts to which Dr. Glonti and Mr. Dateshidze entrusted them to manage and control)

509.    Plaintiffs, Dr. Glonti and Mr. Dateshidze, repeat as if fully set forth here the allegations in ¶¶1-465, above.

510.    This Count is asserted against Lehman Brothers and RBC Dain Rauscher for fraud, arising out of, or in connection with, unsuitable investments and trading, unauthorized and excessive trading, and unauthorized transactions by Foerster in the accounts of Dr. Glonti and Mr. Dateshidze, and for which they are liable to plaintiffs under the doctrine of respondeat superior.

511.    Lehman Brothers and RBC Dain Rauscher employed Foerster and

141

throughout their employment of him controlled the means and manner of his work.

512.    During their employment of Foerster, Foerster committed the complained of misconduct while acting within their effective control and performing work which they had assigned to him that was within the scope of their business and which served and furthered their business purposes.

513.    Lehman Brothers and RBC Dain Rauscher are, therefore, liable to plaintiffs for the complained of harm they suffered because of Foerster's fraudulent conduct while in their employ and acting within the scope of his employment.

### Count VII

(Against Lehman Brothers and RBC Dain Rauscher for breach of fiduciary duty, arising out of, or in connection with, unsuitable investments, unauthorized and excessive trading, and unauthorized transactions in the investment accounts to which Dr. Glonti and Mr. Dateshidze entrusted them to manage and control)

514.    Plaintiffs, Dr. Glonti and Mr. Dateshidze repeat as if fully set forth here the allegations in ¶¶1-465, above.

515.    Lehman Brothers and RBC Dain Rauscher had a fiduciary relationship with Dr. Glonti and Mr. Dateshidze.

516.    Dr. Glonti and Mr. Dateshidze placed their trust and confidence in Lehman Brothers and RBC Dain Rauscher, entrusting their investment assets exclusively to the management and control of the firms, and placing entirely in their hands and at their discretion, the selection, purchase and sale of stock in their accounts.

517.    Lehman Brothers and RBC Dain Rauscher therefore owed Dr. Glonti

142

and Mr. Dateshidze a duty of good faith, integrity, loyalty and due care in managing and controlling the investment assets to which they entrusted them.

518.    Specifically, Lehman Brothers and RBC Dain Rauscher were obligated (a) to manage the accounts of Dr. Glonti and Mr. Dateshidze in a manner directly comporting with their needs and objectives and avoid giving advice that was unsound, reckless, ill-formed, or otherwise defective; (b) to keep them informed regarding the changes in the market which affected their interest and act responsively to protect those interests; (c) to keep them informed as to each completed transaction; (d) to explain honestly the practical impact and potential risks of the course of dealing, in their accounts, in which the firms engaged; and (e) not to take unfair advantage of them because of their incapacities.

519.    Lehman Brothers and RBC Dain Rauscher knowingly breached their fiduciary duties that they owed to Dr. Glonti and Mr. Dateshidze.

520.    As a result of the breach of fiduciary duties that Lehman Brothers and RBC Dain Rauscher owed Dr. Glonti and Mr. Dateshidze, they sustained damages directly attributable to such breaches.

### Count VIII

(Against Lehman Brothers and RBC Dain Rauscher, under principles of respondeat superior, for breach of fiduciary duty, arising out of, or in connection with, unsuitable investments, unauthorized and excessive trading, and unauthorized transactions in the investment accounts to which Dr. Glonti and Mr. Dateshidze entrusted them to manage and control)

521.    Plaintiffs, Dr. Glonti and Mr. Dateshidze, repeat as if fully set forth here the allegations in ¶¶1-465, above.

143

522.    This Count is asserted against Lehman Brothers and RBC Dain Rauscher for breach of fiduciary duty, arising out of, or in connection with, unsuitable investments and trading, unauthorized and excessive trading, and unauthorized transactions by Foerster in the accounts of Dr. Glonti and Mr. Dateshidze, and for which they are liable to plaintiffs under the doctrine of respondeat superior.

523.    Lehman Brothers and RBC Dain Rauscher employed Foerster and throughout their employment of him controlled the means and manner of his work.

524.    During their employment of Foerster, Foerster committed the complained of conduct while acting within their effective control and performing work which they had assigned to him that was within the scope of their business and which served and furthered their business purposes.

525.    RBC Dain Rauscher is, therefore, liable to plaintiffs for the complained of harm they suffered because of Foerster's breach of fiduciary duties while in their employ and acting within the scope of his employment.

### Count IX

(Against Lehman Brothers and RBC Dain Rauscher for failure to supervise and control Foerster, arising out of, or in connection with, unsuitable investments, unauthorized and excessive trading, and unauthorized transactions in the investment accounts to which Dr. Glonti and Mr. Dateshidze entrusted them to manage and control)

526.    Plaintiffs, Dr. Glonti and Mr. Dateshidze, repeat as if fully set forth here the allegations in ¶¶1-465, above.

527.    Lehman Brothers and RBC Dain Rauscher, while Foerster was in their

144

employ were directly responsible for oversight of him, by virtue of federal securities laws and rules and regulations of self-regulatory organizations, including the NASD and NYSE.

528.    Foerster, while he was in the employ Lehman Brothers and RBC Dain Rauscher and was entrusted by them to manage and control the accounts of Dr. Glonti and Mr. Dateshidze along with them, acted within the firm's effective control, performing work they assigned to him which was within the scope of their business and served and furthered their business purposes.

529.    Lehman Brothers and RBC Dain Rauscher failed to reasonably supervise Foerster with a view to preventing unsuitable investments, unauthorized and excessive trading, and unauthorized transactions by Foerster in the investment accounts to which Dr. Glonti and Mr. Dateshidze entrusted them.

530.    Lehman Brothers and RBC Dain Rauscher knew or should have known of the Foerster's propensity for the aforesaid misconduct which caused injury to Dr. Glonti and Mr. Dateshidze.

531.    Lehman Brothers and RBC Dain Rauscher knew of "red flags" that were indicative of suspicious, irregular, unusual or improper activities by Foerster in the accounts of Dr. Glonti and Mr. Dateshidze, but which they deliberately, knowingly or intentionally ignored, did not respond or follow-up, or to which they were grossly negligent or recklessly indifferent.

534.    As a direct and proximate consequence of the failure of Lehman Brothers and RBC Dain Rauscher to reasonably supervise and control Foerster, Dr.

Glonti and Mr. Dateshidze sustained damages.

## Count X

(Against Lehman Brothers and RBC Dain Rauscher for negligent misrepresentation, arising out of, or in connection with, unsuitable investments, unauthorized and excessive trading, and unauthorized transactions in the investment accounts to which Dr. Glonti and Mr. Dateshidze entrusted them to manage and control)

535.    Plaintiffs, Dr. Glonti and Mr. Dateshidze, repeat as if fully set forth here the allegations in ¶¶1-465, above.

536.    The misconduct of Lehman Brothers and RBC Dain Rauscher alleged herein constitutes negligent misrepresentation.

537.    Because Lehman Brothers and RBC Dain Rauscher had a special relationship with Dr. Glonti and Mr. Dateshidze and they had greater access to information than Dr. Glonti and Mr. Dateshidze, and because of the professional status of Lehman Brothers and RBC Dain Rauscher, they had the duty to disclose that the investment advice, guidance and endorsements being offered by them to Dr. Glonti and Mr. Dateshidze were inaccurate and false.

538.    But for the special relationship of Lehman Brothers and RBC Dain Rauscher with and their duty to Dr. Glonti and Mr. Dateshidze, Dr. Glonti and Mr. Dateshidze would not otherwise have relied upon the advice and directions of Lehman Brothers and RBC Dain Rauscher.

539.    Lehman Brothers and RBC Dain Rauscher failed to inform Dr. Glonti and Mr. Dateshidze they did not intend to protect their investment interests and, therefore, plaintiffs should exercise reasonable care to avoid the representations

146

Lehman Brothers and RBC Dain Rauscher made to them.

540.    As a direct and proximate result of their wrongful conduct, Dr. Glonti

and Mr. Dateshidze suffered damages in connection with the investment services,

including information and advice, offered them by Lehman Brothers and RBC Dain

Rauscher.

### Count XI

(Against Lehman Brothers and RBC Dain Rauscher, under principles of respondeat
superior, for negligent misrepresentation, arising out of, or in connection with,
unsuitable investments, unauthorized and excessive trading, and unauthorized
transactions in the investment accounts to which Dr. Glonti and Mr. Dateshidze
entrusted them to manage and control)

541.    Plaintiffs, Dr. Glonti and Mr. Dateshidze, repeat as if fully set forth

here the allegations in ¶¶1-465, above.

542.    This Count is asserted against Lehman Brothers and RBC Dain

Rauscher for negligent misrepresentation, arising out of, or in connection with,

unsuitable investments and trading, unauthorized and excessive trading, and

unauthorized transactions by Foerster in the accounts of Dr. Glonti and Mr.

Dateshidze, and for which they are liable to plaintiffs under the doctrine of

respondeat superior.

543.    Lehman Brothers and RBC Dain Rauscher employed Foerster and

throughout their employment of him controlled the means and manner of his work.

544.    During their employment of Foerster, Foerster committed the

complained of conduct while acting within their effective control and performing

work which they had assigned to him that was within the scope of their business

147

and which served and furthered their business purposes.

545.    Lehman Brothers and RBC Dain Rauscher are, therefore, liable to plaintiffs for the complained of harm they suffered because of Foerster's negligent misrepresentations while in their employ and acting within the scope of his employment.

### Count XII

(Against Lehman Brothers and RBC Dain Rauscher for negligence, arising out of, or in connection with, unsuitable investments, unauthorized and excessive trading, and unauthorized transactions in the investment accounts to which Dr. Glonti and Mr. Dateshidze entrusted them to manage and control)

546.    Plaintiffs, Dr. Glonti and Mr. Dateshidze, repeat as if fully set forth here the allegations in ¶¶1-465, above.

547.    Dr. Glonti and Mr. Dateshidze entrusted their investment assets to Lehman Brothers, from October 2000 through May 2003, and to RBC Dain Rauscher, from May 2003 through April 2006, to manage and control.

548.    Dr. Glonti and Mr. Dateshidze entirely relinquished to these firms the management and control of their assets, giving them the authority, at their discretion, to select, purchase and sell securities in their accounts.

549.    Dr. Glonti and Mr. Dateshidze entrusted their investment assets to Lehman Brothers and RBC Dain Rauscher with the expectation these firms would assure their investment objectives would be fulfilled and they would diligently oversee and supervise the activities of Foerster to whom they assigned their assets to be managed and controlled.

550.    Lehman Brothers and RBC Dain Rauscher did not have reasonable grounds to believe that the investment recommendations they made to and transactions that they undertook for Dr. Glonti and Mr. Dateshidze in their accounts were suitable for them on the basis of the facts disclosed by Dr. Glonti and Mr. Dateshidze to them, including their other investment holdings and their financial situation and needs.

551.    Lehman Brothers and RBC Dain Rauscher did not disclose to Dr. Glonti and Mr. Dateshidze the risks of loss involved in the investments and trading in stock the firms undertook in their accounts, and thus plaintiffs did not know of, or understand, the investment risks the firms took with their accounts.

