UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

DR. IRAKLI GLONTI,                          :
Plaintiff                                   :
                                            : **No. 07 CV 10975 (CM) (AJP)**
and                                         :
                                            :
DAVID DATESHIDZE,                           :
Plaintiff                                   :
                                            :
                                            :
         – against –                        :
                                            :
                                            :
LEHMAN BROTHERS, INC.,                       :
Defendant                                   :
                                            :
and                                         :
                                            :
RBC DAIN RAUSCHER, INC.,                     :
Defendant                                   :
                                            :

------------------------------------------------------------------x

## Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions to Compel Arbitration

ARNOLD I. KALMAN, ESQUIRE (AK 1932)
LAW OFFICES OF ARNOLD I. KALMAN
245 SOUTH HUTCHINSON STREET
PHILADELPHIA, PA 19107-5722
TELEPHONE: (215) 829-9613
FAX: (215) 829-9619

ATTORNEY FOR PLAINTIFFS, DR. IRAKLI GLONTI AND DAVID DATESHIDZE

# Table of Contents

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    I.     Foerster befriends Dr. Glonti and inspires Dr. Glonti, who has extremely poor knowledge of English and no previous experience with a United States investment firm, to place his complete trust and confidence in him . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    II.    Foerster uses his advantage over Dr. Glonti to have him open an investment account at Salomon Smith Barney, telling him the single page, blank document he put before him to sign is a "mere formality" to be used to open the account . . . . . . . . . . . . . . . . . . . . . . . 4

    III.    Foerster opens accounts for Dr. Glonti and Mr. Dateshidze at Lehman Brothers, telling them the single page, blank documents that he transmits to them, and to which he directs them to the spot thereon for them to sign their names, are a "mere formality" to be used to open an account at the firm . . . . . . . . . . . . . . . . . . . . . . . 6

        A.     Foerster opens an investment account for Dr. Glonti with Lehman Brothers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        B.     Foerster opens an investment account for Mr. Dateshidze with Lehman Brothers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    IV.    Foerster opens accounts for Dr. Glonti and Mr. Dateshidze at RBC Dain Rauscher, telling them that the single page, blank documents that he transmits to them, and to which he directs them to the spot thereon for them to sign their names, are a "mere formality" to be used to open an account at the firm . . . . . . . . . . . . . . . . . . . . . . . 8

        A.     The May 19 and 29, 2003 documents that Foerster transmits to Dr. Glonti and Mr. Dateshidze for them to sign . . . . . . . . . 9

        B.     The June 7, 2003 documents that Foerster hands Dr. Glonti, in London, to sign . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

i

C.    The November 13, 2003 document that Foerster hands
Dr. Glonti, in London, to sign . . . . . . . . . . . . . . . . . . . . . . . . . .   11

D.    The documents in RBC Dain Rauscher's possession where
the signatures of Dr. Glonti and Mr. Dateshidze are
forgeries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

I.    The Court determines, in the first instance, whether the contracts
which Lehman Brothers and RBC Dain Rauscher seek to enforce
exist between them and Dr. Glonti and Mr. Dateshidze, even
though embedded in each contract is an agreement to arbitrate  . . .   13

II.    Dr. Glonti and Mr. Dateshidze did not assent to the terms of the
contracts to which Lehman Brothers and RBC Dain Rauscher refer,
and therefore these contracts do not exist and thereby the
agreement to arbitrate which is embedded in each contract is not
enforceable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

III.    Lehman Brothers and RBC Dain Rauscher had fiduciary
obligations to inform Dr. Glonti and Mr. Dateshidze of all the
terms of the documents they transmitted to them for them to sign  .   21

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

# Table of Authorities

**Cases:**

Adams v. Suozzi, 433 F.3d 220, 226 (2d Cir 2005) . . . . . . . . . . . . . . . . . . . . . . . . . .14

Bar-Ayal v. Time Warner Cable Inc., 2006 U.S. Dist. LEXIS 75972
(S.D.N.Y. October 16, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440,126 S. Ct. 1204
(2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

Cancanon v. Smith Barney, Harris, Upham & Co., 805 F.2d 998
(11th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 19

Chastain v. Robinson-Humphrey Co., 957 F.2d 851 (11th Cir. 1992) . . . . . . . . . . 17

De Kwiatkowski v. Bear, Stearns & Co., Inc., 306 F.3d 1293 (2d Cir. 2002) . . . . . 22

Denney v. BDO Seidman, L.L.P., 412 F.3d 58 (2d Cir. 2005) . . . . . . . . . . 13, 14, 20
Dougherty v. Mieczkowski, 661 F. Supp. 267 (D. Del. 1987) . . . . . . . . . . . 17, 19, 20

Fleming v. Ponziani, 24 N.Y.2d 105, 299 N.Y.S.2d 134 (1969) . . . . . . . . . . . . . . . .20

Kloss v. Edward D. Jones & Co., 310 Mont. 123, 54 P.3d 1 (Mont. 2002) . . 17, 21, 23

Kyung In Lee v. Pacific Bullion (New York) Inc., 788 F. Supp. 155
(E.D.N.Y. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 19

Laborers' Pension Fund v. A & C Environmental, Inc., 301 F.3d 768
(7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

Leib v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 461 F. Supp. 951
(S.D.N.Y. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Nuclear Elec. Ins. v. Central Power & Light Co., 926 F. Supp. 428
(S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., 636 F.2d 51(3d Cir. 1980) . . . . . . .13

