
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

DR. IRAKLI GLONTI and DAVID DATESHIDZE,

                Plaintiffs,

    - against -                                                      07 CV 10975 (CM)

LEHMAN BROTHERS, INC. and
RBC DAIN RAUSCHER, INC.,

                Defendants.
-------------------------------------------------------------------X

**REPLY MEMORANDUM OF DEFENDANT LEHMAN BROTHERS INC.
IN FURTHER SUPPORT OF ITS MOTION TO COMPEL ARBITRATION**

KREBSBACH & SNYDER, P.C.
One Exchange Plaza
55 Broadway, Suite 1600
New York, N.Y. 10006
(212) 825-9811

Attorneys for Defendant
Lehman Brothers Inc.

## TABLE OF CONTENTS

PAGE

Table of Authorities ................................................................................................................. ii

Preliminary Statement ............................................................................................................. 1

FACTS ALLEGED IN PLAINTIFFS' DECLARATIONS ..................................................... 1

ARGUMENT

I. PLAINTIFFS ARE BOUND TO ARBITRATE THIS DISPUTE BECAUSE THEY SIGNED THE CLIENT AGREEMENTS AND OFFER NO VALID DEFENSE TO THEIR ENFORCEMENT ............................................................. 3

   A. Plaintiffs' Signatures on the Client Agreements Are Binding ............................................................................................. 4

   B. Plaintiffs' Alleged Lack of Understanding of English Is Not a Valid Basis for Avoiding Enforcement of the Arbitration Agreements ............................................ 5

   C. Lehman Brothers' Alleged Reference to the Agreements as a "Mere Formality" is Irrelevant ................................. 7

   D. Lehman Brothers Had No Affirmative Duty to Orally Disclose the Terms of the Arbitration Agreements to Plaintiffs .................................................................. 8

II. PLAINTIFFS ARE ESTOPPED FROM CONTESTING THE VALIDITY OF THE ARBITRATION AGREEMENTS .......................................................................... 9

III. IT IS NOT FOR THE COURT TO ADJUDICATE CLAIMS OF FRAUD IN THE INDUCEMENT OF THE CLIENT AGREEMENTS .................................................................... 10

Conclusion .............................................................................................................................. 10

# **TABLE OF AUTHORITIES**

<u>CASE</u>                                                                                                                                    PAGE

*American Bureau of Shipping v. Tencara Shipyard S.P.A.*
170 F.3d 349 (2d Cir. 1999)..................................................................................9

*Bensadoun v. Jobe-Riat*
316 F.3d 171 (2d Cir. 2003)..................................................................................3

*Cancanon v. Smith Barney, Harris, Upham & Co.*
805 F.2d 998 (11th Cir. 1986) ............................................................................6-7

*Chiarella v. United States*
445 U.S. 222, 63 L. Ed. 2d 348, 100 S. Ct. 1108 (1980)...................................8-9

*Deloitte Noraudit v. Deloitte Haskins*
9 F.3d 1060 (2d Cir. 1993).....................................................................................9

*Driscoll v. Smith Barney, Harris, Upham & Co.*
815 F.2d 655 (11th Cir. 1987), *cert. denied sub nom Adrian v. Smith Barney, Harris, Upham & Co.*, 484 U.S. 914, 98 L. Ed. 2d 218, 108 S. Ct. 261 (1987).............................................................................................................8

*In re Ferrara S.p.A.*
441 F. Supp. 778 (S.D.N.Y. 1977) ........................................................................4

*Hart v. Canadian Imperial Bank of Commerce*
43 F. Supp. 2d 395 (S.D.N.Y. 1999).....................................................................4

*Maines Paper and Food Service Inc. v. Adel*
256 A.D.2d 760, 681 N.Y.S.2d 390 (3d Dep't 1998)............................................6

*Martinez Tapia v. Banque Indosuez*
1999 U.S. Dist. LEXIS 19 (S.D.N.Y. January 6, 1999) .......................................6

*Maye v. Smith Barney Inc.*
897 F. Supp. 100 (S.D.N.Y. 1999) ........................................................................4

*People v. Camacho*
711 N.Y.S.2d 283, 185 Misc. 2d 31 (N.Y. Crim. Ct. 2000).................................3