552.    Lehman Brothers and RBC Dain Rauscher knew Dr. Glonti and Mr. Dateshidze did not have the financial ability to bear the risks of loss because of the investments and trading in stock they undertook in their accounts.

553.    The investments made and trading of stock by Lehman Brothers and RBC Dain Rauscher in the accounts of Dr. Glonti and Mr. Dateshidze were contrary to the investment objectives they instructed the firms to follow.

554.    As a direct and proximate consequence of the negligence of Lehman Brothers and RBC Dain Rauscher, plaintiffs suffered damages, and they are, therefore, liable to plaintiffs for the complained of damages plaintiffs suffered because of the negligence of the firms.

149

## Count XIII

(Against Lehman Brothers and RBC Dain Rauscher for gross negligence, arising out of, or in connection with, unsuitable investments, unauthorized and excessive trading, and unauthorized transactions in the investment accounts to which Dr. Glonti and Mr. Dateshidze entrusted them to manage and control)

555.   Plaintiffs, Dr. Glonti and Mr. Dateshidze, repeat as if fully set forth here the allegations in ¶¶1-465, above.

556.   Dr. Glonti and Mr. Dateshidze entrusted their investment assets to Lehman Brothers, from October 2000 through May 2003, and to RBC Dain Rauscher, from May 2003 through April 2006, to manage and control.

557.   Dr. Glonti and Mr. Dateshidze entirely relinquished to these firms the management and control of their assets, giving them the authority, at their discretion, to select, purchase and sell securities in their accounts.

558.   Dr. Glonti and Mr. Dateshidze entrusted their investment assets to Lehman Brothers and RBC Dain Rauscher with the expectation these firms would assure their investment objectives would be fulfilled and they would diligently oversee and supervise the activities of Foerster to whom they assigned their assets to be managed and controlled.

559.   Lehman Brothers and RBC Dain Rauscher did not have reasonable grounds to believe that the investment recommendations they made to and transactions that they undertook for Dr. Glonti and Mr. Dateshidze in their accounts were suitable for them on the basis of the facts disclosed by Dr. Glonti and Mr. Dateshidze to them, including their other investment holdings and their

150

financial situation and needs.

560.   Lehman Brothers and RBC Dain Rauscher did not disclose to Dr. Glonti and Mr. Dateshidze the risks of loss involved in the investments and trading in stock the firms undertook in their accounts, and thus plaintiffs did not know of, or understand, the investment risks the firms took with their accounts.

561.   Lehman Brothers and RBC Dain Rauscher knew Dr. Glonti and Mr. Dateshidze did not have the financial ability to bear the risks of loss because of the investments and trading in stock they undertook in their accounts.

562.   The investments made and trading of stock by Lehman Brothers and RBC Dain Rauscher in the accounts of Dr. Glonti and Mr. Dateshidze were contrary to the investment objectives they instructed the firms to follow.

563.   The breach by Lehman Brothers and RBC Dain Rauscher of their duties to Dr. Glonti and Mr. Dateshidze shows more than ordinary carelessness, inadvertence, laxity, or indifference; the firms' actions, or failures to act, were reckless and grossly deviated from the ordinary duty of care they owed Dr. Glonti and Mr. Dateshidze.

564.   As a direct and proximate consequence of gross negligence by Lehman Brothers and RBC Dain Rauscher, plaintiffs suffered damages, and they are, therefore, liable to plaintiffs for the complained of damages plaintiffs suffered because of the gross negligence of the firms.

## Count XIV

(Against Lehman Brothers and RBC Dain Rauscher for misappropriation and conversion of funds from investment accounts to which Dr. Glonti and Mr. Dateshidze entrusted them to manage and control)

565.    Plaintiffs, Dr. Glonti and Mr. Dateshidze, repeat as if fully set forth here the allegations in ¶¶1-465, above.

566.    Foerster, through Lehman Brothers and RBC Dain Rauscher, made unauthorized transactions in the investment accounts of Dr. Glonti and Mr. Dateshidze and utilized such funds for his personal use, wrongfully depriving them of their investment funds.

567.    The funds of Dr. Glonti and Mr. Dateshidze of which Foerster made unlawful use were held in specifically and identifiable accounts to which they entrusted Lehman Brothers and RBC Dain Rauscher to manage and control and they instructed the firms these funds were to be used and treated in specific manner and for which the firms had the obligation to return.

568.    As a direct and proximate consequence of the misappropriation and conversion by Foerster, through Lehman Brothers and RBC Dain Rauscher, plaintiffs suffered damages, and for which Lehman Brothers and RBC Dain Rauscher are liable to plaintiffs.

## Count XV

(Against Lehman Brothers and RBC Dain Rauscher, under principles of respondeat superior, for misappropriation and conversion, arising out of, or in connection with, unauthorized transactions in the investment accounts to which Dr. Glonti and Mr. Dateshidze entrusted them to manage and control)

569.    Plaintiffs, Dr. Glonti and Mr. Dateshidze, repeat as if fully set forth here the allegations in ¶¶1-465, above.

570.    This Count is asserted against Lehman Brothers and RBC Dain Rauscher for misappropriation and conversion, arising out of, or in connection with, unauthorized transactions by Foerster in the accounts of Dr. Glonti and Mr. Dateshidze, and for which they are liable to plaintiffs under the doctrine of respondeat superior.

571.    Dr. Glonti and Mr. Dateshidze entirely relinquished to these firms the management and control of their assets, giving them the authority, at their discretion, to select, purchase and sell securities in their accounts.

572.    Dr. Glonti and Mr. Dateshidze entrusted their investment assets to Lehman Brothers and RBC Dain Rauscher with the expectation these firms would diligently oversee and supervise the activities of Foerster to whom they assigned their assets to be managed and controlled.

573.    Lehman Brothers and RBC Dain Rauscher employed Foerster and throughout their employment of him controlled the means and manner of his work.

574.    During their employment of Foerster, Foerster committed the complained of conduct while acting within their effective control and performing

153

work which they had assigned to him that was within the scope of their business and which served and furthered their business purposes.

575.   Lehman Brothers and RBC Dain Rauscher are, therefore, liable to plaintiffs for the damages they suffered because of Foerster's misappropriation and conversion of their investment funds while in their employ and acting within the scope of his employment.

### IX. Requests for Relief

WHEREFORE, plaintiffs, Dr. Irakli Glonti and David Dateshidze, request relief as follows:

A.   Judgement against Lehman Brothers Inc. and RBC Dain Rauscher for:

(1) violations of Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5;

(2) violations of Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a);

(3) fraud;

(4) breach of fiduciary duty to plaintiffs;

(5) failure to supervise and control Foerster;

(6) negligent misrepresentation;

(7) negligence;

(8) gross negligence; and

(9) misappropriation and conversion.

B.   Judgement against RBC Dain Rauscher for violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1962(c);

154

C.   Recovery of compensatory damages, including loss of future business opportunities, on all claims alleged by them, together with pre-judgment and post-judgment interest thereon;

D.   Recovery of punitive damages on their claims for fraud, breach of fiduciary duty, failure to supervise and control Foerster, negligent misrepresentation, gross negligence and misappropriation and conversion;

E.   Recovery of compensatory and treble damages on their claim against RBC Dain Rauscher for violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1962(c), together with attorney's fees and costs and expenses;

F.   Recovery, on all claims, of their costs and expenses of this litigation, including reasonable attorney's fees and experts' fees and other costs and disbursements; and

G.  Award of further relief as may be just and proper under the

circumstances.

ARNOLD I. KALMAN, ESQUIRE
Law Offices of Arnold I. Kalman
245 South Hutchinson Street
Philadelphia, PA 19107-5722
Telephone: 215-829-9613
Facsimile: 215-829-9619

Attorney for Plaintiffs, Dr. Irakli Glonti and
David Dateshidze

Dated: December 4, 2007

156

Exhibit B

# LEHMAN BROTHERS

**Customer Account Services**
**P.O. Box 3760**
**New York, NY 10008-3760**



### Client Agreement

CPI 3025

Before you sign this agreement, read it thoroughly and return this completed and signed agreement to Lehman Brothers at the address on the left side of this page. Subsequently you will receive literature containing important information about new accounts. Read the information carefully and retain it for future reference.

Account Number
Branch 8,3,1 Account 2,7,8,8 1 8,4,7 2

**Account Title / Name**
Irakli Glonti

**Account Title / Name**
1. Javachishvili 27 Tbilisi 380002 Georgia

Mailing Address

**A. Tax Certification.** Under penalties of perjury, I certify that the number shown below (and to the left) is my correct taxpayer identification number or if not, then the number I have entered below (and to the right) is my correct tax identification number, and that I am not subject to backup withholding because (a) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of failure to report all interest or dividends, or (b) the IRS has notified me that I am no longer subject to backup withholding (see below), or (c) I am exempt from backup withholding (see below). *Note: You must cross out (b) above if you are currently subject to backup withholding because of underreporting interest or dividends on your tax return. The Internal Revenue Service does not require your consent to any provisions of this document other than the certifications required to avoid backup withholding.*

For those exempt from backup withholding (see instructions on page 4), write the word "EXEMPT" here:_____

**B. Client Acknowledgement.** I (we) hereby acknowledge that I (we) have read, understand and agree to the terms of this agreement. If this is a joint account, we further acknowledge that we have read, understand and agree to the terms of this agreement contained in paragraph 21. *Note: Texas residents must execute a Texas Joint Account Supplement agreement (form 3982).* I (We) acknowledge that I (we) have received a copy of the agreement which contains a pre-dispute arbitration clause at Paragraph 22. I (We) have read it and agree to its terms.

| 1. Account Owner's Signature *(Please sign in box)* | Date | 2. Account Owner's Signature *(Please sign in box)* | Date |
|---|---|---|---|
| *[signature]* | 10.10.00 | | |
| 3. Account Owner's Signature *(Please sign in box)* | Date | 4. Account Owner's Signature *(Please sign in box)* | Date |
| | | | |

**C. Name Disclosure.** Please *indicate your choice as to the release or withholding of your name, address and securities positions to issuing corporations.*
☐ NO, I do not want ⎱ my name, address and securities positions disclosed to any companies, upon their request, in which I own securities
☐ YES, I do want ⎰ that are being held for me at Lehman Brothers Inc. ("Lehman") or any firm acting as a clearing broker for Lehman.

**D. Money Market Fund Agreement.** Lehman will be authorized (but not required) to invest or "sweep" available cash in your account into one of its money market funds *unless* you elect otherwise below. If you wish to choose a particular money market fund or you do *not* want available cash swept into a money market fund, please indicate below. If you wish to discuss or change your choice of money market funds, please contact your Investment Representative.
*(Note to Wisconsin residents: You must indicate below specifically whether or not you wish to have a money market sweep for your account.)*
☐ NO, I do not want cash balances in my account automatically swept into a money market fund.
☐ YES, I want the cash balances in my account automatically swept into the fund of my choice.