Patsos v. First Albany Corp., 433 Mass. 323, 741 N.E.2d 841 (2001) . . . . . . . . . . 22

Rosenthal v. Great Western Fin. Securities Corp., 14 Cal. 4th 394,

926 P.2d 1061 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 20

Sphere Drake Ins. Ltd v. Clarendon Nat. Ins. Co., 263 F.3d 26
(2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

Telenor Mobile Communs. v. Storm LLC, 2007 U.S. Dist. LEXIS 81454
(S.D.N.Y. November 2, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Three Valleys Municipal Water District v. E.F. Hutton & Co., 925 F.2d 1136
(9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Town of Amherst v. Custom Lighting Servs., L.L.C., 2007 U.S. Dist.
LEXIS 88296 (W.D.N.Y. November 30, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . .15

**Other Authorities:**

Restatement (Third) Agency, §8.01 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Restatement (Third) Agency, §8.11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

iv

Plaintiffs, Dr. Irakli Glonti and David Dateshidze, file this memorandum in opposition to the motions of defendants, Lehman Brothers Inc. ("Lehman Brothers") and RBC Dain Rauscher Inc. ("RBC Dain Rauscher"), to compel the arbitration of plaintiffs' federal and common law securities fraud and related claims.

## Preliminary Statement

It is for the Court, in the first instance, to determine whether Dr. Glonti and Mr. Dateshidze ever concluded, or in other words formed, a contract with Lehman Brothers or RBC Dain Rauscher in which there was embedded an agreement to arbitrate. The declarations of Dr. Glonti and Mr. Dateshidze show they never formed such a contract with either firm. And this evidence is undisputed by the firms.

Lehman Brothers and RBC Dain Rauscher told Dr. Glonti and Mr. Dateshidze that the blank, single page document that they transmitted to them and instructed them to sign is a "mere formality" to be used to open an account at the firm – thus something other than what the document actually was. And Dr. Glonti and Mr. Dateshidze relied entirely upon what each firm told them. Lehman Brothers and RBC Dain Rauscher did not tell Dr. Glonti or Mr. Dateshidze of the document's terms – for example, assenting to arbitration they would surrender significant and substantial legal rights – though the firms had the duty. And Lehman Brothers and RBC Dain Rauscher had the duty to provide Dr. Glonti and Mr. Dateshidze with the entire document with all its terms, but they never did.

1

Lehman Brothers and RBC Dain Rauscher owed these duties to them, first, because Dr. Glonti and Mr. Dateshidze are foreigners – Georgians. Dr. Glonti did not have sufficient command of English either to read or understand the terms – which were entirely in English – of the portion of the document with which they provided him, and Mr. Dateshidze had no ability whatsoever. And Dr. Glonti and Mr. Dateshidze lacked investment acumen – they had no previous experience with United States-based investment firms and their procedures, and they thus did not know what to expect from the firms.

Second, Lehman Brothers and RBC Dain Rauscher owed these duties to them, since the firms had assumed the role of a fiduciary because of the close personal bonds their stockbroker, Frank Foerster, formed with Dr. Glonti and because Dr. Glonti and Mr. Dateshidze relinquished entirely to them management and control of their investment assets, including discretion to trade securities in their accounts, when they opened their accounts with the firms.

Dr. Glonti and Mr. Dateshidze thus did not know, or have a reasonable opportunity to know, of the terms of the documents to which Lehman Brothers and RBC Dain Rauscher refer and seek to enforce. Their signing pages from such documents was not an effective manifestation of their assent to the terms of the documents. Their signatures on the documents, under these circumstances, have no more effect than if their signatures had been forged. And, in at least four instances, their signatures appearing on the documents are indeed forged.

Because no contract embodying a purported arbitration agreement was ever formed or concluded between Dr. Glonti and Mr. Dateshidze and Lehman Brothers and RBC Dain Rauscher, respectively, the arbitration agreements embedded in such documents to which the firms refer do not exist. There thus exists no contract to cause the Court to compel Dr. Glonti and Mr. Dateshidze to arbitrate.

## Statement of Facts

Dr. Glonti and Mr. Dateshidze entrusted Lehman Brothers and RBC Dain Rauscher with almost $4 million of their investment assets for them to manage and control. The firms thereupon purchased unsuitable securities for Dr. Glonti and Mr. Dateshidze and the firms thereafter excessively traded securities in their accounts, without their knowledge or authorization, earning for themselves commissions of more than $1.067 million and eliminating almost entirely all the investment assets to which Dr. Glonti and Mr. Dateshidze had entrusted them. Lehman Brothers and RBC Dain Rauscher then allowed their accounts to be looted of approximately $971,000 in cash. (Declaration of Dr. Irakli Glonti (hereafter "Glonti Dec."), ¶¶1-2, 13-14)

I.     **Foerster befriends Dr. Glonti and inspires Dr. Glonti, who has extremely poor knowledge of English and no previous experience with a United States investment firm, to place his complete trust and confidence in him.**

Dr. Glonti and Mr. Dateshidze are citizens of the Republic of Georgia and reside in Tbilisi. (Glonti Dec., ¶¶15-18; Declaration of David Dateshidze (hereafter "Dateshidze Dec."), ¶¶1-8) When Dr. Glonti and Mr. Dateshidze signed documents

provided to them by Lehman Brothers and RBC Dain Rauscher, which were all in English, Dr. Glonti's ability to read and understand English was exceptionally poor; and Mr. Dateshidze had no such capability. (Glonti Dec., ¶¶3, 19-21, 27, 37, 76, 96, 114, 156; Dateshidze Dec., ¶¶7-8, 10, 14, 24) And they had no previous experience with a United States investment firm's practices and procedures and their only encounters with these firms were through Foerster. (Glonti Dec., ¶¶1-14, 22-29; Dateshidze Dec., ¶¶9-10)