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*
388 U.S. 395, 87 S. Ct. 1801, 18 L. Ed. 2d 1270 (1967)....................................10

*Rosen v. Waldman*
1993 U.S. Dist. LEXIS 14076 (S.D.N.Y. October 7, 1993), Fed. Sec. L.
Rep. (CCH) P97, 785 ..................................................................................................8

*Scone Invs., L.P. v. American Third Mkt. Corp.*
992 F. Supp. 378 (S.D.N.Y. 1998) ............................................................................9

*Shearson/American Express v. McMahon*
482 U.S. 220, 229-30, 107 S. Ct. 2332, 96 L. Ed. 2d 185 (1987) ...............................7, 9

*Smith Barney Shearson, Inc. v. Anthony DeFries*
1994 U.S. Dist. LEXIS 11793 (S.D.N.Y. August 19, 1994) ...................................... 7-8

*Tuskey v. Volt Info. Scis., Inc.*
2001 U.S. Dist. LEXIS 10980 (S.D.N.Y. August 3, 2001) .........................................4

## RULE

Fed. R. Civ. P 56(e) ....................................................................................................3

**Preliminary Statement**

Plaintiffs do not dispute that they signed account opening agreements (the "Client Agreements") with defendant Lehman Brothers Inc. ("Lehman Brothers"), nor do they dispute that those agreements contain broad arbitration clauses that encompass plaintiffs' claims in this proceeding. Plaintiffs also do not contest the mandate of the Federal Arbitration Act, 9 U.S.C. § 1 *et seq*. that written agreements to arbitrate are "valid, irrevocable and enforceable."

Instead, plaintiffs attempt to evade their obligations to arbitrate by claiming that no contract was formed when they signed the Client Agreements. They claim this is so because they had little or no understanding of the English language; Lehman Brothers allegedly told them that the agreements were a "mere formality"; and the firm had a duty to orally advise them the agreements contained an arbitration clause. These are the very type of easily alleged, after-the-fact excuses that could be put forth by anyone who signed a binding arbitration agreement and later decided he did not want to abide by it. The courts have consistently rejected such claims as a matter of law, holding that a party is legally bound by his signature on a contract and conclusively presumed to know and assent to its contents. Plaintiffs are bound by the arbitration agreements they signed, and Lehman Brothers' motion to compel arbitration should be granted.

**FACTS ALLEGED IN PLAINTIFFS' DECLARATIONS**

Plaintiff Dr. Iraki Glonti ("Glonti") is 45 years old, and has a medical degree with specialized training in cardio-anesthesiology. Glonti Dec. ¶ 16. In 1991, he formed a business venture trading in oil products in the country of Georgia, and later started a telecommunications business there in 1998. *Id.* ¶ 17. He thereafter continued as a trader in oil products in Moscow, expanding his business to cover crude oil refining. *Id.* ¶ 18. Prior to opening an account with Lehman Brothers in October 2000, Glonti maintained a brokerage account with Salomon Smith

1

Barney. Glonti Dec. ¶¶ 36-43. Plaintiff David Dateshidze ("Dateshidze") is 39 years old and is Glonti's brother-in law. Dateshidze Dec. ¶ 5. He has an engineering degree, has worked as an engineer and started a business venture exporting Georgian wine to Russia. *Id.* ¶ 6.

Plaintiffs admit signing Lehman Brothers' Client Agreements and attach copies of them as exhibits to their respective declarations filed with the Court. Glonti Dec. ¶¶ 47-50 & Ex. 1; Dateshidze Dec. ¶¶ 18-20 & Ex. 1. The Client Agreements state at paragraph B:

> **Client Acknowledgement:** I (We) hereby acknowledge that I (we) have read, understand and agree to the terms of this agreement. . . . **I (We) acknowledge that I (we) have received a copy of the agreement which contains a pre-dispute arbitration clause at Paragraph 22: I (We) have read it and agree to its terms.**

Glonti Dec. Ex. 1; Dateshidze Dec. Ex. 1. (emphasis in original). Plaintiffs' signatures are set forth directly below the "Client Acknowledgement" in their respective agreements. *Id.*[1]