**E. Joint Account With Rights Of Survivorship.** If the account has more than one owner, this agreement establishes a Joint Account With Rights of Survivorship. If you and the other account owners wish to establish a Tenancy in Common instead, each of you must execute a Joint Account Agreement As Tenants in Common in addition to this Client Agreement. *Note: Texas residents must execute a Texas Joint Account Supplement agreement (form 3982).*

**F. Margin Account Agreement.** Complete this section only if you accept the margin agreement described in paragraphs 16 through 19 of this agreement. In consideration of your opening and maintaining one or more margin accounts on my behalf, I (we) hereby acknowledge that I (we) have read, understand and agree to the terms of a margin account contained in paragraphs 16 through 19 of this agreement. By signing this agreement, I (we) acknowledge that my (our) securities may be loaned to you or loaned out to others. *If this is a joint account, all parties must sign.*

| 1. Account Owner's Signature *(Please sign in box)* | Date | 2. Account Owner's Signature *(Please sign in box)* | Date |
|---|---|---|---|
| *[signature]* | 10.10.00 | | |
| 3. Account Owner's Signature *(Please sign in box)* | Date | 4. Account Owner's Signature *(Please sign in box)* | Date |
| | | | |

*Note for joint accounts: The Social Security Number of this account is the number of the client whose name appears first in the account title. Do not enter the number of any other account owner.*

| The Social Security Number or Tax Identification Number on Lehman Brothers' records is | Taxpayer Identification Number | The Social Security Number or Tax Identification Number shown to the left is incorrect. The CORRECT number is | Taxpayer Identification Number |
|---|---|---|---|
| | | | |

LBF 3025 (12/97) (PRT. 12/97)

1

In consideration of Lehman accepting my account and agreeing to act as my broker, I agree to the following with respect to any of my accounts with you for extensions of credit and the purchase and sale of securities, options, and other property. This agreement shall not become effective until accepted by you in your New York office. Acceptance may be evidenced by your internal records. Throughout this agreement, "I," "me," "my," "we," and "us" refer to the client and all others who are legally obligated on my accounts. "You" and "your" refer to Lehman, its subsidiaries and parents and any and all divisions, your introducing broker, if any, and their respective officers, directors, agents and/or employees.

**1. MY REPRESENTATIONS.** I represent that I am of the age of majority according to the laws of my place of residence. I further represent that I am not an employee of any exchange or the National Association of Securities Dealers, Inc. ("NASD"), or of a member firm of any exchange or the NASD or of a bank, trust company, insurance company, registered investment company or registered investment advisory firm unless I have notified you to that effect. If I become so employed, I agree to notify you promptly. I also represent that no persons other than those signing this agreement have an interest in my account. I understand that Lehman is prohibited under the NASD's "Free Riding and Withholding Interpretation" from selling securities in certain public offerings to persons restricted by such rules. To my best knowledge, I am not presently so restricted, and if I become so restricted I agree to notify you promptly.

I represent that the financial information and investment objectives provided to you are accurate in all material respects and that I will promptly inform you of any material changes in my financial or other circumstances, including my investment objectives.

**2. DEFINITION OF "PROPERTY".** In this agreement the word "property" means securities of all kinds, certificates of deposit, commercial paper, monies, options, commodities and contracts for the future delivery of, or otherwise relating to, commodities or securities and all other property usually and customarily dealt in by brokerage firms.

**3. ORDERS, EXECUTIONS, DELIVERIES, SETTLEMENTS AND ORAL AUTHORIZATIONS.** In giving orders to sell, I will inform you which sales are "short" and which are "long" sales. A "short sale" means any sale of a security not owned by the seller or any sale that is consummated by delivery of a borrowed security. The designation of a sale order as "long" is my representation that I own the security, and if the security is not in your possession at the time of the contract for sale, I agree to deliver it to you by settlement date. In case of non-delivery of a security, you are authorized to purchase the security to cover my position and charge any loss, commissions and fees to my account. I agree that if you fail to receive payment for securities purchased you may, without prior demand or notice, sell securities or other property held by you in any of my accounts and any resulting loss will be charged to my account. Unless I direct that an order to purchase or sell securities be executed on a specified exchange or market and you agree to such execution, you will, at your sole discretion and without prior notification to me, execute the order on the over-the-counter market in any location or on any exchange, including a foreign exchange where such security is traded, either on a principal or agency basis. I agree that you shall incur no liability in acting upon oral instructions given to you concerning my account.

**4. OPTION POSITIONS–MARGIN DEPOSITS.** I agree not to enter into any purchase or sale of equity, debt, foreign currency or index put or call options without having read and fully understood the terms, conditions, and risks as forth in the Characteristics and Risks of Standardized Options booklet and applicable supplements which you agree to furnish me prior to such transactions. I understand clients' option positions are assigned on an automated random basis. All short options positions can be assigned at any time including the day written. I agree that solely for purposes of entering into options positions, you may treat my account as a margin account; except that you may not pledge, repledge, hypothecate or rehypothecate my property in your possession or under your control unless I execute the margin agreement provided herein. I also agree not to exceed the position or exercise limits set by the options exchange, either acting alone or in concert with others.

**5. NOTICE TO EXERCISE OPTIONS.** If I purchase any listed option, I will notify you of my intention to exercise such option no later than two hours before the expiration time of the option (one hour in the case of an over-the-counter option). Failure to give such notice will constitute an abandonment of the option, in which event it may be exercised for my account if it would be profitable to do so. Except as required by the Options Clearing Corporation Rules, you have no obligation to exercise any option absent specific instructions from me to that effect. If it would not be profitable for my account due to commission expenses, it may be permitted to expire or, at your discretion, sold or acquired by you for some equitable payment to me based on your expenses and risk, without any liability or responsibility on your part to me.

**6. IMPARTIAL LOTTERY ALLOCATION SYSTEM; CALL FEATURES.** When you hold on my behalf bonds or preferred stocks in street or bearer form which are callable in part, I agree to participate in the impartial lottery allocation system of the called securities in accordance with the provisions of the New York Stock Exchange, Inc. ("NYSE") rules. Further, I understand when the call is favorable, no allocation will be made to any account in which you, your officers, or employees, have a financial interest until all other clients' positions in such securities are satisfied on an impartial lottery basis.

For debt securities, call or other redemption features, in addition to those disclosed on the trade confirmation, may exist. Debt securities subject to call or redemption features, such as sinking funds, may be redeemed in whole or in part before maturity, or before the first scheduled call dates. The existence of sinking funds, or other special mandatory redemption features, may not be disclosed on a trade confirmation. It is my obligation to review all prospectuses and offering statements I may receive, and to understand the risks of extraordinary calls or early redemptions, which may affect yield. Issuers may from time to time publish notices of offers to redeem debt securities within limited time, price and tender parameters. I understand that you are not obligated to notify me of such published calls, nor will you tender any securities on my behalf.

**7. RESTRICTIONS ON TRADING; TERMINATION.** I understand that you may in your sole discretion prohibit or restrict trading of securities or substitution of securities in any of my accounts and refuse to enter into any transaction with me. You have the right to terminate any of my accounts (including multiple owner accounts) at any time by notice to me.

**8. TRANSFER OF FUNDS BY WIRE.** By giving your instructions to transfer funds by wire from my accounts to any bank or other entity, I agree to provide you with an accurate account number designating the account to receive such funds. I acknowledge that the bank or other receiving entity may be under no obligation to verify the identity of the beneficiary of the funds transfer and may rely exclusively upon the account number provided by me. I agree to indemnify and hold you harmless from and against all liabilities arising from the provision by me of an inaccurate account number.

**9. TRANSFER OF EXCESS FUNDS; EXCHANGE RATE FLUCTUATIONS.** You may transfer excess funds (also called "free credit balances") between any of my accounts (including commodity accounts) for any reason not in conflict with the Commodity Exchange Act or any other applicable law. If you effect any transactions for me requiring a foreign currency, any profit or loss as a result of a fluctuation in the applicable exchange rate will be charged or credited to my account.

**10. PRINCIPAL, INTEREST AND DIVIDEND PAYMENTS.** With respect to principal and interest payments on debt instruments, you may credit my account with principal and interest due on the payment dates and are entitled to recover any such payments from me if the same are not actually received by you from the trustee or payment agent. You may redeem my money market fund shares, without notice, to the extent necessary to satisfy any debits arising in any of my accounts. I acknowledge that interest will not be paid to me on credit balances in any of my accounts unless specifically agreed to by you in writing. You are not required to remit interest or dividends to me on a daily basis.

**11. FEES AND CHARGES.** I understand that you may impose various service charges and other fees relating to my account as well as charge commissions and other fees for execution of transactions to purchase and sell securities, options or other property, and I agree to pay such charges, commissions and fees at your then prevailing rates. I also understand that such charges, commissions and fees may be changed from time to time without notice to me and I agree to be bound thereby. I may be subject to an administrative fee on any of my accounts which produce insufficient commission revenue for any calendar year and you will notify me prior to applying this fee. I agree to pay a late charge, to the extent permitted by law, if I purchase securities on a cash basis and fail to pay for such securities by settlement date. Any late charge you may impose will be at the maximum rate of interest set forth in your disclosure statement and may be charged from the settlement date to the date of payment.

**12. ACCURACY OF REPORTS; COMMUNICATIONS.** Confirmation of orders and statements of my accounts shall be conclusive if not objected to in writing, within ten days, after mailing by you to me. In the event I fail to receive a confirmation within ten days from the date of a transaction in my account, I agree to notify you immediately in writing. Until you have received notice in writing from me of a different address, communications mailed to me at the address specified by me shall be deemed to have been personally delivered to me and I agree to waive all claims resulting from failure to receive such communications.

**13. INTRODUCED ACCOUNTS.** If my account has been introduced to you and is carried by you only as a clearing broker, I agree that you are not responsible for the conduct of the introducing broker and your only responsibilities to me relate to your execution, clearing and bookkeeping of transactions in my account.

**14. SECURITY INTEREST.** As security for the payment of all liabilities or indebtedness presently outstanding or to be incurred under this or any other agreement between us, I grant you a security interest in any and all property belonging to me or in which I may have an interest, held by you or carried in any of my accounts including individual, multiple owner or commodity accounts. All property shall be subject to such security interest as collateral for the discharge of my obligations to you, wherever or however arising and without regard to whether or not you have made loans with respect to such property. You are authorized to sell and/or purchase any and all property in any of my accounts or to liquidate any open positions, commodity futures or forward contracts or redeem money market funds in any of my accounts without notice in order to satisfy such obligations. In enforcing your security interest, you shall have the discretion to determine the amount, order and manner of property to be sold and shall have all the rights and remedies available to a secured party under the New York Uniform Commercial Code. Without your prior written consent, I will not cause or allow any of the collateral held in any account, whether now owned or hereafter acquired, to be or become subject to any liens, security interests, mortgages or encumbrances of any nature other than your security interest.

**15. LIQUIDATION OF COLLATERAL OR ACCOUNT.** You may sell any or all property held in any of my accounts and cancel any open orders for the purchase or sale of any property without notice in the event of my death or whenever in your discretion you consider it necessary for your protection. In such events you also may borrow or buy-in all property required to make delivery against any sale, including a short sale, effected for me. Such sale or purchase may be public or private and may be made without advertising or notice to me and in such manner as you may in your discretion determine. No demands, calls, tenders or notices by you shall invalidate this waiver by me. At any such sale you may purchase the property free of any right of redemption and I shall be liable for any remaining deficiency in any of my accounts.