Foerster solicited Dr. Glonti's investment business. (Glonti Dec., ¶¶22-28) And he brought Dr. Glonti to the United States, in May 2000, for his first ever visit, to open an investment account at Salomon Smith Barney for his firm and him to manage and control, and over which they would have authority, at their discretion, to select, purchase and sell securities in his account. (Glonti Dec., ¶¶29-43)

Foerster immediately inspired Dr. Glonti's trust and confidence by befriending him and he later took control of his affairs. (Glonti Dec., ¶¶29-35) The close bonds Foerster encouraged Dr. Glonti to form with him and later with his family continued thereafter for more than six years. (Glonti Dec., ¶¶7, 56, 62-93, 106-110, 129, 138-142)

**II.    Foerster uses his advantage over Dr. Glonti to have him open an investment account at Salomon Smith Barney, telling him the single page, blank document he put before him to sign is a "mere formality" to be used to open the account.**

Foerster knew full well of Dr. Glonti's disabilities – he did not have sufficient capability to speak, read and understand English and he was not familiar with

4

practices and procedures of United States investment firms – and used them to his advantage.  (Glonti Dec., ¶¶3, 4, 8, 9, 10, 27, 37, 47, 76, 114)  He thus started the practice with Dr. Glonti to open an investment account for him, and later for Mr. Dateshidze, that he would repeat at Lehman Brothers and afterwards at RBC Dain Rauscher, telling them each time that the single-page document with which he provided them, and on which he directed them to the spot at which each should sign his name, is a "mere formality" to be used for him to open the account for them.  (Glonti Dec., ¶¶3-7, 10, 36-41, 46-54, 94-104, 111-126, 129-137, 142-152; Dateshidze Dec., ¶¶12-18, 21-27)

Foerster did not tell Dr. Glonti that there were any legal implications for him because of this or that there were other pages appended to the document.  And no one at Salomon Smith Barney told Dr. Glonti otherwise.  (Glonti Dec., ¶¶37-40)  Dr. Glonti dutifully followed Foerster's instructions and signed the document at the place at which Foerster indicated.  Dr. Glonti had no reason to doubt the truth of what Foerster had told him.  (Glonti Dec., ¶¶41-42)

And Foerster gave Dr. Glonti no reason afterwards for him to doubt what he told him – Foerster befriended him and inspired Dr. Glonti to place unquestioned trust and confidence in him.  (Glonti Dec., ¶¶7, 30-35, 56, 62-93, 106-110, 129, 138-142)

### III.    Foerster opens accounts for Dr. Glonti and Mr. Dateshidze at Lehman Brothers, telling them the single page, blank documents that he transmits to them, and to which he directs them to the spot thereon for them to sign their names, are a "mere formality" to be used to open an account at the firm.

### A.    Foerster opens an investment account for Dr. Glonti with Lehman Brothers.

In October 2000, Foerster informed Dr. Glonti he had left Salomon Smith Barney and joined Lehman Brothers. He then encouraged Dr. Glonti to open an account at Lehman Brothers. Dr. Glonti told Foerster he would. Foerster thereupon transmitted to Dr. Glonti, who was then in Tanzania, Africa, two blank, single-page documents for him to sign. Foerster told Dr. Glonti, over the telephone, the documents are a "mere formality" to be used to open an account at Lehman Brothers. (Glonti Dec., ¶¶44-46)

Knowing of Dr. Glonti's disabilities and he had come to rely entirely on him, Foerster instructed Dr. Glonti to sign his name on each document at the place where he indicated. Following Foerster's direction, Dr. Glonti signed his name on the two blank, single-page forms. (Glonti Dec., ¶¶47-48)

LB 00683 and LB 00685 appear to be copies of the documents which Foerster transmitted to Dr. Glonti for him to sign. (Glonti Dec., ¶¶ 49-50) However, the documents that Foerster actually transmitted to him were blank and none of the information reported on the documents in their current format appeared on the documents that were originally transmitted by Foerster.

6

Foerster did not then, or afterwards, tell Dr. Glonti the terms of these documents or that there were other pages appended to them but which he did not transmit to him. (Glonti Dec., ¶¶51-52) And, of course, Lehman Brothers did not tell Dr. Glonti otherwise or attempt to verify verbally that he received the entire document. Lehman Brothers, however, had ample opportunity though, because when Dr. Glonti later visited Lehman Brother's offices, Foerster had him meet several Lehman Brothers executives, including his office's branch manager. (Glonti Dec., ¶¶53-61)

### B.    Foerster opens an investment account for Mr. Dateshidze with Lehman Brothers.

In March 2002, Dr. Glonti arranged with Foerster to open an investment account for Mr. Dateshidze. Mr. Dateshidze is Dr. Glonti's brother-in-law. Foerster transmitted to Dr. Glonti two blank, single-page documents for him to have Mr. Dateshidze sign. Dr. Glonti acted as an intermediary for Foerster and Mr. Dateshidze because he had absolutely no command of English. (Glonti Dec., ¶¶3, 4, 94-96; Dateshidze Dec., ¶¶3, 12-14)