Although plaintiffs now claim they did not receive the additional agreement pages from the firm (Plaintiffs' Opp. at 1), they acknowledged in the Client Agreements that they "have received a copy of the agreement which contains a predispute arbitration clause at paragraph 22," and they "have read it and agree to its terms." *Id.*

The full Client Agreements, including the arbitration clause, are annexed as Exhibits B and C to the Declaration of Geoffrey Valentino, which was submitted with Lehman Brothers' initial moving papers. In those agreements, <u>which they acknowledged receipt of</u>, plaintiffs agreed to arbitration of "any controversy . . . arising out of or relating to their accounts." *See id.*

Glonti attests to the delivery of the Client Agreement to him in 2000 in Tanzania, Africa. He asserts that he signed "two blank, single-page documents" in the spots indicated to him by Frank Foerster of Lehman Brothers. Glonti Dec. ¶¶ 44, 46. Glonti alleges at the time he "knew

---

[1] Unlike their claims with respect to certain agreements with defendant RBC Dain Rauscher, Inc., plaintiffs do not allege their signatures on the Lehman Brothers' Client Agreements were forged.

2

about 100 words, but no more than 200 words of English." Glonti Dec. ¶ 19. He allegedly recalls Foerster telling him over the telephone (seven years ago!) that signing the documents was a "mere formality" for him to open his account. *Id.* ¶ 46. He does not allege he was denied the opportunity to read, review or copy the documents or have them translated or explained to him.

In March 2002, Glonti arranged for Dateshidze to open a Lehman Brothers account, Dateshidze Dec. ¶ 12, and acted as an intermediary in connection with the execution of the Client Agreement by Dateshidze. Foerster transmitted "two blank, two single-page documents" to Glonti in Tbisilisi, Georgia for Dateshidze to sign. *Id.* ¶ 15. According to Dateshidze's Declaration, Glonti explained to him (per Foerster's instructions) that the document was a "mere formality" and showed him where Foerster had said to sign. *Id.* ¶¶ 16-17. Dateshidze alleges that he does not understand English. *Id.* ¶ 14. Like Glonti, he does not allege that he was denied an opportunity to read, review, or copy the Client Agreement or have it translated or explained to him. He signed the Client Agreement and returned it to Lehman Brothers. *Id.* ¶ 18.

Given plaintiffs' professed inability to read and understand English, and absent a certificate of translation, their "English" declarations are invalid for not complying with Federal Rule of Civil Procedure 56 (e) (requiring that supporting affidavits "…be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein"). Fed. R. Civ. P. 56(e); *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003); *People v. Camacho*, 711 N.Y.S.2d 283, 288, 185 Misc. 2d 31, 32 (N.Y. Crim. Ct. 2000).

### ARGUMENT

**I. PLAINTIFFS ARE BOUND TO ARBITRATE THIS DISPUTE BECAUSE THEY SIGNED THE CLIENT AGREEMENTS AND OFFER NO VALID DEFENSE TO THEIR ENFORCEMENT**

Plaintiffs allege several spurious claims in an effort to evade their signed, written agreements to arbitrate their dispute -- most notably, that they had little or no understanding of the English language and that Lehman Brothers allegedly referred to the Client Agreement as a "mere formality." The courts have roundly rejected such efforts.

### A.   Plaintiffs' Signatures on the Client Agreements Are Binding

Plaintiffs are bound by the Client Agreements they signed, including the arbitration agreements therein, regardless of whether they read them. It is well-settled law that parties are conclusively bound by contracts they sign whether or not they read them. *Tuskey v. Volt Info. Scis., Inc.*, 2001 U.S. Dist. LEXIS 10980, *9 (S.D.N.Y. August 3, 2001) (granting motion to compel arbitration because "[c]ontract law is clear that parties are 'conclusively' bound by the contracts they sign whether or not the party has read the contract as long as there is no fraud, duress or some other wrongful act of the other party") (citations omitted); *see also Hart v. Canadian Imperial Bank of Commerce*, 43 F. Supp. 2d 395, 405 (S.D.N.Y. 1999) (stating that "under general contract principles, absent a showing of fraud or other unlawful behavior, plaintiff's subjective knowledge of the scope of the arbitration clause is irrelevant and he is presumed to have agreed to all the terms of the contract") (citations omitted); *Maye v. Smith Barney Inc.*, 897 F. Supp. 100, 108 (S.D.N.Y. 1995) (granting motion to compel arbitration and holding that "[u]nder New York law, one 'who signs or accepts a written contract, in the absence of fraud or other wrongful act on the part of another contracting party, is conclusively presumed to know its contents and to assent to them . . . .'") (citations omitted); *In re Ferrara S.p.A.*, 441 F. Supp. 778, 781 (S.D.N.Y. 1977) (holding as a matter of law that parties were bound by arbitration clause on back of agreement of which they allegedly were not aware).