---

**MARGIN AGREEMENT;**
**PARAGRAPHS 16 THROUGH 19 APPLY ONLY TO MARGIN ACCOUNTS.**

**16. MARGIN LOANS.** From time to time you may, at your discretion, make loans to me for the purpose of purchasing, carrying or trading in securities ("Margins Loans"). Pursuant to Regulation T, Margin Loans will be made in a Margin Account. The minimum and maximum amount of any particular loan may be established by you in your discretion regardless of the amount of collateral delivered to you and you may change such minimum and maximum amounts from time to time.

**17. PAYMENT OF LOANS ON DEMAND.** I agree to pay ON DEMAND any balance owing on any of my accounts, including interest, commissions and late charges and any costs of collection (including attorneys' fees, if incurred by you). I understand that you may demand full payment of the balance due in my accounts plus any interest charges at your sole option, at any time and whether or not such demand is made for your protection. I understand that all

loans made are not for any specific term or duration but are due and payable at your discretion upon demand for payment made to me. I agree that all payments received for my accounts including interest, dividends, premiums, principal or other payments may be applied by you to any balances due in any of my accounts.

**18. MAINTENANCE OF COLLATERAL.** I understand that the securities or other instruments ("securities") in my Margin Account may be carried as general loans and may be pledged hypothecated or otherwise used by you in a *financing transaction (collectively "pledge(d)")* separately or in common with other properties. I understand that I may not be entitled to vote the securities in my Margin Account any period in which they have been pledged by you. In addition, while I will receive an amount equal to any dividends or other distributions in respect of such securities, I understand that the actual dividend or other distributions will be made to the entity to whom the securities have been pledged. The pledge by you may secure your indebtedness equal to or greater than the amount owed to you by me. I agree to deposit additional collateral, as you may in your discretion require from time to time, in the form of cash or securities in accordance with the rules and regulations of the Federal Reserve Board, the NYSE, the American Stock Exchange, Inc. ("AMEX"), other national securities exchanges, associations or regulatory agencies under whose jurisdiction you are subject and your own minimum house margin maintenance requirements. If I no longer maintain a debit balance or an indebtedness to you, you will fully segregate all securities in my accounts in your safekeeping or control (directly or through a clearing house) and/or deliver them to me upon my request.

**19. INTEREST CHARGES AND PAYMENTS.** I agree to pay interest, to the extent not prohibited by the laws of the State of New York, upon all amounts advanced and other balances due in my accounts in accordance with your current disclosure statement, which by this reference is herein specifically incorporated. By entering into any transactions with you after I receive your current disclosure statement, I acknowledge that I have read and agree to its terms for all past and future transactions in my account. I understand that interest on all debit balances shall be payable ON DEMAND and that in the absence of any demand interest shall be due on the first business day of each interest period. My daily net debit balance will include accrued interest I have not paid from prior interest periods, if any. Thus, to the extent permitted by applicable law you may charge me compound interest. Payments of interest and principal and all other payments made by me under this agreement shall be made to your main office in New York, New York. You may, in your discretion, not deem any check or other remittance to constitute payment until it has been paid by the drawee and the funds representing such payment have become available to you.

**20. CREDIT AND BUSINESS CONDUCT INFORMATION AND INVESTIGATION.** I authorize you at your discretion to obtain reports and to provide information to others concerning my credit standing and my business conduct. You may ask credit reporting agencies for reports of my credit history. Upon my request you will inform me whether you have obtained any such consumer reports and if you have, you will inform me of the name and address of the credit reporting agency that furnished the reports to you.

**21. JOINT ACCOUNTS; DESIGNATION OF TENANCY.**

a. If this is a Joint Account, we agree that each of us shall have the authority on behalf of the account to buy, sell (including short sales) and otherwise deal in, through you as brokers or dealers, securities, options or other property on margin or otherwise; to receive for the account, confirmations, statements and communications of every kind; to receive for the account and to dispose of money, securities and other property; to make, terminate, or modify for the account, agreements relating to these matters or waive any of the provisions of such agreements; and generally to deal with you as if each of us alone were the account owner, all without notice to all account owners. We agree that notice to any account owner shall be deemed to be notice to all account owners. Each account owner shall be jointly and severally liable for this account.

b. You may follow the instructions of any of us concerning this account and make deliveries to any of us, of any or all securities or other property in this account, and make payments to any of us, of any or all monies in this account as any of us may order and direct, even if such deliveries and/or payments shall be made to one of us personally or to third parties. You shall be under no obligation to inquire into the purpose of such demand for delivery of securities, property, or payment of monies, and you shall not be bound to see to the application or disposition of the said securities, property, and/or monies so delivered or paid to any of us. Notwithstanding the foregoing, you are authorized, in your discretion, to require joint action by the joint tenants with respect to any matter concerning the joint account, including the giving or cancellation of orders and the withdrawal or transfer of monies, securities or other property.

c. In the event of the death of any of us, the survivor(s) shall immediately give you written notice thereof, and you may, before or after receiving such notice, take such actions, require such papers, retain such portion of the account and/or restrict transactions in the account as you may deem advisable to protect you against any tax, liability, penalty or loss under any present or future laws or otherwise. The estate of any of us who shall have died shall be liable and each survivor will be liable, jointly and severally, to you for any debt or loss in this account resulting from the completion of transactions initiated prior to your receipt of a written notice of such death or incurred in the liquidation of the account or the adjustment of the interests of the respective parties.

d. Any taxes or other expenses becoming a lien against or being payable out of the account as the result of the death of any of us, or through the exercise by his or her estate or representatives of any rights in the account shall be chargeable against the interest of the survivor(s) as well as against the interest of the estate of the descendent. This provision shall not release the descendent's estate from any liability provided for in this agreement.

e. It is the express intention of us to create an estate or account as joint tenants with rights of survivorship and not as tenants-in-common, unless a separate Tenancy-in-Common form is properly completed. In the event of the death of either or any of us, the entire interest in the joint account shall be vested in the survivor(s) on the same terms and conditions as theretofore held, without in any manner releasing the descendent's estate from the liability, unless properly designated as a Tenancy-in-Common.

**22. ARBITRATION.**

• Arbitration is final and binding on the parties.

• The parties are waiving their right to seek remedies in court, including the right to a jury trial.

• Pre-arbitration discovery is generally more limited than and different from court proceedings.

• The arbitrator's award is not required to include factual findings or legal reasoning and any party's right to appeal or to seek modification of rulings by the arbitrators is strictly limited.

• The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.

Any controversy: (1) arising out of or relating to any of my accounts with you, maintained individually or jointly with any other party, in any capacity; or (2) with respect to transactions of any kind executed by, through or with you, your officers, directors, agents and/or employees; or (3) relating to my transactions or accounts with any of your predecessor firms by merger, acquisition or other business combination from the inception of such accounts; or (4) with respect to this agreement or any other agreements entered into with you relating to my accounts, or the breach thereof, shall be resolved by arbitration conducted only at the NYSE, NASD, or AMEX or any other self-regulatory organization ("SRO") subject to the jurisdiction of the Securities and Exchange Commission and pursuant to the arbitration procedures then in effect at any such exchange or SRO as I elect. If I do not make such election by registered mail addressed to you at your main office within 5 days after demand by you that I make such election, then you will have the right to elect the arbitration tribunal of your choice. Judgment upon any award rendered by the arbitrators may be entered in any court having jurisdiction thereof. No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action, or who is a member of a putative class but has not opted out of the class with respect to any claims encompassed by the putative class action, until: (i) the class certification is denied; (ii) the class action is decertified; or (iii) such person is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this agreement except to the extent stated herein. The foregoing agreement to arbitrate does not entitle me to obtain arbitration of claims that would be barred by the relevant statutes of limitations if such claims were brought in a court of competent jurisdiction. If, at the time that a demand for arbitration is made or an election or notice of intention to arbitrate is served, the claims sought to be arbitrated would have been barred by the relevant statue of limitations or other time bar, any party to this agreement, may assert the limitations as a bar to the arbitration either before the arbitrators or by applying to any court of competent jurisdiction. I expressly agree that any issues relating to the application of a statute of limitations or other time bar are referable to such court.

**23. GOVERNING LAW AND APPLICABLE REGULATIONS.** This agreement, including the arbitration provisions in paragraph 22, shall be governed by the laws of the State of New York without giving effect to the choice of law or conflict of laws provisions thereof. All transactions entered into under this agreement shall be subject to any applicable constitution, rules, regulations, customs and usages of the exchange or market and its clearinghouse, if any, where such transactions are executed by Lehman or its agents and to all applicable laws, rules, regulations of governmental authorities and SROs (collectively the "Rules"). Any reference to such Rules in this agreement shall in no way be construed to create a cause of action arising from any violation of such Rules. If any Rule is enacted that would be inconsistent with any of the provisions of this agreement, the provision so affected shall be deemed modified or superseded by the enactment, but the remaining provisions of this agreement shall remain in full force and effect.

**24. BINDING EFFECT; ASSIGNMENT.** This agreement and its terms shall be binding upon my heirs, executors, successors, administrators, assigns, committee and/or conservators ("successors"). In the event of my death, incompetency, or disability, whether or not any successors of my estate and property shall have given notice to Lehman, you may continue to operate as though I were alive and competent and you may liquidate my account as described in Paragraph 15 above without prior notice to or demand upon my successors. This agreement shall inure to the benefit of your assigns and successors, by merger, consolidation or otherwise (and you may transfer my accounts to any such successors and assigns at your discretion).

**25. WAIVER NOT IMPLIED.** Your failure to insist at any time upon strict compliance with this agreement or with any of its terms or any continued course of such conduct on your part shall not constitute or be considered a waiver by you of any of your rights.

**26. NO ORAL MODIFICATION; EFFECT ON PRIOR AGREEMENTS.** No modification of this agreement shall be effective unless in writing and executed by you and me. The signing of this agreement supersedes any prior agreement (except those governing transactions in my commodity accounts) made with you or any of your predecessors or assignors. To the extent this agreement is inconsistent with any other agreement governing my account, the provisions of this agreement shall govern.

**27. FOREIGN SECURITIES.** If my account contains securities issued by a foreign issuer, I acknowledge that you are acting solely as a custodian with respect to such securities and have no obligation to provide me with any proxies, annual statements or other disclosures from the issuer or facilitate my participation in any rights offer or other transaction that the issuer may conduct with or offer to holders of its securities.

**28. NOTICES; CLEARING ARRANGEMENTS.** You will endeavor to notify me in advance of any calls in my Margin Account and to provide various other notices relating to activities in my accounts. But, I understand that you reserve the right to take any necessary or appropriate action with respect to my accounts permitted by this Agreement and/or required by law or regulation without prior notice to me in advance of any such action. I acknowledge and consent that you may, from time to time, monitor and/or electronically record conversations between me/us and your employees or agents for the purpose of quality assurance, employee training, and the mutual protection of both of us. Any such recordings may be offered by you as evidence in any arbitration or other proceedings relating to this agreement. During the term of any clearing agreement between Lehman and any broker/dealer that is providing Lehman clearing services, Lehman's rights and benefits (but not its obligations) under this agreement shall inure to any such clearing firm.

## IMPORTANT TAX INFORMATION

Under the Interest and Dividend Tax Compliance Act of 1983 you (as a payee) are required to provide us with your correct Taxpayer Identification Number (TIN). If you are an individual, your TIN is your Social Security Number. If you do not provide us with your correct TIN you may be subject to a $50 penalty to the I.R.S. and backup withholding tax, at a rate of 31% on all dividends, interest and other payments made by us to you after January 1, 1984. Even though our records indicate a TIN for your account, you must use the attached form to certify the number as it appears on our files or to furnish us with your correct TIN.