Foerster afterwards telephoned Dr. Glonti instructing him to explain to Mr. Dateshidze the documents are a "mere formality" for Foerster to use to open an account for him at Lehman Brothers. (Glonti Dec., ¶97; Dateshidze Dec., ¶¶15-16) Foerster then guided Dr. Glonti to the spot on each document on which he indicated Mr. Dateshidze was to sign his name. Dr. Glonti followed Foerster's instructions and had Mr. Dateshidze sign his name on each document at the spot at which

7

Foerster indicated for him to sign.  Dr. Glonti then re-transmitted the documents to

Foerster.  (Glonti Dec., ¶¶98-99; Dateshidze Dec., ¶¶17-18)

LB 00687 and 00688 appear to be a copies of the documents Foerster

transmitted to Dr. Glonti to have him have Mr. Dateshidze sign, but the documents

Foerster actually transmitted to Dr. Glonti were blank and none of the information

reported on each document in its current format appeared on the document

originally transmitted to Dr. Glonti.  (Glonti Dec., ¶¶100-101; Dateshidze Dec.,

¶¶19-20)

Foerster did not then, or afterwards, tell or explain to Dr. Glonti the terms of

these documents or that there were other pages appended to them but which he did

not transmit.  (Glonti Dec., ¶102)  And, of course, Lehman Brothers did not tell Dr.

Glonti or Mr. Dateshidze otherwise or attempt to verify verbally that either

received the entire document.  (Glonti Dec., ¶¶103-104)

### IV.   Foerster opens accounts for Dr. Glonti and Mr. Dateshidze at RBC Dain Rauscher, telling them that the single page, blank documents that he transmits to them, and to which he directs them to the spot thereon for them to sign their names, are a "mere formality" to be used to open an account at the firm.

Foerster transmitted documents to Dr. Glonti and Mr. Dateshidze to sign in

May 2003, and for Dr. Glonti to sign in June 2003 and November 2003, to be used to

open accounts at RBC Dain Rauscher.  (Glonti Dec., ¶¶111-152; Dateshidze Dec.,

¶¶21-31)

Foerster did not then, or afterwards, tell Dr. Glonti or Mr. Dateshidze the terms of the documents or that there were other pages to the documents but which he did not transmit to them.  (Glonti Dec., ¶¶123-124, 134-135, 149-150)  And, at no time afterwards, did any representative of RBC Dain Rauscher tell Dr. Glonti or Mr. Dateshidze otherwise, or attempt to verify verbally that they had received the entire document, though they had the opportunity.  (Glonti Dec., ¶¶125-126, 136-137, 151-152)

### A.    The May 19 and 29, 2003 documents that Foerster transmits to Dr. Glonti and Mr. Dateshidze for them to sign.

On or about May 19, 2003, Foerster telephoned Dr. Glonti, in Tbilisi, to tell him that he had left Lehman Brothers and joined RBC Dain Rauscher.  Foerster then transmitted to Dr. Glonti documents and repeated to him what he had told him when he opened accounts for him at Salomon Smith Barney and Lehman Brothers – the documents are a "mere formality" to be used to open an account for him and Mr. Dateshidze at RBC Dain Rauscher.  (Glonti Dec., ¶¶111-115; Dateshidze Dec., ¶25)

Foerster thereupon instructed Dr. Glonti only to pay attention to the space provided for their signatures and indicated on each such page the place at which Mr. Dateshidze and he should sign their names.  Dr. Glonti and Mr. Dateshidze followed Foerster's instructions, signed the documents and transmitted the documents to Foerster.  (Glonti Dec., ¶¶116-117; Dateshidze Dec., 26-27)

RBC 0000013 appears to be a copy of the document Foerster transmitted to Dr. Glonti for him to sign, but the document Foerster transmitted was blank and none of the information reported on the document in its current format appeared on the document that was originally transmitted to him.  (Glonti Dec., ¶118)

RBC 0000442,  RBC 0000443, and RBC 0000444 (transmitted on May 19, 2003) and RBC 0000445 (transmitted on May 29, 2003) appear to be copies of the documents that Foerster transmitted to Dr. Glonti for him to have Mr. Dateshidze sign, but the documents Foerster transmitted were blank and none of the information reported on the documents in its current format appeared on the documents that were originally transmitted to Dr. Glonti to have him have Mr. Dateshidze sign.  (Glonti Dec., ¶¶119-122; Dateshidze Dec., ¶¶28-31)

## B.    The June 7, 2003 documents that Foerster hands Dr. Glonti, in London, to sign.

In June 2003, Foerster joined Dr. Glonti and his family who were then on vacation in London.  During Foerster's visit with Dr. Glonti, Foerster asked him to sign two blank documents.  Foerster again told Dr. Glonti the forms are a "mere formality" to open an account at RBC Dain Rauscher.  (Glonti Dec., ¶¶129-130) Having the utmost trust and confidence in Foerster and having no reason to doubt what Foerster told him, Glonti followed Foerster's instructions and signed his name on the documents at the spots Foerster indicated.  (Glonti Dec., ¶131)

RBC 0000001 and RBC 0000002 appear to be copies of the documents Foerster gave Dr. Glonti to sign, but the documents Foerster actually gave him

10

were blank and none of the information reported on each document in its current

format appeared on the document that was originally given him by Foerster to sign.

(Glonti Dec., ¶¶132-133)

### C. The November 13, 2003 document that Foerster hands Dr. Glonti, in London, to sign.

On November 13, 2003, Foerster again met up, in London, with Dr. Glonti.