4

Plaintiffs should be bound to the terms of the Client Agreements they signed (and their arbitration clauses) because as adults they know that signing a document in a business context signifies something important. It is especially unavailing for plaintiffs to feign ignorance of their contractual undertakings and obligations given their medical and engineering degrees, and the sophistication inherent in creating international start-up ventures in oil trading, wine-exporting and telecommunications. Plaintiffs cannot credibly contend they did not understand they would be bound by the contents of documents they signed, such as their arbitration agreements. In addition, their claim (first made in this proceeding) that they did not receive the part of the agreement containing the arbitration clause is of no consequence as each acknowledged in the signed Client Agreements that they received and read the arbitration clause, and agreed to its terms. Glonti Dec. Ex. 1; Dateshidze Dec. Ex. 1. Their claim that they signed a "blank" document is meaningless as all the relevant language is contained in the printed text of the document.

### B. Plaintiffs' Alleged Lack of Understanding of English Is Not a Valid Basis for Avoiding Enforcement of the Arbitration Agreements

Plaintiffs cannot evade their arbitration agreements by claiming they did not have sufficient command of the English language to read or understand their terms.

Glonti asserts that he knew only 100-200 words of English when he opened his Lehman Brothers account. This contention strains credulity. Two of those words must have been "mere" and "formality" because Glonti allegedly recalls Foerster using those words to describe the Client Agreement. Glonti Dec. ¶ 46. Glonti had previously communicated with Foerster in English concerning his investment account at Salomon Smith Barney, including conveying details about his asset allocation and investments in Switzerland. Glonti Dec. ¶¶ 27-28, 35; Complaint ¶¶ 101-14. Glonti also admits that as early as 2001 he conversed with Foerster about

5

his Lehman Brothers account, and personally reviewed his account statements and analyzed his transactions. Complaint ¶¶ 123, 205-06. Also, in February 2001, four months after opening his account with Lehman Brothers, he sent a detailed email written in plain English to Foerster, annexed as Exhibit A to the accompanying Declaration of Geoffrey Valentino. There is thus no reason to doubt Glonti's ability to effectively communicate with Dateshidze in carrying out his self-proclaimed role as "intermediary" between Dateshidze and Foerster. Glonti Dec. ¶ 4.

Plaintiffs' knowledge of English is ultimately irrelevant, as New York law holds a signed contract cannot be avoided on grounds that a party does not understand English. *See Martinez Tapia v. Banque Indosuez,* 1999 U.S. Dist. LEXIS 19, *4 (S.D.N.Y. January 6, 1999) ("A party, even if illiterate in English, is bound by his signature on an agreement and is 'conclusively presumed to know its contents and assent to them.' . . . A party is bound by a contract in a language he does not understand") (citations omitted); *see also Maines Paper and Food Service Inc. v. Adel,* 256 A.D.2d 760, 761, 681 N.Y.S.2d 390, 391 (3d Dep't 1998) ("a signer of an agreement is deemed to be conclusively bound by its terms whether or not he or she read it" and that the rule applies even where the party challenging the agreement suffers from "an inability to understand the English language"). The *Adel* court enforced a written guarantee: "[h]aving failed to read the agreement or, because of an alleged difficulty with the English language, having failed to have someone else read or explain it to him, defendant is precluded from asserting fraudulent inducement since there cannot be any justifiable reliance." *Id.* at 761.