### Instructions
*(Section references are to the Internal Revenue Code.)*

**Purpose of Form.** A person who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) to report income paid to you, real estate transactions, mortgage interest you paid, the acquisition or abandonment of secured property, or contributions you made to an individual retirement arrangement (IRA). Use Form W-9 to furnish your correct TIN to the requester (the person asking you to furnish your TIN), and, when applicable, (1) to certify that the TIN you are furnishing is correct (or that you are waiting for a number to be issued), (2) to certify that you are not subject to backup withholding, and (3) to claim exemption from backup withholding if you are an exempt payee. Furnishing your correct TIN and making the appropriate certifications will prevent certain payments from being subject to backup withholding. Note: *If a requestor gives you a form other than a W-9 to request your TIN, you must use the requester's form.*

**How to Obtain a TIN.** If you do not have a TIN, apply for one immediately. To apply, get Form SS-5, Application for a Social Security Number Card (for individuals) from your local office of the Social Security Administration, or Form SS-4, Application for Employer Identification Number (for business and other entities), from your local Internal Revenue Service office.

To complete Form W-9, if you do not have a TIN, write "Applied For" in the space for the TIN in Part 1, sign and date the form, and give it to the requester. Generally, you will then have 60 days to obtain a TIN and furnish it to the requester. If the requester does not receive your TIN within 60 days, backup withholding, if applicable, will begin and continue until you furnish your TIN to the requester. For reportable interest or dividend payments, the payer must exercise one of the following options concerning backup withholding during the 60-day period. Under option (1), a payer must backup withhold on any withdrawals you make from your account after 7 business days after the requester receives this form back from you. Under option (2), the payer must backup withhold on any reportable interest or dividend payments made to your account, regardless of whether you made any withdrawals. The backup withholding under option (2) must begin no later than 7 business days after the requester receives this form back. Under option (2) the payer is required to refund the amounts withheld if your certified TIN is received within the 60-day period and you were not subject to backup withholding during that period. Note: *Writing "Applied For" on the form means that you have already applied for a TIN OR that you intend to apply for one in the near future. As soon as you receive your TIN, complete another Form W-9, including your TIN, sign and date the form, and give it to the requester.*

**What is Backup Withholding?** Persons making certain payments to you are required to withhold and to pay the IRS 31% of such payments under certain conditions. This is called "backup withholding". Payments that could be subject to backup withholding include interest, dividends, broker and barter transactions, rents, royalties, nonemployee compensation, and certain payments from fishing boat operators, but do not include real estate transactions. If you give the requester your correct TIN, make the appropriate certifications, and report all your taxable interest and dividends on your tax return, your payments will not be subject to backup withholding. Payments you receive will be subject to backup withholding if:

(1) You do not furnish your TIN to the requester, or
(2) IRS notifies the requester that you furnished an incorrect TIN, or
(3) You are notified by the IRS that you are subject to backup withholding because you failed to report all your interest and dividends on your tax return (for interest and dividend accounts only), or
(4) You fail to certify to the requester that you are not subject to backup withholding under (3) above (for interest and dividend accounts opened after 1983 only), or
(5) You fail to certify your TIN. This applies only to interest, dividend, broker, or barter exchange accounts opened after 1983, or broker accounts considered inactive in 1983.

For other payments, you are subject to backup withholding only if (1) or (2) above applies. Certain payees and payments are exempt from backup withholding and information reporting. See Payees and Payments Exempt From Backup Withholding, and Exempt Payees and Payments under Specific Instructions, below, if you are an exempt payee.

**Payees and Payments Exempt From Backup Withholding.** The following is a list of payees exempt from backup withholding and for which no information reporting is required. For interest and dividends, all listed payees are exempt except item (9). For broker transactions, payees listed in (1) through (13), and a person registered under the Investment Advisers Act of 1940 who regularly acts as a broker are exempt. Payments subject to reporting under sections 6041 and 6041A are generally exempt from backup withholding only if made to payees described in items (1) through (7), except that a corporation that provides medical and health care services or bills and collects payments for such services is not exempt from backup withholding or information reporting. Only payees described in items (2) through (6) are exempt from backup withholding for barter exchange transactions, patronage dividends, and payments by certain fishing boat operators.

(1) A corporation.
(2) An organization exempt from tax under section 501(a), or an individual retirement plan (IRA), or a custodial account under section 403(b)(7).
(3) The United States or any of its agencies or instrumentalities.
(4) A state, the District of Columbia, a possession of the United States, or any of their political subdivisions or instrumentalities.
(5) A foreign government or any of its political subdivisions, agencies or instrumentalities.
(6) An international organization or any of its instrumentalities.
(7) A foreign central bank of issue.
(8) A dealer in securities or commodities required to register in the U.S. or a possession of the U.S.
(9) A futures commission merchant registered with the Commodity Future Trading Commission.

(10) A real estate investment trust.
(11) An entity registered at all times during the tax year under the Investment Company Act of 1940.
(12) A common trust fund operated by a bank under section 584(a).
(13) A financial institution.
(14) A middleman known in the investment community as a nominee or listed in the most recent publication of the American Society of Corporate Secretaries, Inc. Nominee List.
(15) A trust exempt from tax under section 664 or described in section 4947.

Payments of dividends and patronage dividends generally not subject to backup withholding also include the following:

* Payments to nonresident aliens subject to withholding under section 1441.
* Payments to partnerships not engaged in a trade or business in the U.S. and that have at least one nonresident partner.
* Payments of patronage dividends not paid in money.
* Payments made by certain foreign organizations.

Payments of interest generally not subject to backup withholding include the following:

* Payments of interest on obligations issued by individuals. Note: You may be subject to backup withholding if this interest is $600 or more and is paid in the course of the payer's trade or business and you have not provided your correct TIN to the payer.
* Payments of tax-exempt interest (including exempt-interest dividends under section 852).
* Payments described in section 6049(b)(5) to nonresident aliens.
* Payments on tax-free covenant bonds under section 1451.
* Payments made by certain foreign organizations.
* Mortgage interest paid by you.

Payments are not subject to information reporting are also not subject to backup withholding. For details, see sections 6041, 6041A(a), 6042, 6044, 6045, 6049, 6050A, and 6050N, and the regulations under such sections.

### Penalties

**Failure to Furnish TIN.** If you fail to furnish your correct TIN to a requester, you are subject to a penalty of $50 for each such failure unless your failure is due to reasonable cause and not to willful neglect.

**Failure To Include Certain Items on Your Tax Return.** If you fail to properly include on your tax return certain items required to the IRS, such failure will be treated as being due to negligence, and you will be subject to a penalty of 5% on any part of an underpayment of tax attributable to that failure unless there is clear and convincing evidence to the contrary.

**Civil Penalty for False Information With Respect To Withholding.** If you make a false statement with no reasonable basis that results in no imposition of backup withholding, you are subject to a penalty of $500.

**Criminal Penalty for Falsifying Information.** Willfully falsifying certifications or affirmations may subject you to criminal penalties including fines and/or imprisonment.

### Specific Instructions

**Name.** If you are an individual, generally provide the name shown on your social security card. However, if you have changed your last name, for instance, due to marriage, without informing the Social Security Administration of the name change, please enter your first name and both the last name shown on your social security card and your new last name.

**Signing the Certification.**
(1) Interest, Dividend, and Barter Exchange Accounts Opened Before 1984 and Broker Accounts That Were Considered Active During 1983. - You are not required to sign the certification; however, you may do so. You are required to provide your correct TIN.
(2) Interest, Dividend, Broker and Barter Exchange Accounts Opened After 1983, and Broker Accounts That Were Considered Inactive During 1983. - You must sign the certification or backup withholding will apply. If you are subject to backup withholding and you are merely providing your correct TIN to the requester, you must cross out item (b) in the certification before signing the form.
(3) Real Estate Transactions. - You must sign the certification. You may cross out item (b) of the certification if you wish.
(4) Other Payments. - You are required to furnish your correct TIN, but you are not required to sign the certification unless you have been notified of an incorrect TIN. Other payments include payments made in the course of the requester's trade or business for rents, royalties, goods (other than bills for merchandise), medical and health care services, payments to a nonemployee for services (including attorney and accounting fees), and payments to certain fishing boat crew members.
(5) Mortgage Interest Paid by You, Acquisition or Abandonment of Secured Property, or IRA Contributions. - You are required to furnish your correct TIN, but you are not required to sign the certification.
(6) Exempt Payees and Payments. - If you are exempt from backup withholding, you should complete this form to avoid possible erroneous backup withholding. Enter your correct TIN in Part I, write "EXEMPT" in the block in Part II, sign and date the form. If you are a nonresident alien or foreign entity not subject to backup withholding, give the requester a completed Form W-8, Certificate of Foreign Status.
(7) TIN "Applied For." - Follow the instructions under How To Obtain a TIN, above, sign and date this form. You must provide a TIN whether or not you are required to file a tax return. Payers must generally withhold 31% of taxable interest, dividend, and certain other payments to a payee who does not furnish a TIN to a payer. Certain penalties may also apply.

**What Name and Number To Give The Requester**
(1) List first and circle the names of the person whose number you furnish.
(2) Circle the minor's name and furnish the minor's social security number.
(3) Show the name of the owner.
(4) List first and circle the name of the legal trust, estate, or pension trust.
Note: If no name is circled when there is more than one name, the number will be considered to be that of the first name listed.

Exhibit C

MAR-25-02 MON 03:50 PM    FAX NO.    P. 01

# LEHMAN BROTHERS

**Customer Account Services**
**P.O. Box 3760**
**New York, NY 10008-3760**

**Client Agreement**    | CPI 3025 |

Before you sign this agreement, read it thoroughly and return this completed and signed agreement to Lehman Brothers at the address on the left side of this page. Subsequently you will receive literature containing important information about new accounts. Read the information carefully and retain it for future reference.

| Account Number | Account |
| 8,3,1 | 7,7,7,1,4,1,1,4,7,2 |

**Account Title / Name**
David Dateshidze

**Account Title / Name**
88 Genesee Boulevard

**Mailing Address**
Atlantic Beach NY 11509

**A. Tax Certification.** Under penalties of perjury, I certify that the number shown below (and to the left) is my correct taxpayer identification number or if not, then the number I have entered below (and to the right) is my correct tax identification number, and that I am not subject to backup withholding because (a) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of failure to report all interest or dividends, or (b) the IRS has notified me that I am no longer subject to backup withholding (see below), or (c) I am exempt from backup withholding (see below). Note: You must cross out (b) above if you are currently subject to backup withholding because of underreporting interest or dividends on your tax return. The Internal Revenue Service does not require your consent to any provisions of this document other than the certifications required to avoid backup withholding.