Foerster handed Dr. Glonti this time a three page document to sign, a version of

RBC 000008-0000010, telling him once again the document is a "mere formality" of

RBC Dain Rauscher and that he should just sign it.  (Glonti Dec., ¶¶142-143)

Foerster handed the document to Dr. Glonti for him to sign late at night, in a

London hotel bar, in which there was almost no light, and only after he and Dr.

Glonti had spent considerable time together drinking alcoholic beverages.  (Glonti

Dec., ¶144)  The version of RBC 0000008-0000010 that Foerster presented to Dr.

Glonti to sign was entirely blank with the exception that Foerster had himself

printed on the first page (RBC 0000008) "IVANE JAVACHISHVILI 27, TBILISI,

GEORGIA, 38002."  Foerster then instructed Dr. Glonti to sign his name at the spot

right below where he had printed Dr. Glonti's home address in Tbilisi, Georgia, and

Dr. Glonti did.  (Glonti Dec., ¶145)

Foerster then directed Dr. Glonti to the third page of the document (RBC

0000010) and instructed him to sign and write the date on which he signed the

document at the spots on the document he indicated.  Having full and complete

trust and confidence in Foerster, Dr. Glonti dutifully signed the document at the

spot on the page at which Foerster directed him to sign his name.  Dr. Glonti then wrote the date on which he signed the document.  (Glonti Dec., ¶¶146-147)

RBC 0000008-0000010 appears to be a copy of the document Foerster presented to Dr. Glonti – late at night, in a hotel bar, and after an evening of drinking – to sign, but the document Foerster presented to him was blank, with the exception of Dr. Glonti's street address, in Tbilisi, Georgia, which Foerster had printed on the document, and none of the information reported on the document in its current format appeared on the document that Foerster had handed Dr. Glonti to sign.  (Glonti Dec., ¶148)

### D.  The documents in RBC Dain Rauscher's possession where the signatures of Dr. Glonti and Mr. Dateshidze are forgeries.

After RBC Dain Rauscher was notified of the claims that Dr. Glonti and Mr. Dateshidze had against it, RBC Dain Rauscher produced RBC 0000007, 0000447-0000449, 0000451 and 0000453.  (Glonti Dec., ¶153)

Dr. Glonti never before saw RBC 0000007.  And the signature appearing on RBC 0000007 is not his signature, but is a forgery.  (Glonti Dec., ¶154-155)

Dr. Glonti and Mr. Dateshidze never before saw RBC 0000447-0000449, RBC 00000451 and RBC 0000453.  And the signatures appearing on RBC0000449, RBC 0000451 and 0000453 are not the signatures of Mr. Dateshidze, but are forgeries. (Glonti Dec., ¶¶156-159; Dateshidze Dec., ¶¶32-36)

## Argument

**I.    The Court determines, in the first instance, whether the contracts which Lehman Brothers and RBC Dain Rauscher seek to enforce exist between them and Dr. Glonti and Mr. Dateshidze, even though embedded in each contract is an agreement to arbitrate.**

Before either Dr. Glonti or Mr. Dateshidze can be ordered to arbitrate and thus be deprived of their day in court, there first must be found that they assented unequivocally to form a contract in which the arbitration agreement is embedded. If there is doubt they did, the matter should be submitted to a jury to decide.  Only if there is no doubt of this does the court decide as a matter of law that they did or did not form such a contract.  See Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., 636 F.2d 51, 54-55 (3d Cir. 1980) ("The mere execution of a document, however, . . . does not negate the factual assertion that such signature was not intended to represent a contractual undertaking. . . . An unequivocal denial that the agreement had been made, accompanied by supporting affidavits, however, in most cases should be sufficient to require a jury determination on whether there had in fact been a 'meeting of the minds,'" citing Interocean Shipping Co. v. National Shipping & Trading Corp., 462 F.2d 673 (2d Cir. 1972)); Denney v. BDO Seidman, L.L.P., 412 F.3d 58, 67-68 (2d Cir. 2005) (the same).

Therefore, the Court determines, in the first instance, whether Dr. Glonti and Mr. Dateshidze have shown a contract was ever formed between them and Lehman Brothers and RBC Dain Rauscher, even though the contract embodies an

arbitration agreement.[1]  See <u>Nuclear Elec. Ins. v. Central Power & Light Co.</u>, 926 F. Supp. 428, 434 (S.D.N.Y. 1996) ("Where, however, a party claims that it never actually manifested assent to a contract containing an agreement to arbitrate – for example, because its signature was forged on the contract, . . . or <u>because the party was fraudulently told the contract was something other than what it actually was</u>, . . . –  that party cannot be forced to arbitrate until it is first established by a court that the party willingly manifested assent to the underlying contract. [Citations omitted]." ).