Plaintiffs rely on an Eleventh Circuit case, *Cancanon v. Smith Barney, Harris, Upham & Co.,* 805 F.2d 998, 1001 (11th Cir. 1986), where the appellate court remanded for a trial on the issue of whether an agreement containing an arbitration clause was made between Smith Barney and customers who did not speak English. This case is readily distinguishable. In *Cancanon,*

6

the plaintiffs' signatures on the agreement were "furtively obtained" or forged (*Id.* at 999); there are no such allegations here against Lehman Brothers. Moreover, key to the *Cancanon* decision was plaintiffs' allegation that they didn't know they opened a securities account and were duped into believing it was a money market account. *Id.* Plaintiffs' declarations herein make clear they knew they were opening securities accounts (Glonti Dec. ¶¶ 44-55; Dateshidze Dec. ¶¶ 12-20) and, as discussed earlier, Glonti admits in his Statement of Claim that he read and analyzed his monthly statements and discussed his account transactions with Foerster.

Since the Client Agreements were transmitted to plaintiffs in foreign countries, neither Foerster nor other Lehman Brothers employees was present when they were signed. Plaintiffs, experienced businessmen, signed the documents after having a full opportunity to read them or have them translated or explained to them, and without duress. They cannot now escape the terms of the Client Agreements they signed, including the arbitration clause therein.

### C. Lehman Brothers' Alleged Reference to the Client Agreements as a "Mere Formality" is Irrelevant

Plaintiffs cannot avoid the terms of their arbitration agreements merely by alleging that Foerster referred to the Client Agreements as a "mere formality." Signing the Client Agreements was certainly a "formality," and Plaintiffs cannot unilaterally render them and their terms void merely by alleging that the word "mere" was used as an adjective. Of course, these sophisticated businessmen knew that there was legal significance to the signing of the Client Agreements.

Such a claim was rejected in *Smith Barney Shearson, Inc. v. Anthony DeFries*, 1994 U.S. Dist. LEXIS 11793 (S.D.N.Y. August 19, 1994), wherein a stockbroker sent a client the second of two pages of a "customer document" and told him its signing was a "mere formality" to open his account. *Id.* at *2. The client alleged he was fraudulently induced into entering into the agreement containing an arbitration clause. The court found no merit to the argument:

7

> DeFries' assertion that Goldstein fraudulently induced him to sign the contract by referring to it as a "mere formality" and failing to direct him to the arbitration clause is similarly unavailing. A party claiming fraud in the inducement of an arbitration clause itself must show that one party "made a specific misrepresentation regarding the arbitration clause or in some way * * * prevented or dissuaded the other party from becoming aware if [its] existence."

*Id.* at *7 (citations omitted). *See also Driscoll v. Smith Barney, Harris, Upham & Co.*, 815 F.2d 655, 659 (11th Cir. 1987), *cert. denied sub nom Adrian v. Smith Barney, Harris, Upham & Co.*, 484 U.S. 914, 98 L. Ed. 2d 218, 108 S. Ct. 261 (1987) (granting motion to compel arbitration where plaintiffs alleged they were told to sign a client agreement as a "mere formality" required to transact business with the brokerage firm, and were not told about the arbitration provision).

### D. Lehman Brothers Had No Affirmative Duty to Orally Disclose the Terms of the Arbitration Agreements to Plaintiffs

Just above the signature line where plaintiffs executed the Client Agreements, it discloses in bold letters the arbitration clause and sets forth plaintiffs' acknowledgement of receipt thereof and agreement to its terms. Glonti Dec. Ex. 1; Dateshidze Dec. Ex. 1. Nevertheless, plaintiffs allege that Lehman Brothers had a fiduciary obligation to orally disclose to them the existence of the arbitration clause and "that they would be surrendering significant and substantial legal rights." Plaintiffs' Opp. at 21. No such duty existed, nor was it true that plaintiffs were surrendering significant and substantial rights.

Lehman Brothers had no fiduciary or other legal duty to make an additional oral disclosure (beyond the bold language of the Client Agreement) of the existence of the arbitration clause, and thus engaged in no fraud by failing so to do. *See DeFries, supra*, 1999 U.S. Dist. LEXIS 11793 at *7; *Rosen v. Waldman*, 1993 U.S. Dist. LEXIS 14076, *7 (S.D.N.Y. October 7, 1993), Fed. Sec. L. Rep. (CCH) P97, 785, (citations omitted) (failure of stockbroker to disclose arbitration clause not fraud because stockbrokers owe no such affirmative duty); *see also*

8

*Chiarella v. United States,* 445 U.S. 222, 228, 63 L. Ed. 2d 348, 356, 100 S. Ct. 1108, 1114 (1980) (mere omission is not actionable fraud in the absence of an affirmative duty to disclose fact at issue).