For those exempt from backup withholding (see instructions on page 4), write the word "EXEMPT" here: _____

**B. Client Acknowledgement.** I (we) hereby acknowledge that I (we) have read, understand and agree to the terms of this agreement. If this is a joint account, we further acknowledge that we have read, understand and agree to the terms of this agreement contained in paragraph 21. Note: Texas residents must execute a Texas Joint Account Supplement agreement (form 3882). I (We) acknowledge that I (we) have received a copy of the agreement which contains a pre-dispute arbitration clause at Paragraph 22; I (We) have read it and agree to its terms.

| 1. Account Owner's Signature (Please sign in box) | Date | 2. Account Owner's Signature (Please sign in box) | Date |
| *P pay Id* | | | |
| 3. Account Owner's Signature (Please sign in box) | Date | 4. Account Owner's Signature (Please sign in box) | Date |

**C. Name Disclosure.** Please indicate your choice as to the release or withholding of your name, address and securities positions to issuing corporations.
☒ NO, I do not want ⎫ my name, address and securities positions disclosed to any companies, upon their request, in which I own securities
☐ YES, I do want ⎭ that are being held for me at Lehman Brothers Inc. ("Lehman") or any firm acting as a clearing broker for Lehman.

**D. Money Market Fund Agreement.** Lehman will be authorized (but not required) to invest or "sweep" available cash in your account into one of its money market funds unless you elect otherwise below. If you want to choose a particular money market fund or you do not want available cash swept into a money market fund, please indicate below. If you wish to discuss or change your choice of money market funds, please contact your Investment Representative.
(Note to Wisconsin residents: You must indicate below specifically whether or not you wish to have a money market sweep for your account.)
☐ NO, I do not want cash balances in my account automatically swept into a money market fund.
☒ YES, I want the cash balances in my account automatically swept into the fund of my choice.

**E. Joint Account With Rights Of Survivorship.** If the account has more than one owner, this agreement establishes a Joint Account With Rights of Survivorship. If you and the other account owners wish to establish a Tenancy in Common instead, each of you must execute a Joint Account Agreement As Tenants in Common in addition to this Client Agreement. Note: Texas residents must execute a Texas Joint Account Supplement agreement (form 3882).

**F. Margin Account Agreement.** Complete this section only if you accept the margin agreement described in paragraphs 16 through 19 of this agreement. In consideration of your opening and maintaining one or more margin accounts on my behalf, I (we) hereby acknowledge that I (we) have read, understand and agree to the terms of a margin account contained in paragraphs 16 through 19 of this agreement. By signing this agreement, I (we) acknowledge that my (our) securities may be loaned to you or loaned out to others. If this is a joint account, all parties must sign.

| 1. Account Owner's Signature (Please sign in box) | Date | 2. Account Owner's Signature (Please sign in box) | Date |
| *P pay Id* | | | |
| 3. Account Owner's Signature (Please sign in box) | Date | 4. Account Owner's Signature (Please sign in box) | Date |

Note for joint accounts: The Social Security Number of this account is the number of the client whose name appears first in the account title. Do not enter the number of any other account owner.

| The Social Security Number or Tax Identification Number on Lehman Brothers' records is | Taxpayer Identification Number N/A | | The Social Security Number or Tax Identification Number shown to the left is incorrect. The CORRECT number is | Taxpayer Identification Number |

BF 3025 (12/97) (PRT. 12/97)    1

In consideration of Lehman accepting my account and agreeing to act as my broker, I agree to the following with respect to any of my accounts with you for extensions of credit and the purchase and sale of securities, options, and other property. This agreement shall not become effective until accepted by you in your New York office. Acceptance may be evidenced by your internal records. Throughout this agreement, "I," "me," "my," "we", and "us" refer to the client and all others who are legally obligated on my accounts. "You" and "your" refer to Lehman, its subsidiaries and parents and any and all divisions, your introducing broker, if any, and their respective officers, directors, agents and/or employees.

**1. MY REPRESENTATIONS.** I represent that I am of the age of majority according to the laws of my place of residence. I further represent that I am not an employee of any exchange or the National Association of Securities Dealers, Inc. ("NASD"), or of a member firm of any exchange or the NASD or of a bank, trust company, insurance company, registered investment company or registered investment advisory firm unless I have notified you to that effect. If I become so employed, I agree to notify you promptly. I also represent that no persons other than those signing this agreement have an interest in my account. I understand that Lehman is prohibited under the NASD's "Free Riding and Withholding Interpretation" from selling securities in certain public offerings to persons restricted by such rules. To my best knowledge, I am not presently so restricted, and if I become so restricted I agree to notify you promptly.

I represent that the financial information and investment objectives provided to you are accurate in all material respects and that I will promptly inform you of any material changes in my financial or other circumstances, including my investment objectives.

**2. DEFINITION OF "PROPERTY".** In this agreement the word "property" means securities of all kinds, certificates of deposit, commercial paper, monies, options, commodities and contracts for the future delivery of, or otherwise relating to, commodities or securities and all other property usually and customarily dealt in by brokerage firms.

**3. ORDERS, EXECUTIONS, DELIVERIES, SETTLEMENTS AND ORAL AUTHORIZATIONS.** In giving orders to sell, I will inform you which sales are "long" sales. A "short sale" means any sale of a security not owned by the seller or any sale that is consummated by delivery of a borrowed security. The designation of a sale order as "long" is my representation that I own the security, and if the security is not in your possession at the time of the contract for sale, I agree to deliver it to you by settlement date. In case of non-delivery of a security, you are authorized to purchase the security to cover my position and charge any loss, commissions and fees to my account. I agree that if you fail to receive payment for securities purchased you may, without prior demand or notice, sell securities or other property held by you in any of my accounts and any resulting loss will be charged to my account. Unless I direct that an order to purchase or sell securities be executed on a specified exchange or market and you agree to such execution, you will, at your sole discretion and without prior notification to me, execute the order on the over-the-counter market in any location or on any exchange, including a foreign exchange where such security is traded, either on a principal or agency basis. I agree that you shall incur no liability in acting upon oral instructions given to you concerning my account.

**4. OPTION POSITIONS-MARGIN DEPOSITS.** I agree not to enter into any purchase or sale of equity, debt, foreign currency or index put or call options without having read and fully understood the terms, conditions, and risks, as set forth in the Characteristics and Risks of Standardized Options booklet and applicable supplements which you agree to furnish me prior to such transactions. I understand clients' short options positions are assigned on an automated random basis. All short options positions can be assigned at any time including the day written. I agree that solely for purposes of entering into options positions, you may treat my account as a margin account; except that you may not pledge, repledge, hypothecate or rehypothecate my property in your possession or under your control unless I execute the margin agreement provided herein. I also agree not to exceed the position or exercise limits set by the options exchange, either acting alone or in concert with others.

**5. NOTICE TO EXERCISE OPTIONS.** If I purchase any listed option, I will notify you of my intention to exercise such option no later than two hours before the expiration time of the option (one hour in the case of an over-the-counter option). Failure to give such notice will constitute an abandonment of the option, in which event it may be exercised for my account if it would be profitable to do so. Except as required by the Options Clearing Corporation Rules, you have no obligation to exercise any option absent specific instructions from me to that effect. If it would not be profitable for my account due to commission expenses, it may be permitted to expire or, at your discretion, sold or acquired by you for some equitable payment to me based on your expenses and risk, without any liability or responsibility on your part to me.

**6. IMPARTIAL LOTTERY ALLOCATION SYSTEM; CALL FEATURES.** When you hold on my behalf bonds or preferred stocks in street or bearer form which are callable in part, I agree to participate in the impartial lottery allocation system of the called securities in accordance with the provisions of the New York Stock Exchange, Inc. ("NYSE") rules. Further, I understand when the call is favorable, no allocation will be made to any account in which you, your officers, or employees, have a financial interest until all other clients' positions in such securities are satisfied on an impartial lottery basis.

For debt securities, call or other redemption features, in addition to those disclosed on the trade confirmation, may exist. Debt securities subject to call or redemption features, such as sinking funds, may be redeemed in whole or in part before maturity, or before the first scheduled call dates. The existence of sinking funds, or other special mandatory redemption features, may not be disclosed on a trade confirmation. It is my obligation to review all prospectuses and offering statements I may receive, and to understand the risks of extraordinary calls or early redemptions, which may affect yield. Issuers may from time to time publish notices of offers to redeem debt securities within limited time, price and tender parameters. I understand that you are not obligated to notify me of such published calls, nor will you tender any securities on my behalf.

**7. RESTRICTIONS ON TRADING; TERMINATION.** I understand that you may in your sole discretion prohibit or restrict trading of securities or substitution of securities in any of my accounts and refuse to enter into any transaction with me. You have the right to terminate any of my accounts (including multiple owner accounts) at any time by notice to me.

**8. TRANSFER OF FUNDS BY WIRE.** By giving your instructions to transfer funds by wire from my accounts to your bank or other entity, I agree to provide you with an accurate account number designating the account to receive such funds. I acknowledge that the bank or other receiving entity may be under no obligation to verify the identity of the beneficiary of the funds transfer and may rely exclusively upon the account number provided by me. I agree to indemnify and hold you harmless from and against all liabilities arising from the provision by me of an inaccurate account number.

**9. TRANSFER OF EXCESS FUNDS; EXCHANGE RATE FLUCTUATIONS.** You may transfer excess funds (also called "free credit balances") between any of my accounts (including commodity accounts) for any reason not in conflict with the Commodity Exchange Act or any other applicable law. If you effect any transactions for me requiring a foreign currency, any profit or loss as a result of a fluctuation in the applicable exchange rate will be charged or credited to my account.

**10. PRINCIPAL, INTEREST AND DIVIDEND PAYMENTS.** With respect to principal and interest payments on debt instruments, you may credit my account with principal and interest due on the payment dates and are entitled to recover any such payments from me if the same are not actually received by you from the trustee or payment agent. You may redeem my money market fund shares, without notice, to the extent necessary to satisfy any debits arising in any of my accounts. I acknowledge that interest will not be paid to me on credit balances in any of my accounts unless specifically agreed to by you in writing. You are not required to remit interest or dividends to me on a daily basis.

**11. FEES AND CHARGES.** I understand that you may impose various service charges and other fees relating to my account as well as charge commissions and other fees for execution of transactions to purchase and sell securities, options or other property, and I agree to pay such charges, commissions and fees at your then prevailing rates. I also understand that such charges, commissions and fees may be changed from time to time without notice to me and I agree to be bound thereby. I may be subject to an administrative fee on any of my accounts which produce insufficient commission revenue for any calendar year and you will notify me prior to applying this fee. I agree to pay a late charge, to the extent permitted by law, if I purchase securities on a cash basis and fail to pay for such securities by settlement date. Any late charge you may impose will be at the maximum rate of interest set forth in your disclosure statement and may be charged from the settlement date to the date of payment.

**12. ACCURACY OF REPORTS; COMMUNICATIONS.** Confirmation of orders and statements of my accounts shall be conclusive if not objected to in writing within ten days, after mailing by you to me. In the event I fail to receive a confirmation within ten days from the date of a transaction in my account, I agree to notify you immediately in writing. Until you have received notice in writing from me of a different address, communications mailed to me at the address specified by me shall be deemed to have been personally delivered to me and I agree to waive all claims resulting from failure to receive such communications.

**13. INTRODUCED ACCOUNTS.** If my account has been introduced to you and is carried by you only as a clearing broker, I agree that you are not responsible for the conduct of the introducing broker and your only responsibilities to me relate to your execution, clearing and bookkeeping of transactions in my account.