The United States Court of Appeals for the Second Circuit and the district courts within the Circuit have consistently applied this principle.  See <u>Adams v. Suozzi</u>, 433 F.3d 220, 226 (2d Cir 2005) ("If the contract embodying a purported arbitration agreement never existed, the arbitration agreement itself does not exist."); <u>Denney v. BDO Seidman, L.L.P.</u>, <u>supra,</u> 412 F.3d at 67-68 ("[W]e distinguished contracts that were "void" (because, for example, the parties failed to

---

[1] The Court has the unflagging obligation to determine whether a contract was formed.  Only when the party opposing arbitration concedes the contract's existence, and then disputes its validity, for example challenging its legality, or preventing enforcement of its arbitration clause by alleging the clause was fraudulently induced, is this determination taken out of the hands of the court and placed in the hands of the arbitrators.  The reason is simple – "[t]he issue of the contract's validity is different from the issue of whether any agreement between the [parties] was ever concluded."  See <u>Buckeye Check Cashing, Inc. v. Cardegna</u>, 546 U.S. 440, 444 n.1, 126 S. Ct. 1204, 1208 n.1 (2006); <u>Bar-Ayal v. Time Warner Cable Inc.</u>, 2006 U.S. Dist. LEXIS 75972, *24 (S.D.N.Y. October 16, 2006) ("Thus, as suggested by this distinction made by the <u>Buckeye</u> <u>Cashing</u> Court, and as found by the Court of Appeals for the Second Circuit, as well as judges in this district, the <u>Prima</u> <u>Paint</u> rule does not apply to claims that a contract that includes an arbitration agreement does not, as a whole, exist.").

agree to essential contract terms), from those that were merely "voidable" (for example, because of fraud in the inducement). [Citation omitted]. A party alleging that a contract is void may be entitled to a trial prior to arbitration, . . . ; cf. Burden v. Check into Cash of Ky., LLC, 267 F.3d 483, 489 (6th Cir. 2001) ('The sort of fraud that procures a party's signature to an instrument without knowledge of its true nature or contents renders a contract void, . . . .')."); Sphere Drake Ins. Ltd v. Clarendon Nat. Ins. Co., 263 F.3d 26, 31-32 (2d Cir. 2001) (courts may not compel a party to arbitrate a dispute where there is a genuine issue as to whether that party actually entered into an agreement to arbitrate); Town of Amherst v. Custom Lighting Servs., L.L.C., 2007 U.S. Dist. LEXIS 88296, *20-*21 (W.D.N.Y. November 30, 2007) ("The Second Circuit and the Southern District of New York have squarely addressed this question and concluded that the Prima Paint rule does not apply to challenges to the existence of a contract containing an arbitration provision. . . . In short, this Circuit has determined that challenges to the existence of an agreement are for the courts to decide."); Telenor Mobile Communs. v. Storm LLC, 2007 U.S. Dist. LEXIS 81454, *44-*45 (S.D.N.Y. November 2, 2007) ("In the Second Circuit, a party challenging the existence or formation of an agreement from which an arbitration proceeding derives is entitled to have those issues decided in court, rather than by the arbitral tribunal, if the party (1) presents 'some evidence' in support of its claim; and (2) has unequivocally denied that an agreement was made. [Citations omitted]. The party challenging contract formation has the right to a jury trial when the Sphere Drake prerequisites have been met. [Citation

15

omitted].").

And in disputes between customers and their stockbrokerage firms this too is the rule – where the customer disputes the very existence of a contract, it is for the court to decide at the outset whether a contract was formed, applying state-law principles of contract, regardless of an embedded arbitration clause. And these courts all made this determination in the first instance. See Cancanon v. Smith Barney, Harris, Upham & Co., 805 F.2d 998, 1000-1001 (11th Cir. 1986)[2] (holding customers who did not have knowledge of English and whose signatures were "furtively obtained" is sufficient showing they did not assent to a contract containing an arbitration agreement and remanding the case for trial on the issue of the contract's existence); Kyung In Lee v. Pacific Bullion (New York) Inc., 788 F. Supp. 155, 157-58 (E.D.N.Y. 1992) (trial ordered on existence of contract in which was embedded an arbitration agreement, since broker had denied customer reasonable opportunity to learn terms of an agreement because the broker knew she could barely read English and he had told her the document she was to sign, which

---

[2] Indeed, the allegations the customers made in Cancanon v. Smith Barney, Harris, Upham & Co., 805 F.2d at 999, are remarkably similar to that which Dr. Glonti and Mr. Dateshidze allege in their complaint. The customers there alleged that when they opened their account with Smith Barney the agreements in question were written in English and they had no knowledge of the English language; their signatures were "furtively obtained" or were forged, as part of a scheme by the broker to steal their money; and that soon after they opened their account, the broker falsified records to direct client correspondence to his own address, and in this manner, they were deprived of their monthly statements and the broker was thus able to conceal the fraudulent and unauthorized transactions that took place.

was in English, was a mere "administrative" document); <u>Dougherty v. Mieczkowski</u>, 661 F. Supp. 267, 274-275 (D. Del. 1987) (holding a brokerage firm cannot rely on a contract which its customers never saw to establish the existence of an agreement to arbitrate and ordering trial on the issue of the existence of the contract); <u>Rosenthal v. Great Western Fin. Securities Corp.</u>, 14 Cal. 4th 394, 427-428, 926 P.2d 1061, 1082-1083 (1996) (holding the customer's inability to read and understand English together with the financial institution's misrepresentations of the character of the written contract and its terms are sufficient to show the customer was deprived of a reasonable opportunity to learn of the terms of the contract she signed which would render the arbitration agreement embedded in the contract unenforceable, and remanding for trial the issue of the contract's existence); <u>Kloss v. Edward D. Jones & Co.</u>, 310 Mont. 123, 135, 54 P.3d 1, 9 (Mont. 2002) (broker with discretion to buy and sell securities in customer's account had duty to explain consequences of arbitration clause in new agreement to customer and holding the agreement was thereby unenforceable); <u>see</u> <u>also</u> <u>Chastain v. Robinson-Humphrey Co.</u>, 957 F.2d 851, 854-855 (11th Cir. 1992) (since the customer demonstrated she never personally signed the contract in which was embedded an arbitration agreement, she was entitled to a trial on the issue of whether such a contract exists); <u>Three Valleys Municipal Water District v. E.F. Hutton & Co.</u>, 925 F.2d 1136, 1139-42 (9th Cir. 1991) (remanding for trial the existence of a contract in which was embedded an arbitration clause because the contract had been signed by an unauthorized individual).