Moreover, contrary to plaintiffs' assertions, a party by agreeing to arbitrate does not agree to forego substantive rights – he merely agrees to have his claims adjudicated in an arbitral rather than a judicial forum. *See Shearson/American Express v. McMahon,* 482 U.S. 220, 229-30, 107 S. Ct. 2332, 2339, 96 L. Ed. 2d 185, 196 (1987).

## II. PLAINTIFFS ARE ESTOPPED FROM CONTESTING THE VALIDITY OF THE ARBITRATION AGREEMENTS

Independent of the fact that plaintiffs admittedly signed the Client Agreements and are thereby bound to arbitrate, they assented to their terms (including the arbitration clause) by their conduct, and are equitably estopped from denying an obligation to arbitrate since they received benefits from the contract containing the arbitration provision. *See Scone Invs., L.P. v. American Third Mkt. Corp.,* 992 F. Supp. 378, 381 (S.D.N.Y. 1998) (consent to brokerage account transactions constituted consent to arbitration in accordance with client agreement's arbitration clause); *see also American Bureau of Shipping v. Tencara Shipyard S.P.A.,* 170 F.3d 349, 353 (2d Cir. 1999) ("A party is estopped from denying its obligation to arbitrate when it receives a 'direct benefit' from a contract containing an arbitration clause.") (citation omitted); *Deloitte Noraudit v. Deloitte Haskins,* 9 F.3d 1060, 1064 (2d Cir. 1993) (party that knowingly accepted benefits of an agreement estopped from denying its obligation to arbitrate under the agreement).

It is undisputed that plaintiffs had accounts at Lehman Brothers and received the rights and benefits of firm clients, including the ability to invest and trade securities. Plaintiffs' accounts were actively traded over several years, and they were sent monthly account statements and trade confirmations from Lehman Brothers for all transactions. Plaintiffs' Opp. at 3, 6,

9

Glonti Dec. ¶¶ 2, 46, Dateshidze Dec. ¶ 16, Glonti Compl. ¶¶ 236-37. In short, the parties conducted themselves under the terms of the Client Agreements, and plaintiffs derived benefits thereunder, binding them to Client Agreements and the arbitration clauses.

### III. IT IS NOT FOR THE COURT TO ADJUDICATE CLAIMS OF FRAUD IN THE INDUCEMENT OF THE CLIENT AGREEMENTS

Plaintiffs' concessions -- that they received the Client Agreements, signed them and operated under them -- require the Court to compel arbitration of their claims pursuant to the arbitration clauses agreed to by them, and case law establishes as a matter of law that a party cannot evade a signed agreement merely by alleging that he did not understand English or was told that the agreement was a "mere formality." If nevertheless the Court decides there is an issue concerning the making of the Client Agreements, this is not an issue for the Court to resolve. The controlling authority on this point is the United States Supreme Court decision in *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 403-04, 87 S. Ct. 1801, 1806, 18 L. Ed. 2d 1270, 1277 (1967), where the Court held that:

> if the claim is fraud in the inducement of the arbitration clause itself -- an issue which goes to the "making" of the agreement to arbitrate -- the federal court may proceed to adjudicate it. But the statutory language [of *9 U.S.C. § 4*] does not permit the federal court to consider claims of fraud in the inducement of the contract generally.

*Id.* at 403-04.

Plaintiffs' challenges go to the making of the Client Agreement generally, not to the making of the arbitration clause itself. Pursuant to *Prima Paint,* any determination about the making of the Client Agreement would be for the arbitrators, not the Court, to decide.

### Conclusion

For all of the foregoing reasons, the Court should grant Lehman Brothers' motion, and issue an order staying Plaintiffs' claims against it, and compelling the claims to arbitration.

KREBSBACH & SNYDER, P.C.

BY: _____
Theodore A. Krebsbach (TAK-2041)
Theodore R. Snyder (TRS-6376)

One Exchange Plaza
55 Broadway, Suite 1600
New York, NY 10006

(212) 825-9811

11