**14. SECURITY INTEREST.** As security for the payment of all liabilities or indebtedness presently outstanding or to be incurred under this or any other agreement between us, I grant you a security interest in any and all property belonging to me or in which I may have an interest, held by you or carried in any of my accounts including individual, multiple owner or commodity accounts. All property shall be subject to such security interest as collateral for the discharge of my obligations to you, wherever or however arising and without regard to whether or not you have made loans with respect to such property. You are authorized to sell and/or purchase any and all property in any of my accounts or to liquidate any open options, commodity futures or forward contracts or redeem money market funds in any of my accounts without notice in order to satisfy such obligations. In enforcing your security interest, you shall have the discretion to determine the amount, order and manner of property to be sold and shall have all the rights and remedies available to a secured party under the New York Uniform Commercial Code. Without your prior written consent, I will not cause or allow any of the collateral held in my account, whether now owned or hereafter acquired, to be or become subject to any liens, security interests, mortgages or encumbrances of any nature other than your security interest.

**15. LIQUIDATION OF COLLATERAL OR ACCOUNT.** You may sell any or all property held in any of my accounts and cancel any open orders for the purchase or sale of any property without notice in the event of my death or whenever in your discretion you consider it necessary for your protection. In such events you also may borrow or buy-in all property required to make delivery against any sale, including a short sale, effected for me. Such sale or purchase may be public or private and may be made without advertising or notice to me and in such manner as you may in your discretion determine. No demands, calls, tenders or notices by you shall invalidate this waiver by me. At any such sale you may purchase the property free of any right of redemption and I shall be liable for any remaining deficiency in any of my accounts.

---

**MARGIN AGREEMENT;**
**PARAGRAPHS 16 THROUGH 19 APPLY ONLY TO MARGIN ACCOUNTS.**

**16. MARGIN LOANS.** From time to time you may, at your discretion, make loans to me for the purpose of purchasing, carrying or trading in securities ("Margins Loans"). Pursuant to Regulation T, Margin Loans will be made in a Margin Account. The minimum and maximum amount of any particular loan may be established by you in your discretion regardless of the amount of collateral delivered to you and you may change such minimum and maximum amounts from time to time.

**17. PAYMENT OF LOANS ON DEMAND.** I agree to pay ON DEMAND any balance owing on any of my accounts, including interest, commissions and late charges and any costs of collection (including attorneys' fees, if incurred by you). I understand that you may demand full payment of the balance due in my accounts plus any interest charges at any time or upon option, in any time and whether or not such demand is made for your protection. I understand that all

loans made are not for any specific term or duration but are due and payable at your discretion upon demand for payment made to me. I agree that all payments received for my accounts including interest, dividends, premiums, principal or other payments may be applied by you to any balances due in any of my accounts.

**18. MAINTENANCE OF COLLATERAL.** I understand that the securities or other instruments ("securities") in my Margin Account may be carried as general loans and may be pledged hypothecated or otherwise used by you in a *financing transaction (collectively "pledge(d)")* separately or in common with other properties. I understand that I may not be entitled to vote the securities in my Margin Account during any period in which they have been pledged by you. In addition, while I will receive an amount equal to any dividends or other distributions in respect of such securities, I understand that the actual dividend or other distributions will be made to the entity to whom the securities have been pledged. The pledge by you may secure your indebtedness equal to or greater than the amount owed to you by me. I agree to deposit additional collateral, as you may in your discretion require from time to time, in the form of cash or securities in accordance with the rules and regulations of the Federal Reserve Board, the NYSE, the American Stock Exchange, Inc. ("AMEX"), other national securities exchanges, associations or regulatory agencies under whose jurisdiction you are subject and your own minimum house margin maintenance requirements. If I no longer maintain a debit balance or an indebtedness to you, you will fully segregate all securities in my accounts in your safekeeping or control (directly or through a clearing house) and/or deliver them to me upon my request.

**19. INTEREST CHARGES AND PAYMENTS.** I agree to pay interest, to the extent not prohibited by the laws of the State of New York, upon all amounts advanced and other balances due in my accounts in accordance with your current disclosure statement, which by this reference is herein specifically incorporated. By entering into any transactions with you after I receive your current disclosure statement, I acknowledge that I have read and agree to its terms for all past and future transactions in my account. I understand that interest on all debit balances shall be payable ON DEMAND and that in the absence of any demand interest shall be due on the first business day of each interest period. My daily net debit balances will include accrued interest I have not paid from prior interest periods, if any. Thus, to the extent permitted by applicable law you may charge me compound interest. Payments of interest and principal and all other payments made by me under this agreement shall be made to your main office in New York, New York. You may, in your discretion, not deem any check or other remittance to constitute payment until it has been paid by the drawee and the funds representing such payment have become available to you.

**20. CREDIT AND BUSINESS CONDUCT INFORMATION AND INVESTIGATION.** I authorize you at your discretion to obtain reports and to provide information to others concerning my credit standing and my business conduct. You may ask credit reporting agencies for reports of my credit history. Upon my request you will inform me whether you have obtained any such consumer reports and if you have, you will inform me of the name and address of the credit reporting agency that furnished the reports to you.

**21. JOINT ACCOUNTS; DESIGNATION OF TENANCY.**
a. If this is a Joint Account, we agree that each of us shall have the authority on behalf of the account to buy, sell (including short sales) and otherwise deal in, through you as brokers or dealers, securities, options or other property on margin or otherwise; to receive for the account, confirmations, statements and communications of every kind; to receive for the account and to dispose of money, securities and other property; to make, terminate, or modify for the account, agreements relating to these matters or waive any of the provisions of such agreements; and generally to deal with you as if each of us alone were the account owner, all without notice to all account owners. We agree that notice to any account owner shall be deemed to be notice to all account owners. Each account owner shall be jointly and severally liable for this account.
b. You may follow the instructions of any of us concerning this account and make deliveries to any of us, of any or all securities or other property in this account, and make payments to any of us, of any or all monies in this account as any of us may order and direct, even if such deliveries and/or payments shall be made to one of us personally or to third parties. You shall be under no obligation to inquire into the purpose of such demand for delivery of securities, property, or payment of monies, and you shall not be bound to see to the application or disposition of the said securities, property, and/or monies so delivered or paid to any of us. Notwithstanding the foregoing, you are authorized, in your discretion, to require joint action by the joint tenants with respect to any matter concerning the joint account, including the giving or cancellation of orders and the withdrawal or transfer of monies, securities or other property.
c. In the event of the death of any of us, the survivor(s) shall immediately give you written notice thereof, and you may, before or after receiving such notice, take such actions, require such papers, retain such portion of the account and/or restrict transactions in the account as you may deem advisable to protect you against any tax, liability, penalty or loss under any present or future laws or otherwise. The estate of any of us who shall have died shall be liable and each survivor will be liable, jointly and severally, to you for any debt or loss in this account resulting from the completion of transactions initiated prior to your receipt of a written notice of such death or incurred in the liquidation of the account or the adjustment of the interests of the respective parties.
d. Any taxes or other expenses becoming a lien against or being payable out of the account as the result of the death of any of us, or through the exercise by his or her estate or representatives of any rights in the account shall be chargeable against the interest of the survivor(s) as well as against the interest of the estate of the descendent. This provision shall not release the descendent's estate from any liability provided for in this agreement.
e. It is the express intention of us to create an estate or account as joint tenants with rights of survivorship and not as tenants-in-common, unless a separate Tenancy-in-Common form is properly completed. In the event of the death of either or any of us, the entire interest in the joint account shall be vested in the survivor(s) on the same terms and conditions as theretofore held, without in any manner releasing the descendent's estate from the liability, unless properly designated as a Tenancy-in-Common.

**22. ARBITRATION.**
• Arbitration is final and binding on the parties.
• The parties are waiving their right to seek remedies in court, including the right to a jury trial.

• Pre-arbitration discovery is generally more limited than and different from court proceedings.
• The arbitrator's award is not required to include factual findings or legal reasoning and any party's right to appeal or to seek modification of rulings by the arbitrators is strictly limited.
• The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.

Any controversy: (1) arising out of or relating to any of my accounts with you, maintained individually or jointly with any other party, in any capacity; or (2) with respect to transactions of any kind executed by, through or with you, your officers, directors, agents and/or employees; or (3) relating to my transactions or accounts with any of your predecessor firms by merger, acquisition or other business combination from the inception of such accounts; or (4) with respect to this agreement or any other agreements entered into with you relating to my accounts, or the breach thereof, shall be resolved by arbitration conducted only at the NYSE, NASD, or AMEX or any other self-regulatory organization ("SRO") subject to the jurisdiction of the Securities and Exchange Commission and pursuant to the arbitration procedures then in effect at any such exchange or SRO as I elect. If I do not make such election by registered mail addressed to you at your main office within 5 days after demand by you that I make such election, then you will have the right to elect the arbitration tribunal of your choice. Judgment upon any award rendered by the arbitrators may be entered in any court having jurisdiction thereof. No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in a court a putative class action, or who is a member of a putative class but has not opted out of the class with respect to any claims encompassed by the putative class action, until: (i) the class certification is denied; (ii) the class action is decertified; or (iii) such person is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this agreement except to the extent stated herein. The foregoing agreement to arbitrate does not entitle me to obtain arbitration of claims that would be barred by the relevant statutes of limitations if such claims were brought in a court of competent jurisdiction. If, at the time that a demand for arbitration is made or an election or notice of intention to arbitrate is served, the claims sought to be arbitrated would have been barred by the relevant statute of limitations or other time bar, any party to this agreement may assert the limitations as a bar to the arbitration either before the arbitrators or by applying to any court of competent jurisdiction. I expressly agree that any issues relating to the application of a statute of limitations or other time bar are referable to such court.

**23. GOVERNING LAW AND APPLICABLE REGULATIONS.** This agreement, including the arbitration provisions in paragraph 22, shall be governed by the laws of the State of New York without giving effect to the choice of law or conflict of laws provisions thereof. All transactions entered into under this agreement shall be subject to any applicable constitution, rules, regulations, customs and usages of the exchange or market and its clearinghouse, if any, where such transactions are executed by Lehman or its agents and to all applicable laws, rules, regulations of governmental authorities and SROs (collectively the "Rules"). Any reference to such Rules in this agreement shall in no way be construed to create a cause of action arising from any violation of such Rules. If any Rule is enacted that would be inconsistent with any of the provisions of this agreement, the provision so affected shall be deemed modified or superseded by the enactment, but the remaining provisions of this agreement shall remain in full force and effect.

**24. BINDING EFFECT; ASSIGNMENT.** This agreement and its terms shall be binding upon my heirs, executors, successors, administrators, assigns, committee and/or conservators ("successors"). In the event of my death, incompetency, or disability, whether or not any successors of my estate and property shall have qualified or been appointed, you may continue to operate as though I were alive and competent and you may liquidate my account as described in Paragraph 15 above without prior notice to or demand upon my successors. This agreement shall inure to the benefit of your assigns and successors, by merger, consolidation or otherwise (and you may transfer my accounts to any such successors and assigns at your discretion).

**25. WAIVER NOT IMPLIED.** Your failure to insist at any time upon strict compliance with this agreement or with any of its terms or any continued course of such conduct on your part shall not constitute or be considered a waiver by you of any of your rights.