17

## II. Dr. Glonti and Mr. Dateshidze did not assent to the terms of the contracts to which Lehman Brothers and RBC Dain Rauscher refer, and therefore these contracts do not exist and thereby the agreement to arbitrate which is embedded in each contract is not enforceable.

Lehman Brothers and RBC Dain Rauscher cannot enforce contracts in which are embedded arbitration agreements:

(a) that Dr. Glonti and Mr. Dateshidze never saw (Glonti Dec., ¶¶3-4, 6, 11, 46, 49-50, 52-53, 95, 100-101, 103-104, 118-122, 125, 132-133, 136, 148, 151; Dateshidze Dec., ¶¶19-20, 28-31);

(b) that in some instances they never signed (Glonti Dec., ¶¶153-159; Dateshidze Dec., ¶¶32-36);

(c) that on every single occasion Lehman Brothers and RBC Dain Rauscher misrepresented the terms of which, telling Dr. Glonti and Mr. Dateshidze the document they were about to sign was a "mere formality" to be used to open an account for them with it and thus something other than what it actually was (Glonti Dec., ¶¶3, 5, 10, 12, 46, 97, 115, 130, 143; Dateshidze Dec., ¶¶16, 25)); and

(d) that at every step of which Lehman Brothers and RBC Dain Rauscher knew of the handicap of Dr. Glonti and Mr. Dateshidze – they could not read and understand the contracts' terms which were all in English (Glonti Dec., ¶¶3, 6, 11, 12, 19-21, 47, 96, 114; Dateshidze Dec., ¶¶7, 10, 24) – and advantaged themselves of this and did not explain to them the terms of the contracts (Glonti Dec., ¶¶3, 6-7, 11-12, 51-54, 61, 101-104, 123-126, 134-137, 149-152).

Lehman Brothers and RBC Dain Rauscher thus deprived Dr. Glonti and Mr. Dateshidze of the opportunity to learn of the terms of the documents the firms had them sign. It is undisputed Dr. Glonti and Mr. Dateshidze held a reasonable belief they were signing something entirely else than that which Lehman Brothers and RBC Dain Rauscher now seek to enforce. And Lehman Brothers and RBC Dain Rauscher offer no evidence to dispute this. Absent entirely is Foerster's testimony, their former employee, and the only person other than Dr. Glonti and Mr. Dateshidze with first hand personal knowledge of the documents that Lehman Brothers and RBC Dain Rauscher transmitted to Dr. Glonti and Mr. Dateshidze to sign and what was said to them about the documents.

Dr. Glonti and Mr. Dateshidze are therefore not obligated to arbitrate any claim they assert in their Complaint against Lehman Brothers and RBC Dain Rauscher. No contract was ever formed. There exists then no contract that Lehman Brothers or RBC Dain Rauscher can thus enforce. See Cancanon v. Smith Barney, Harris, Upham & Co., supra, 805 F.2d at 1000 ("Where misrepresentation of the character or essential terms of a proposed contract occurs, assent to the contract is impossible. In such a case there is no contract at all."); Dougherty v. Mieczkowski, supra, 661 F. Supp. at 275 ("Defendants cannot rely on a contract which plaintiffs never signed and, on the record, never saw, to establish the existence of an agreement to arbitrate. . . . Basic contract principles require some objective evidence of assent, especially in the present context where an agreement to arbitrate forces a party to forego substantial rights.); Kyung In Lee v. Pacific

19

Bullion (New York) Inc., supra, 788 F. Supp. at 157-58 (broker denied customer reasonable opportunity to learn terms of an agreement, where broker knew she could barely read English and had told her the document she was to sign, which was in English, was a mere "administrative" document, thus concealing from her an embedded arbitration clause); Rosenthal v. Great Western Fin. Securities Corp., supra, 14 Cal. 4th at 427-428, 926 P.2d at 1082-1083 (customer with limited ability to understand English and who had prior business relationship with account representative and thus could justifiably rely on the representative's representation of the terms of the agreement was deprived of a reasonable opportunity to learn of an arbitration clause embedded in the documents when the representative failed to recite to her its terms).

And this is always the case – a party must have had a reasonable opportunity to discover the terms of the contract in order for it to be formed and for its terms afterwards to be enforced.  See Denney v. BDO Seidman, L.L.P., supra, 412 F.3d at 68 ("'The sort of fraud that procures a party's signature to an instrument without knowledge of its true nature or contents renders a contract void, . . . .'", citing Burden v. Check into Cash of Ky., LLC, 267 F.3d 483, 489 (6th Cir. 2001)); Laborers' Pension Fund v. A & C Environmental, Inc., 301 F.3d 768, 779-780 (7th Cir. 2002) ("A promisor's signature procured by fraud in the execution gives no more effect to a contract than a promisor's signature that has been forged.  In either case the contract is void; it has never had any legal effect."); Fleming v. Ponziani, 24 N.Y.2d 105, 111, 299 N.Y.S.2d 134, 140 (1969) (a release even though properly

20

executed may, nonetheless, be void, if a party is induced to sign in the belief that the paper is a document other than a release).