**26. NO ORAL MODIFICATION; EFFECT ON PRIOR AGREEMENTS.** No modification of this agreement shall be effective unless in writing and executed by you and me. The signing of this agreement supersedes any prior agreement (except those governing transactions in my commodity accounts) made with you or any of your predecessors or assignors. To the extent this agreement is inconsistent with any other agreement governing my account, the provisions of this agreement shall govern.

**27. FOREIGN SECURITIES.** If my account contains securities issued by a foreign issuer, I acknowledge that you are acting solely as a custodian with respect to such securities and have no obligation to provide me with any proxies, annual statements or other disclosures from the issuer or facilitate my participation in any rights offer or other transaction that the issuer may conduct with or offer to holders of its securities.

**28. NOTICES; CLEARING ARRANGEMENTS.** You will endeavor to notify me in advance of any calls in my Margin Account and to provide various other notices relating to activities in my accounts. But, I understand that you reserve the right to take any necessary or appropriate action with respect to my accounts permitted by this Agreement and/or required by law or regulation without prior notice to me in advance of any such action. I acknowledge and consent that you may, from time to time, monitor and/or electronically record conversations between me/us and your employees or agents for the purpose of quality assurance, employee training, and the mutual protection of both of us. Any such recordings may be offered by you as evidence in any arbitration or other proceedings relating to this agreement. During the term of any clearing agreement between Lehman and any broker/dealer that is providing Lehman clearing services, Lehman's rights and benefits (but not its obligations) under this agreement shall inure to any such clearing firm.

## IMPORTANT TAX INFORMATION

Under the Interest and Dividend Tax Compliance Act of 1983 you (as a payee) are required to provide us with your correct Taxpayer Identification Number (TIN). If you are an individual, your TIN is your Social Security Number. If you do not provide us with your correct TIN you may be subject to a $50 penalty to the I.R.S. and backup withholding tax, at a rate of 31% on all dividends, interest and other payments made by us to you after January 1, 1984. Even though our records indicate a TIN for your account, you must use the attached form to certify the number as it appears on our files or to furnish us with your correct TIN.

### Instructions
*(Section references are to the Internal Revenue Code.)*

**Purpose of Form.** A person who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) to report income paid to you, real estate transactions, mortgage interest you paid, the acquisition or abandonment of secured property, or contributions made to an individual retirement arrangement (IRA). Use Form W-9 to furnish your correct TIN to the requester (the person asking you to furnish your TIN), and, when applicable, (1) to certify that the TIN you are furnishing is correct (or that you are waiting for a number to be issued), (2) to certify that you are not subject to backup withholding, and (3) to claim exemption from backup withholding if you are an exempt payee. Furnishing your correct TIN and making the appropriate certifications will prevent certain payments from being subject to backup withholding. *Note: If a requestor gives you a form other than a W-9 to request your TIN, you must use the requester's form.*

**How to Obtain a TIN.** If you do not have a TIN, apply for one immediately. To apply, get Form SS-5, Application for a Social Security Number Card (for individuals) from your local office of the Social Security Administration, or Form SS-4, Application for Employer Identification Number (for business and other entities), from your local Internal Revenue Service office.

To complete Form W-9, if you do not have a TIN, write "Applied For" in the space for the TIN in Part 1, sign and date the form, and give it to the requester. Generally, you will then have 60 days to obtain a TIN and furnish it to the requester. If the requester does not receive your TIN within 60 days, backup withholding, if applicable, will begin and continue until you furnish your TIN to the requester. For reportable interest or dividend payments, the payer must exercise one of the following options concerning backup withholding during the 60-day period. Under option (1), a payer must backup withhold on any withdrawals you make from your account after 7 business days after the requester receives this form back from you. Under option (2), the payer must backup withhold on any reportable interest or dividend payments made to your account, regardless of whether you made any withdrawals. The backup withholding under option (2) must begin no later than 7 business days after the requester receives this form back. Under option (2) the payer is required to refund the amounts withheld if your certified TIN is received within the 60-day period and you were not subject to backup withholding during that period. *Note: Writing "Applied For" on the form means that you have already applied for a TIN OR that you intend to apply for one in the near future. As soon as you receive your TIN, complete another Form W-9, including your TIN, sign and date the form, and give it to the requester.*

**What is Backup Withholding?** Persons making certain payments to you are required to withhold and to pay the IRS 31% of such payments under certain conditions. This is called "backup withholding". Payments that could be subject to backup withholding include interest, dividends, broker and barter transactions, rents, royalties, nonemployee compensation, and certain payments from fishing boat operators, but do not include real estate transactions.
If you give the requester your correct TIN, make the appropriate certifications, and report all your taxable interest and dividends on your tax return, your payments will not be subject to backup withholding. Payments you receive will be subject to backup withholding if:

(1) You do not furnish your TIN to the requester, or
(2) IRS notifies the requester that you furnished an incorrect TIN, or
(3) You are notified by the IRS that you are subject to backup withholding because you failed to report all your interest and dividends on your tax return (for interest and dividend accounts only), or
(4) You fail to certify to the requester that you are not subject to backup withholding under (3) above (for interest and dividend accounts opened after 1983 only), or
(5) You fail to certify your TIN. This applies only to interest, dividend, broker, or barter exchange accounts opened after 1983, or broker accounts considered inactive in 1983.

For other payments, you are subject to backup withholding only if (1) or (2) above applies. Certain payees and payments are exempt from backup withholding and information reporting. See Payees and Payments Exempt From Backup Withholding, and Exempt Payees and Payments under Specific Instructions, below, if you are an exempt payee.

**Payees and Payments Exempt From Backup Withholding.** The following is a list of payees exempt from backup withholding and for which no information reporting is required. For interest and dividends, all listed payees are exempt except item (9). For broker transactions, payees listed in (1) through (13), and a person registered under the Investment Advisers Act of 1940 who regularly acts as a broker are exempt. Payees subject to reporting under sections 6041 and 6041A are generally exempt from backup withholding only if made to payees described in items (1) through (7), except that a corporation that provides medical and health care services or bills and collects payments for such services is not exempt from backup withholding or information reporting. Only payees described in items (2) through (6) are exempt from backup withholding for barter exchange transactions, patronage dividends, and payments by certain fishing boat operators.

(1) A corporation.
(2) An organization exempt from tax under section 501(a), or an individual retirement plan (IRA), or a custodial account under 403(b)(7).
(3) The United States or any of its agencies or instrumentalities.
(4) A state, the District of Columbia, a possession of the United States, or any of their political subdivisions or instrumentalities.
(5) A foreign government or any of its political subdivisions, agencies or instrumentalities.
(6) An international organization or any of its instrumentalities.
(7) A foreign central bank of issue.
(8) A dealer in securities or commodities required to register in the U.S. or a possession of the U.S.
(9) A futures commission merchant registered with the Commodity Future Trading Commission.

(10) A real estate investment trust.
(11) An entity registered at all times during the tax year under the Investment Company Act of 1940.
(12) A common trust fund operated by a bank under section 584(a).
(13) A financial institution.
(14) A middleman known in the investment community as a nominee or listed in the most recent publication of the American Society of Corporate Secretaries, Inc. Nominee List.
(15) A trust exempt from tax under section 664 or described in section 4947.

Payments of dividends and patronage dividends generally not subject to backup withholding also include the following:

• Payments to nonresident aliens subject to withholding under section 1441.
• Payments to partnerships not engaged in a trade or business in the U.S. and that have at least one nonresident partner.
• Payments of patronage dividends not paid in money.
• Payments made by certain foreign organizations.

Payments of interest generally not subject to backup withholding include the following:

• Payments of interest on obligations issued by individuals. Note: You may be subject to backup withholding if this interest is $600 or more and is paid in the course of the payer's trade or business and you have not provided your correct TIN to the payer.
• Payments of tax-exempt interest (including exempt-interest dividends under section 852).
• Payments described in section 6049(b)(5) to nonresident aliens.
• Payments on tax-free covenant bonds under section 1451.
• Payments made by certain foreign organizations.
• Mortgage interest paid by you.

Payments that are not subject to information reporting are also not subject to backup withholding. For details, see sections 6041, 6041A(a), 6042, 6044, 6045, 6049, 6050A, and 6050N, and the regulations under such sections.

### Penalties

**Failure to Furnish TIN.** If you fail to furnish your correct TIN to a requester, you are subject to a penalty of $50 for each such failure unless your failure is due to reasonable cause and not to willful neglect.

**Failure To Include Certain Items on Your Tax Return.** - If you fail to properly include on your tax return certain items required to the IRS, such failure will be treated as being due to negligence, and you will be subject to a penalty of 5% on any part of an underpayment of tax attributable to that failure unless there is clear and convincing evidence to the contrary.

**Civil Penalty for False Information With Respect To Withholding.** If you make a false statement with no reasonable basis that results in no imposition of backup withholding, you are subject to a penalty of $500.

**Criminal Penalty for Falsifying Information.** Willfully falsifying certifications or affirmations may subject you to criminal penalties including fines and/or imprisonment.

### Specific Instructions

**Name.** If you are an individual, generally provide the name shown on your social security card. However, if you have changed your last name, for instance, due to marriage, without informing the Social Security Administration of the name change, please enter your first name and both the last name shown on your social security card and your new last name.

**Signing the Certification.**
(1) Interest, Dividend, and Barter Exchange Accounts Opened Before 1984 and Broker Accounts That Were Considered Active During 1983. - You are not required to sign the certification; however, you may do so. You are required to provide your correct TIN.
(2) Interest, Dividend, Broker and Barter Exchange Accounts Opened After 1983, and Broker Accounts That Were Considered Inactive During 1983. - You must sign the certification or backup withholding will apply. If you are subject to backup withholding and you are merely providing your correct TIN to the requester, you must cross out item (b) in the certification before signing the form.
(3) Real Estate Transactions. - You must sign the certification. You may cross out item (b) of the certification if you wish.
(4) Other Payments. - You are required to furnish your correct TIN, but you are not required to sign the certification unless you have been notified of an incorrect TIN. Other payments include payments made in the course of the requester's trade or business for rents, royalties, goods (other than bills for merchandise), medical and health care services, payments to a nonemployee for services (including attorney and accounting fees), and payments to certain fishing boat crew members.
(5) Mortgage Interest Paid by You, Acquisition or Abandonment of Secured Property, or IRA Contributions. - You are required to furnish your correct TIN, but you are not required to sign the certification.
(6) Exempt Payees and Payments. - If you are exempt from backup withholding, you should complete this form to avoid possible erroneous backup withholding. Enter your correct TIN in Part I, write "EXEMPT" in the block in Part II, sign and date the form. If you are a nonresident alien or foreign entity not subject to backup withholding, give the requester a completed Form W-8, Certificate of Foreign Status.
(7) TIN "Applied For." - Follow the instructions under How To Obtain a TIN, above, sign and date this form. You must provide a TIN whether or not you are required to file a tax return. Payers must generally withhold 31% of taxable interest, dividend, and certain other payments to a payee who does not furnish a TIN to a payer. Certain penalties may also apply.

**What Name and Number To Give The Requester**
(1) List first and circle the names of the person whose number you furnish.
(2) Circle the minor's name and the minor's social security number.
(3) Show the name of the owner.
(4) List first and circle the name of the legal trust, estate, or pension trust.
Note: If no name is circled when there is more than one name, the number will be considered to be that of the first name listed.