To suggest Dr. Glonti and Mr. Dateshidze may have ratified the contract when Lehman Brothers and RBC Dain Rauscher afterwards proceeded to trade stock in their accounts ignores basic contract law – the contract is void and will be always void.  See Dougherty v. Mieczkowski, supra, 661 F. Supp. at 274-275 ("In determining whether a party has subsequently ratified a contract, the Court must apply the standard principles of the law of contracts.  Under the Restatement (Second) Contracts §163, if a person 'neither knows nor has reasonable opportunity to know of the character or essential terms of the proposed contract, his conduct is not effective as a manifestation of assent.'  In such a case, the contract is considered 'void,'. . . . The act of placing orders through Prudential-Bache, standing alone, is insufficient to demonstrate the requisite manifestation of assent to a contract.")

### III.    Lehman Brothers and RBC Dain Rauscher had fiduciary obligations to inform Dr. Glonti and Mr. Dateshidze of all the terms of the documents they transmitted to them for them to sign.

Because of the special circumstances of the relationship that Lehman Brothers and RBC Dain Rauscher had formed with Dr. Glonti and Mr. Dateshidze, the firms had the specific obligation, at the outset, to tell Dr. Glonti and Mr. Dateshidze that embedded in the contract they presented to them to sign was an arbitration clause in which they would be surrendering significant and substantial legal rights.  See Kloss v. Edward D. Jones & Co., supra, 310 Mont. at 135, 54 P.3d

21

at 9 (broker with discretion to buy and sell securities in customer's account had duty to explain consequences of arbitration clause in new agreement to customer, "with no bargaining power and a relative lack of sophistication in such matters").

Lehman Brothers and RBC Dain Rauscher were fiduciaries of Dr. Glonti and Mr. Dateshidze. See Leib v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 461 F. Supp. 951, 953-954 (S.D.N.Y. 1978) (a brokerage firm assumes obligations of a fiduciary when (a) it exercises control over the customer's account and trades stock at its discretion and without the customer's prior approval, or (b) it involves itself in the social or personal affairs of the customer); Patsos v. First Albany Corp., 433 Mass. 323, 331-335, 741 N.E.2d 841, 848-851 (2001) (the same); see also De Kwiatkowski v. Bear, Stearns & Co., Inc., 306 F.3d 1293, 1308 (2d Cir. 2002) ("The transformative 'special circumstances' recognized in the cases are circumstances that render the client dependent – . . . one who has a closer than arms-length relationship with the broker, or one who is so lacking in sophistication that de facto control of the account is deemed to rest in the broker.  The law thus imposes additional extra-contractual duties on brokers who can take unfair advantage of their customers' incapacity or simplicity.") .

Dr. Glonti and Mr. Dateshidze surrendered to the firms management and control of their investment assets and the firms then, at their discretion, bought and sold stocks in the accounts.  (Glonti Dec., ¶¶1, 55, 105, 127-128)  They thus relied entirely on the investment acumen of the firms and Foerster.  (Glonti Dec., ¶¶7, 60)  And there existed a relationship of trust and confidence – Foerster

22

involved himself in the social and personal affairs of Dr. Glonti well beyond the norm.  (Glonti Dec., ¶¶7, 30-35, 56, 62-93, 106-110, 129, 138-142)  Lehman Brothers and RBC Dain Rauscher offer no evidence disputing this or their knowledge of this.

Therefore, at each pivotal point – when they presented a writing to Dr. Glonti and Mr. Dateshidze to sign – a fiduciary relationship existed.  And Lehman Brothers and RBC Dain Rauscher thus had the duty to make full disclosure of the terms of the embedded arbitration clause.  See Kloss v. Edward D. Jones & Co., supra, 310 Mont. at 135, 54 P.3d at 9; see also Restatement (Third) Agency, §8.01 "General Fiduciary Principles," comment b  ("An agent also has a duty to use reasonable efforts to provide material information to the principal."), §8.11 "Duty to Provide Information," comment b ("An agent owes the principal a duty to provide information to the principal that the agent knows or has reason to know the principal would wish to have.")

Lehman Brothers and RBC Dain Rauscher, however, did not at all fulfill their duty.  Because the firms did not inform Dr. Glonti and Mr. Dateshidze of the terms of the contracts which they seek to enforce Dr. Glonti and Mr. Dateshidze could not have assented to be bound by such terms.  No contracts whatsoever were formed and thus none exist to be enforced.

## Conclusion

The basis on which the Court can order arbitration of the claims being asserted by Dr. Glonti and Mr. Dateshidze in their Complaint is the existence of a contract with Lehman Brothers and RBC Dain Rauscher, respectively.  If there is

no contract there can be no arbitration.  The undisputed facts show no contract whatsoever was formed between Dr. Glonti and Mr. Dateshidze, on one hand, and Lehman Brothers and RBC Dain Rauscher on other hand.  No contract exists.  Dr. Glonti and Mr. Dateshidze therefore cannot be ordered to arbitrate the claims they have asserted in their Complaint against Lehman Brothers and RBC Dain Rauscher.  Their claims therefore should be tried to a jury.

Respectfully submitted,

**ARNOLD I. KALMAN, ESQUIRE** (AK 1932)
Law Offices of Arnold I. Kalman
245 South Hutchinson Street
Philadelphia, PA 19107-5722
Telephone: (215) 829-9613
Fax: (215) 829-9619

Attorney for Plaintiffs, Dr. Irakli Glonti and David Dateshidze

Dated: January 10, 2008

24